IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENENTECH, INC. ET AL, | No. C 08-04909 SI |
| Plaintiff, | **ORDER GRANTING GENENTECH'S MOTION TO DISQUALIFY COUNSEL** |
| v. | |
| SANOFI-AVENTIS DEUTSCHLAND GMBH ET AL | |
| Defendant. | |

Before the Court is Genentech's motion to disqualify McDonnell, Boehnen, Hulbert & Berghoff, LLP from representing Sanofi-Aventis Deutschland GMBH, Sanofi-Aventis U.S., LLC, and Sanofi-Aventis U.S., Inc. (collectively "Sanofi") in the instant patent dispute over CMV enhancer technology.

This litigation involves a dispute between the parties over whether Genentech infringes Sanofi's patents-in-suit (United States Patent Nos. 5,849,522 and 6,218,140) and whether those patents are valid. This disqualification motion was filed to prevent the McDonnell law firm from using confidential information that John McDonnell, a founder of the McDonnell firm, may have received during a former representation of Genentech. After consideration of the parties' papers, including their supplemental papers, and good cause appearing, the Court hereby GRANTS Genentech's motion to disqualify.

**BACKGROUND**

**1.     Factual similarities between the '054 Interference and this action**

Sanofi's patents-in-suit[1] are both titled "Enhancer for Eukaryotic Expression Systems," and relate to enhancers derived from the DNA of human cytomegalovirus ("CMV enhancers"). An enhancer

---

[1] U.S. Patent No. 5,849,522 ("'522 Patent") was filed June 6, 1995 and issued December 15, 1998. U.S. Patent No. 6,218,140 ("'140" Patent) was filed November 9, 1994 and issued April 17, 2001. Both were filed based on continuations of applications dating back to 1985.

is a sequence of DNA which can be used to aid the expression of proteins in cells.

The former representation on which the motion to disqualify is based occurred in 1989 and 1990, when John McDonnell represented Genentech during Patent Interference No. 102,054 ("the '054 Interference"). McDonnell was then an attorney with the law firm Allegretti & Witkoff and was designated lead counsel on the '054 Interference. The interference concerned first-inventorship of a modified variant of human factor VIII protein ("Factor VIII"), a necessary protein for blood coagulation. *See* Kokjohn Ex. 2, p. 1. In this earlier proceeding, Genentech asserted that it had diligently sought ways of producing Factor VIII, and supported this position by citing its development of an expression vector bearing the CMV enhancer. *See* Kokjohn Ex. 8, p. 34-37. Genentech summarizes the connection between the CMV enhancer patents in this action and the '054 Interference as follows:

> Both proceedings relate to the use of genetically engineered host cells, which may be thought of as protein-producing "factories." The host cells express DNA that is artificially inserted into them to make proteins. The patents-in-suit relate to the use of a particular DNA sequence from human cytomegalovirus ("CMV"), which is known as an "enhancer." According to the patents-in-suit, the enhancer is inserted into a host cell to increase the amount of protein that the cell makes. At issue in the '054 Interference was who was first to invent a certain variant of a blood protein known as Factor VIII. To demonstrate that Genentech was the first inventor, [attorney] Dr. McDonnell submitted numerous documents to the Patent Office regarding Genentech's use of a CMV enhancer to produce the Factor VIII protein.

Pl.'s Br. in Reply, p. 1:12-22 ("Reply").

It was reported in the '054 Interference that Genentech's scientist Dr. Cornelia Gorman had done work screening for genetic regulatory elements, including enhancers, to use in Factor VIII "expression vectors" (i.e. transgenic cells engineered to produce Factor VIII protein). *See* Kokjohn, Ex. 8 at 43; *See also* Gorman aff. ("Gorman Affidavit")(Wall Ex. 1). As part of this work, Dr. Gorman used the CMV enhancer developed by Walter Schaffner and Bernhard Fleckenstein, inventors of the '522 and '140 patents. Gorman Affidavit at ¶¶ 16-17. Specifically, it is known from Dr. Gorman's affidavit filed in the '054 Interference that:

> 16. [Dr. Gorman] attended the Banbury Conference in March 1985 and heard Walter Schaffner discuss the cytomegalovirus (CMV) enhancer, and his work with Fleckenstein using the CMV enhancer. . . She became interested in trying to use the CMV enhancer and promoter with Factor VIII. She obtained a vector containing the CMV enhancer and promoter region on 3rd of June 1985.
>
> 17. Upon receiving the CMV region vector from Fleckenstein she began manipulating the CMV region to facilitate its incorporation in expression vectors.

2

> 18. She supervised [her student] in constructing vectors in which the CMV enhancer and promoter drive transcription of the cat gene. She believes that the construction of these plasmids, between July 2 and July 31, 1985 is shown in [her student's] notebook. Some of these constructions were used in CAT assay expression experiments.
>
> 19. A result from the CAT assay expression experiments was that the enhancer/promoter region from cytomegalovirus (CMV) worked very well in [HEK 293 cells] and not well in other cell types . . . . Since the CMV promoter worked well in 293 cells, it was a good candidate for use in an expression vector for the expression of Factor VIII variants in 293 cells.
>
> 20. She constructed, with assistance from [two Genentech scientists], an expression vector for Factor VIII and Factor VIII variants using the CMV enhancer, promoter and splice donor . . . . This vector was known as pF8CIS.

Gorman Affidavit at ¶¶ 16-20.

Another alleged factual similarity between the successive representations concerns a license agreement between Genentech and Behringwerke AG, effective January 1, 1991, for the rights to use the Fleckenstein/Schaffner CMV enhancer. Complaint at ¶¶ 19-21; *See* Behringwerke AG License Agreement attached to Complaint as Ex. 1. ("1991 License Agreement"). The '522 and '140 patents on the CMV enhancer issued from the 285,330 patent application identified in this 1991 License Agreement. Complaint at ¶ 29; *See also* '522 Patent and '140 Patent. In Section 2 of the 1991 License Agreement, Genentech is granted the right to use the CMV enhancer (a) to make and use proteins "for research purposes" and (b) "to make, use and sell certain products 'in commercial quantities,' subject to terms and conditions." Complaint at ¶ 22 (citing § 2.1 of 1991 License Agreement).

According to a June 30, 2008 prelitigation letter to Genentech, written by Paul Berghoff[2] of the McDonnell firm, Sanofi asserts it is the successor in interest to Behringwerke AG in the 1991 License Agreement and that Genentech and Biogen Idec ("Biogen") are infringing the '522 and '140 patents by using the CMV enhancer to produce commercial products without paying royalties under the license. (Ex. 6 in support of Plaintiff's Motion for Discovery, Dkt. #37). In a July 15, 2008 follow-up letter from Mr. Berghoff, Sanofi specifically accuses Genentech's therapeutic protein antibody products made in mammalian cells, including Avastin, Rituxan, and Herceptin. (Ex. 7 in support of Plaintiff's Motion for Discovery, Dkt. #37). Responding in an August 27, 2008 letter, Genentech terminated the 1991

---

[2] Mr. Berghoff appears to be lead litigation counsel for Sanofi in these cases. He had also been with John McDonnell at Allegretti & Witkoff.

License Agreement pursuant to its terms. The termination became effective October 27, 2008. Complaint at ¶¶ 34-25; *See* Wall Ex. 35 (termination letter).

**2. Alleged connections between John McDonnell's role in the '054 Interference and this action**

Attorney McDonnell was Genentech's lead counsel before the U.S. Patent and Trademark Office ("USPTO") in the '054 Interference from January 3, 1989 until September 6, 1990. *See* Kokjohn Ex. 22 at tab 4 & 45 (identifying McDonnell as new principal attorney on Jan. 3, 1989 and substituting counsel at Sept. 10, 1990). McDonnell signed and submitted the mailing certificate to the affidavit of Dr. Cornelia Gorman describing her procurement and use of the CMV enhancer. *See* Wall Ex. 1 at ¶¶ 16-27; *see also* Wall Ex. 12. McDonnell also signed and submitted to the USPTO numerous motions, briefs, and mailing certificates for affidavits of other Genentech scientists detailing their work with Dr. Gorman creating Factor VIII expression vectors using the CMV enhancer. *See e.g.* Stake Exs. 1-16 (motions and briefs filed under McDonnell's signature); *see also e.g.* Wall Ex. 7 at ¶¶ 30-39; Wall Ex. 8 at ¶¶ 11-16; Wall Ex. 9 at ¶¶ 36-45; Wall Ex. 10 at ¶¶ 32-41; Wall Ex. 11 at ¶¶ 44-52 (affidavits describing Genentech's use of the CMV enhancer); Wall Exs. 13, 14, 15, 16, 17 (certificates of mailing the aforementioned affidavits to the USPTO signed by Dr. McDonnell).[3]

Further, on April 6, 1990, contemporaneous with McDonnell's representation in the '054 Interference, Sanofi's predecessor, Behringwerke AG, contacted Dr. Gorman about licensing the Fleckenstein/Schaffner CMV enhancer. Wall Ex. 20. This license was negotiated and became the 1991 Licensing Agreement. It became effective after the termination of McDonnell's representation in the '054 Interference. No facts indicate that McDonnell took part in the licensing negotiations.

Genentech contends that a disqualifying conflict exists as to McDonnell because he was in a position to receive material confidential information during his representation in the '054 Interference,

---

[3] Throughout the term of his representation, McDonnell erroneously alleged that Dr. Gorman was an inventor of the Factor VIII variants. *See* Kokjohn Ex. 8 at 18-19. After McDonnell's representation was terminated, Genentech's theory of first-inventorship was amended to one in which Drs. Wood, Vehar, and Eaton, and not Gorman, were the first to conceive of and possess an operative method of producing Factor VIII. *See id.* at 9; Kokjohn Ex. 9 at 4-5. Still, Dr. Gorman's work was cited as evidence that Genentech was diligent, post-conception, in producing the Factor VIII invention. Kokjohn Ex. 8 at 29, 33-37, 43.

4

which is substantially related to the issues of nonobviousness and license in the present matter. Further, Genentech argues that this disqualifying conflict should be imputed to the McDonnell firm under the rules for imputed conflicts within law firms.

The McDonnell firm alleges that McDonnell has had no input into the case and has had no communications with the McDonnell attorneys working on the case about the subject of the interference except as necessary to respond to the motion to disqualify. Further, it its supplemental filings dated January 11, 2010, the McDonnell firm represents that John McDonnell announced that he is retiring from the firm within the next ninety days.

## LEGAL STANDARD

**1. Disqualification generally**

Whether to disqualify counsel is a decision committed to the discretion of the district court. *See Gas-A-Tron of Ariz. v. Union Oil Co. of Calif.*, 534 F.2d 1322, 1325 (9th Cir. 1976). Pursuant to Local Rule 11, every attorney before this Court must "comply with the standards of professional conduct required of the members of the State Bar of California." N.D. Cal. Civ. Local Rule 11-4(a)(1). Accordingly, the Court applies California law in this matter. *Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 914 (N.D.Cal. 2003); *see also Asyst Technologies v. Empak, Inc.*, 962 F. Supp. 1241, 1242 (N.D Cal. 1997); *Elan Transdermal Ltd. v. Cygnus Therapeutic Systems*, 809 F. Supp. 1383, 1387 (N.D.Cal. 1992).

Motions to disqualify are often tactically motivated and can be disruptive to the litigation process. *See Visa U.S.A., Inc. v. First Data Corp.*, 241 F.Supp.2d 1100, 1104 (N.D. Cal. 2003); *cf. Certain Underwriters*, 264 F. Supp. 2d at 918. Because disqualification is a drastic measure, it is generally disfavored and should only be imposed when absolutely necessary. *Visa,* 241 F. Supp.2d at 1104. On the other hand, however, "the paramount concern must be the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar." *State Farm Mut. Auto Ins. Co. v. Federal Ins. Co.*, 86 Cal. Rptr. 2d 20, 24 (Cal. Ct. App. 1999).

5

**2.    Successive representations**

The issue in this case is whether an attorney's successive representation of clients with adverse interests mandates disqualification. The standard to be applied is governed by Rule 3-310(E) of the California Rules of Professional Conduct, which states:

> A member shall not, without the informed written consent of the client or former client, accept employment adverse to the . . . former client where, by reason of the representation of the . . . former client, the member has obtained confidential information material to the employment.

Cal. Rules of Prof'l Conduct 3-310(E). Rule 3-310 prevents a former attorney from representing an adverse party when the former attorney possesses confidential information adverse to the former client. *HF Ahmanson & Co. v. Salomon Brothers, Inc.*, 229 Cal. App. 3d 1445, 1452 (1991). However, a party seeking disqualification need not prove actual possession of confidential information in order to disqualify the former attorney. "It is enough to show a 'substantial relationship' between the former and current representation." *Id.* (citing *Global Van Lines, Inc. v. Superior Court*, 144 Cal. App.3d 483, 489 (1983).

> The "substantial relationship" test mediates between two interests that are in tension in such a context—the freedom of the subsequent client to counsel of choice, on the one hand, and the interest of the former client in ensuring the permanent confidentiality of matters disclosed to the attorney in the course of the prior representation, on the other. Where the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory . . . .

*Jessen v. Hartford Cas. Ins. Co.*, 111 Cal. App. 4th 698, 706 (2003) (emphasis in original) (citing *Flatt v. Superior Court*, 9 Cal.4th 275, 283 (1994)). This standard, with its conclusive presumption of knowledge of confidential information, is "justified as a rule of necessity" because:

> [I]t is not within the power of the former client to prove what is in the mind of the attorney. Nor should the attorney have to engage in a subtle evaluation of the extent to which he acquired relevant information in the first representation and of the actual use of that knowledge and information in the subsequent representation. The conclusive presumption also avoids the ironic result of disclosing the former client's confidences and secrets through an inquiry into the actual state of the lawyer's knowledge and it makes clear the legal profession's intent to preserve the public's trust over its own self-interest.

*Ahmanson*, 229 Cal.App.3d at 1453 (internal quotations omitted)(citing *Global Van Lines*, 144 Cal. App.3d at 498).

6

In assessing whether a "substantial relationship" exists, "courts look at the practical consequences of the attorney's representation of the former client and ask whether confidential information material to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation." *Ahmanson*, 229 Cal. App. 3d at 1454 (citing *Global Van Lines,* 144 Cal. App.3d at 489). This inquiry turns on two variables: (1) "the relationship between the attorney and the former client with respect to the legal problem involved in the former representation," and (2) the relationship between the subjects of the former and current representations. *Jessen*, 111 Cal. App. 4th at 709-712.

With respect to the first variable, courts must differentiate "between lawyers who become heavily involved in the facts of a particular matter and those who enter briefly on the periphery for a limited and specific purpose related solely to legal questions." *Ahmanson*, 229 Cal. App.3d at 1457. This rule protects the confidences of the former client when the "attorney has been in a position to learn them" but does not require disqualification "when there is no realistic chance that confidences were disclosed." *Id*. at p. 1455. Thus, if the court determines that the attorney's former representation of the prior client was direct and personal, the disclosure of confidential information is presumed, and "the only remaining question is whether there is a connection between the two successive representations." *Ahmanson*, 229 Cal.App.3d at 1453.

> On the other hand, where the former attorney-client relationship is peripheral or attenuated instead of direct, then the presumption will not be applied in the absence of an adequate showing that the attorney was in a position vis-à-vis the client to likely have acquired confidential information material to the current representation. In these circumstances, the relationship between the compared representations shares equal billing with the relationship between the attorney and the former client, and the two [variables] of the [] test are assessed in combination in determining whether disqualification is mandated.

*Jessen*, 111 Cal. App. 4th at 710.

In addressing the second variable of the analysis, a "substantial relationship" exists between the prior and the current representations whenever the "subjects" are linked in some rational manner. *Id.* at 711 (citing *Flatt*, 9 Cal.4th. at 283). Evaluation of the "subjects" of the representations is broader "than the discrete legal and factual issues involved in the compared representations." *Jessen*, 111 Cal. App. 4th at 712-13. This is necessary because a test that applies a strict "comparison of the two

7

representations to their precise legal and factual issues might operate unrealistically to the detriment of the first client" because it would fail to recognize that "an attorney may acquire confidential information about the client or the client's affairs which may not be directly related to the transaction or lawsuit at hand." *Id.* The "subject" of a representation therefore includes

> information material to the evaluation, prosecution, settlement or accomplishment of the litigation or transaction given its specific legal and factual issues. Thus, successive representations will be "substantially related" when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues.

*Id.* This standard is not changed by *Farris v. Firemans Fund Insurance Co.* 119 Cal.App.4th 671, 679-80 (2004) ("There is no reason to reconsider *Jessen*. [. . .] To create a conflict requiring disqualification, *Jessen* mandates that the information acquired during the first representation be 'material' to the second; that is, it must be found to be directly at issue in, or have some critical importance to, the second representation.").

The court in *Jessen* recognized that this two part test is not a "bright line" standard and that "the relevant legal principles are only generally stated and must be applied to individual cases by the exercise of the court's considered judgment based in reason, logic and common sense." *Id.* at 713-14.

### 3. Law firm imputation

"[T]he need to protect client confidences can cause one attorney's conflict of interest disqualification to be imputed to other attorneys in the same firm." *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Sys.*, 20 Cal.4th 1135, 1153 (1999). This "vicarious disqualification rule recognizes the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." *Id.* at 1153-54. This rule applies even when the conflicted attorney provided the former representation as a member of another firm. *Largo Concrete, Inc. v. Liberty Mut. Fire Ins. Co.*, No. C 07-4651 CRB, 2008 WL 53128, at *4-5 (N.D. Cal. Jan. 2, 2008). Further, California law rejects the use of ethical walls to prevent disqualification by imputed conflicts. *See Hitachi, Ltd. v. Tatung Co.*, 419 F.Supp.2d 1158, 1164 (N.D.Cal.2006); *see also City and County of San Francisco v. Cobra Solutions*, 38 Cal.4th 839 (2006).

**DISCUSSION**

**1.  Relationship between McDonnell and Genentech in the '054 Interference**

From January 3, 1989 until September 6, 1990, John McDonnell was lead counsel for Genentech in the '054 Interference. Wall Exs. 18 and 19. His signature appears on at least sixteen moving papers and briefs and the mailing certificates for six affidavits, including the affidavit of Dr. Gorman. Stake Exs. 1-16; Wall Exs. 12-17. Despite this, Sanofi contends this Court should find that McDonnell had little involvement in the earlier representation because Genentech has not submitted evidence that McDonnell "played any role in preparing the affidavits." Opp. at 6:7-22. Further, Sanofi suggests that this Court should not grant disqualification because McDonnell has "no recollection" of having had any substantive role in the interference. *Id.* Rather, he believes that Janet McNicholas was the attorney "primarily involved in the substance of the '054 Interference." *Id.* Moreover, McDonnell contends that he played no role in the negotiation of the license, retained no records from this earlier representation, has had no involvement in the present matter, and that all material information has been made public, – i.e. that he retains no confidential information. *See* Sanofi's Sur-reply Brief ("Sur-reply"), p. 2:18-23. However, Sanofi's suggestion, that McDonnell's involvement in the representation was "quite limited," is inconsistent with the facts that McDonnell was Genentech's lead attorney for twenty months and that he signed and submitted numerous motions and briefs on its behalf. It is irrelevant that McDonnell may have no recollection of any confidential information he received. Numerous courts have held that an attorney's asserted failure to remember confidential information is insufficient to avoid disqualification. *See*, *e.g. Rosenfeld Constr. Co. v. Super. Ct.*, 235 Cal. App. 3d 566, 576 (1991) ("We find no authority that supports the notion that, standing alone, the present recollection of the members of the firm is an adequate criterion [for not disqualifying.]"); *Global Van Lines, Inc. v. Super. Ct.*, 144 Cal. App. 3d 483, 488 (1983) ("While [attorney] may not have any present recollection of such a complaint being brought to his attention, he was then the head of the legal office [] to which such a potential legal problem would logically have been referred."). In light of McDonnell's designation as lead attorney and the many filings under his signature, this Court concludes that McDonnell's representation of Genentech was direct and personal. Therefore the disclosure of confidential information by Genentech to McDonnell is presumed and the only remaining question is whether there is a substantial relationship between the

9

two successive representations.

### 2. Connection between the successive representations

The McDonnell firm's representation of Sanofi in the instant litigation and McDonnell's representation of Genentech in the '054 Interference are substantially related for two reasons. First, facts that were material to the first representation, namely those surrounding Dr. Gorman's receipt and experimentation with the CMV enhancer, are material to support Sanofi's assertions that the patents are nonobvious because they demonstrate unexpected results and support secondary indicia of non-obviousness including copying and long-felt need. Second, the facts surrounding Dr. Gorman's receipt of the CMV enhancer and communication with its inventors are material to Genentech's defense that it did not infringe because, until October 2008, the patents were licensed.

The former representation is substantially related to subject matter concerning to the present issue of nonobviousness because the Gorman affidavit filed by McDonnell describes that: (1) Genentech acquired the CMV enhancer from the inventors, (2) Dr. Gorman tested the strength of the expression of the CMV enhancer in numerous cell types, and (3) Dr. Gorman compared the expression obtained with the CMV enhancer to the expression observed with other enhancers. These facts, material in the first representation to Genentech's diligence in producing Factor VIII protein, are also material to Genentech's acquisition and allegedly infringing use of the CMV enhancer in this litigation.

Also underscoring the materiality of these facts from the prior representation, Sanofi has stated that it intends to rebut Genentech's obviousness argument for invalidity by "relying upon unexpected results (for example, the [CMV] enhancer is unexpectedly strong and is useful in an unexpectedly large number of different animal cell expression systems), as well as secondary considerations of nonobviousness, such as copying and long-felt need." Letter from Raffi Zerounian dated October 8, 2009 (Letter brief in support of Sanofi's motion to compel discovery from Genentech, Dkt. 171). The affidavits filed in the '054 Interference support Sanofi's arguments that the invention is nonobvious because they document that Genentech confirmed the CMV enhancer's strength and versatility in producing proteins and suggest that Genentech had a need for and "copied" the invention from Schaffner and Fleckenstein. The representations therefore share material subject matter.

10

Sanofi's sur-reply brief adds the following arguments. First, that the representations share no common subject matter because Genentech invented the Factor VIII variants without the help of Dr. Gorman and before she ever learned of the CMV enhancer. Sur-reply at 4:14-18. Second, that the CMV enhancer was rarely mentioned in the briefs and affidavits and played an insignificant role in the former proceedings. Sur-reply at 4:19-5:12. Third, that Genentech erroneously referred in its reply brief to Dr. Gorman's experiments involving a CMV promoter instead of a CMV enhancer. Sur-reply at 5:23-6:19. Fourth, that the erroneous naming of Dr. Gorman as an inventor of Factor VIII was never related to her use of the CMV enhancer. Sur-reply at 6:20-7:9. And fifth, that McDonnell did not rely on Dr. Gorman's work to demonstrate that she was a co-inventor of Factor VIII. Sur-reply at 7:10-8:6. However, these arguments cannot overcome the fact that because of Dr. McDonnell's direct and personal representation of Genentech in the former matter, the disclosure of confidential information is presumed. Also, it is undeniable that Genentech's use of the CMV enhancer was referenced in the '054 Interference to support the material contentions of Genentech's inventorship and diligence in developing Factor VIII. It is not necessary for Genentech to prove that McDonnell retains any confidential information from the earlier representation because:

> [I]t is not within the power of the former client to prove what is in the mind of the attorney. Nor should the attorney have to engage in a subtle evaluation of the extent to which he acquired relevant information in the first representation and of the actual use of that knowledge and information in the subsequent representation. The conclusive presumption [that confidences were imparted during the former representation] avoids the ironic result of disclosing the former client's confidences and secrets through an inquiry into the actual state of the lawyer's knowledge and it makes clear the legal profession's intent to preserve the public's trust over its own self-interest.

*Ahmanson*, 229 Cal.App.3d at 1453 (citing *Global Van Lines*, 144 Cal. App.3d at 498)(internal quotations omitted). Further, the fact that the CMV enhancers were not featured prominently in the '054 Interference does not decide the issue because "an attorney may acquire confidential information about the client or the client's affairs which may not be directly related to the transaction or lawsuit at hand." *Jessen*, 111 Cal. App. 4th at 712-13.

The earlier representation is also related to the defense of license because during the time of McDonnell's representation there was correspondence between Sanofi's predecessor, Behringwerke AG, and Dr. Gorman, regarding her receipt of the CMV enhancer and the possibility of taking a license.

11

Sanofi asserts there is no evidence McDonnell had any role in the negotiation of this license. Opposition at 6:17-18; Sur-reply at 9:6-25. However, the representations are related because McDonnell submitted an affidavit on Genentech's behalf detailing contacts between Dr. Gorman and the inventors of the patents-in-suit. These contacts directly precipitated the licensing negotiations. Though this connection is more tenuous than those described above, courts recognize that "an attorney may acquire confidential information about the client or the client's affairs which may not be directly related to the transaction or lawsuit at hand." Therefore these facts, though less persuasive, also support the McDonnell firm's disqualification.

The connection between McDonnell's successive representations is underscored by the fact that discovery sought by Sanofi would require Genentech to produce the same affidavits that McDonnell submitted to the USPTO during his earlier representation. Specifically, Sanofi has requested production of all documents concerning Genentech's use of a CMV enhancer in mammalian expression systems and work performed to measure increases in gene expression caused by CMV enhancers . Wall Ex. 24 at 1. The Gorman affidavit is responsive to both requests. The affidavits submitted by McDonnell might also be responsive to Sanofi's requests seeking information regarding Genentech's interactions with Schaffner and Fleckenstein, inventors of the patents. Further, should The McDonnell firm depose Dr. Gorman regarding Genentech's original receipt, testing, and licensing of the CMV enhancers, they will be inquiring into the same subject matter described in the Gorman affidavit that McDonnell submitted on Genentech's behalf. Sanofi contends that documents from the '054 Interference that would be responsive to Sanofi's requests in this litigation would have minimal if any importance. Sur-reply at 8:8-9:5. While this may be true, the subjects of the representations overlap on material issues and underscore the connection between the successive representations.

Based on the above, a disqualifying conflict exists as to McDonnell. The disclosure of confidential information is presumed due to McDonnell's direct and personal representation of Genentech in the earlier proceeding and because information material to the question of Genentech's diligence in producing Factor VIII with the CMV enhancer in the former representation is also material to the issues of nonobviousness and license of the CMV enhancer in the current representation. This disqualifying conflict must be imputed to the McDonnell firm under the conflict rules of law firm

imputation reflected in the American Bar Association Model Rules of Professional Conduct, rule 1.6, comment [8]. The McDonnell firm has submitted affidavits stating that McDonnell is semi-retired, has had no involvement, and has not been consulted in this matter. However, these statements are insufficient to overcome the presumption enunciated in *Spee Dee Oil* that "attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." *Spee Dee Oil*, 20 Cal.4th 1135, at 1153-54.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS Genentech's motion and DISQUALIFIES McDonnell, Boehnen, Hulbert, and Berghoff, LLP from representing Sanofi-Aventis Deutschland GMBH, Sanofi-Aventis U.S., LLC, and Sanofi-Aventis U.S., Inc. in this litigation concerning the '522 and '140 patents.

**IT IS SO ORDERED.**

Dated: March 20, 2010

SUSAN ILLSTON
United States District Judge