# EXHIBIT A TO
# SANOFI'S  MOTION FOR LEAVE
# TO FILE MOTION FOR
# RECONSIDERATION
# OF DISQUALIFICATION ORDER

HARVEY SISKIND LLP
D. PETER HARVEY (State Bar No. 55712)
pharvey@harveysiskind.com
NAOMI JANE GRAY (State Bar No. 230171)
ngray@harveysiskind.com
RAFFI V. ZEROUNIAN (State Bar No. 236388)
rzerounian@harveysiskind.com
Four Embarcadero Center, 39th Floor
San Francisco, California 94111
Telephone: 415-354-0100
Facsimile: 415-391-7124

Attorneys for Plaintiff/Counterdefendant
SANOFI-AVENTIS DEUTSCHLAND GMBH

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SANOFI-AVENTIS DEUTSCHLAND GMBH, | Case No.: C 08-04909 SI (BZ) |
| Plaintiff, | |
| v. | SANOFI-AVENTIS DEUTSCHLAND GMBH'S MOTION FOR RECONSIDERATION OF DISQUALIFICATION ORDER |
| GENENTECH, INC. and BIOGEN IDEC INC., | |
| Defendants. | |
| GENENTECH, INC. and BIOGEN IDEC INC., | |
| Counterplaintiffs, | |
| v. | |
| SANOFI-AVENTIS DEUTSCHLAND GMBH, | |
| Counterdefendant. | |

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT.................................................................................................1

ARGUMENT ..........................................................................................................................2

I.    MCDONNELL BOEHNEN SHOULD BE ALLOWED TO CONTINUE ITS
      REPRESENTATION OF SANOFI IN LIGHT OF *KIRK* ...................................................2

      A.  California law does not require automatic vicarious disqualification here...............4

          1.  *Kirk* concluded that vicarious disqualification is not automatic ..................4

          2.  A number of factors militate against a rule
              of automatic vicarious disqualification .........................................................6

          3.  Policy considerations weigh in favor of allowing ethical screens
              under appropriate circumstances..................................................................6

      B.  An effective screen rebuts the presumption
          of shared confidences within a law firm..................................................................8

      C.  An attorney's departure from the firm obviates
          the need for disqualification absent evidence that
          the attorney shared confidential information .........................................................9

          1.  Dr. McDonnell has retired from McDonnell Boehnen .................................9

          2.  Dr. McDonnell conveyed no confidential Genentech information
              to other McDonnell Boehnen attorneys .....................................................10

          3.  McDonnell Boehnen implemented an appropriate ethical screen
              which adequately protected Genentech's confidential information...........11

              (a)  McDonnell Boehnen implemented the screen
                   as soon it was aware of a conflict, with notice to
                   Genentech's parent corporation........................................................11

              (b)  The screen imposed preventive measures to protect
                   Genentech's confidential information ...............................................11

                   (i)    McDonnell Boehnen established prohibitions
                          against discussing confidential matters ............................12

                   (ii)   McDonnell Boehnen established rules and procedures
                          preventing access to confidential information and files ...12

        (iii)   Dr. McDonnell did not share in the profits of
McDonnell Boehnen's representation of Sanofi
in this action ..................................................................13

        (iv)   Dr. McDonnell was effectively physically segregated
from the screened Sanofi attorneys.................................13

        (v)   Dr. McDonnell had little supervisory role
over the attorneys involved in this action
after the action was filed..................................................14

        (vi)  McDonnell Boehnen attorneys are subject
to requirements for continuing education
in professional responsibility...........................................14

        (vii) McDonnell Boehnen notified Genentech's
parent company as soon as it was aware
of a conflict with the parent company .............................15

II.     THIS COURT SHOULD FOLLOW *KIRK* BECAUSE THE CALIFORNIA
SUPREME COURT IS LIKELY TO RULE THE SAME WAY ..................................15

CONCLUSION ...........................................................................................................................17

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Air-Sea Forwarders, Inc. v. Air Asia Co.*
    880 F.2d 176, 186 (9th Cir. 1989) ........................................................................15

*Flatt v. Super. Ct.*
    9 Cal. 4th 275 (1994) ..........................................................................4, 5, 16

*Goldberg v. Warner/Chappell Music, Inc.*
    125 Cal. App. 4th 752 (2005) ........................................................................9

*Henriksen v. Great Am. Sav. & Loan*
    11 Cal. App. 4th 109 (Cal. Ct. App. 1992) ..................................................4, 5, 8, 16

*In re Complex Asbestos Litig.*
    232 Cal. App. 3d 572 (Cal. 1991) ........................................................................11

*Johnson v. Symantec Corp.*
    58 F. Supp. 2d 1107 (N.D. Cal. 1999) ..........................................................15, 16

*Kirk v. First Am. Title Ins. Co.*
    __ Cal. App. __ (Cal. Ct. App. 2010) ............................................................ *passim*

*People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys.*
    20 Cal. 4th 1135 (1999) ..........................................................................2, 5, 10, 16

## Rules

American Bar Association Model Rules of Professional Conduct ........................................1, 6

Civil Local Rule 7-9(b)(2) ..........................................................................1

Illinois Supreme Court Rules 793 and 794 ..........................................................14

1

## **PRELIMINARY STATEMENT**

2        In this district, "a change of law occurring after the time of [an interlocutory] order"

3 constitutes a basis for reconsideration of that order.  Civ. Local Rule 7-9(b)(2).  On March 20, 2010,

4 this Court issued an order disqualifying Plaintiff Sanofi-Aventis Deutschland GmbH's counsel,

5 McDonnell Boehnen Hulbert & Berghoff LLP ("McDonnell Boehnen") from representing Sanofi in

6 this proceeding.  It did so on the basis that Dr. John McDonnell, while employed by another firm 20

7 years earlier, had performed legal services for Defendant Genentech.  The Court concluded that

8 confidential Genentech information was presumed to have been disclosed in the earlier

9 representation, that this representation was "substantially related" to the current case, and that under

10 then-existing California law Dr. McDonnell's conflict must be automatically and conclusively

11 imputed to the entire firm.  D.N. 341 ("Disqualification Order" or "DQ Order") at 12-13.

12        Two and a half weeks later, on April 7, 2010, California law on this issue changed.  *Kirk v.*

13 *First Am. Title Ins. Co.*, __ Cal. App. __ (Cal. Ct. App. 2010).  In *Kirk*, the court held, for the first

14 time, that a law firm is not *automatically* vicariously disqualified due to the imputed knowledge of

15 one of its attorneys gained from a prior representation while at a prior law firm.  *Kirk,* slip op. at 28.

16 Rather, "the law gives rise to a rebuttable presumption of imputed knowledge to the law firm, which

17 may be rebutted by evidence of effective ethical screening." *Id.* at 50.  Moreover, once the attorney

18 with disqualifying knowledge "has left the firm, vicarious disqualification is not necessary where

19 the evidence establishes that no one other than the departed attorney had any dealings with the

20 client or obtained confidential information." *Id.* at 52 (internal quotation and citation omitted).  In

21 determining whether it is likely that the departing attorney conveyed confidential information to

22 other members of the law firm, the trial court "may consider the elements of [an] ethical wall"

23 constructed by the law firm to prevent such disclosures. *Id.* at 53.

24        The *Kirk* holding directly contradicts the rules applied by the Court in disqualifying

25 McDonnell Boehnen in this case.  The Court held that a "disqualifying conflict *must* be imputed to

26 the McDonnell firm under the conflict rules of law firm imputation reflected in the American Bar

27 Association Model Rules of Professional Conduct 1.6, comment [8]." DQ Order at 12-13.   The

28                                                                    -1-

Court further held that "California law rejects the use of ethical walls to prevent disqualification by imputed conflicts." *Id.* at 8. Finally, the Court found that McDonnell Boehnen's evidence that Dr. McDonnell "is semi-retired, has had no involvement, and has not been consulted in this matter . . . [is] insufficient to overcome the presumption enunciated in *SpeeDee Oil* that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." *Id.* at 13 (internal quotation and citation omitted).

The *Kirk* opinion is thoroughly and soundly reasoned. The court meticulously examined the history of decisional law in California, recent proposed amendments to the ethical rules, and a raft of policy considerations. Its analysis and conclusions, applied to this case, would allow McDonnell Boehnen's continued representation of Sanofi. Sanofi respectfully requests that the Court reconsider its order disqualifying McDonnell Boehnen from representing Sanofi in this case in light of the principles and holding enunciated in *Kirk*. Granting this relief will not cause any delay in the case.

## ARGUMENT

### I.   MCDONNELL BOEHNEN SHOULD BE ALLOWED TO CONTINUE ITS REPRESENTATION OF SANOFI IN LIGHT OF *KIRK*.

The Court's Disqualification Order focused primarily on the issue whether McDonnell Boehnen's representation of Sanofi in this action relates substantially to Dr. McDonnell's representation of Genentech in another matter while at another firm over 20 years ago. Once the Court determined that the two matters were substantially related, it automatically concluded that it must impute the presumption that Dr. McDonnell had obtained confidential Genentech information to the entire McDonnell Boehnen firm pursuant to the California Supreme Court's opinion in *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys.*, 20 Cal. 4th 1135 (1999). DQ Order at 13. It also rejected the ethical wall as a means of preventing any transmission of confidential client information from an attorney's prior representation to the attorney's current firm. *Id.* at 8.

*Kirk* demonstrated that the California Supreme Court's decision in *SpeeDee Oil* left unresolved the issue whether ethical walls might effectively rebut the presumption of shared

confidences within a law firm.  In *Kirk*, First American retained three Bryan Cave attorneys to represent it in a series of four related complex class actions filed by consumers.  *Kirk*, slip op. at 3-4.  In connection with the class actions, plaintiffs' counsel sought to retain as a consultant attorney Cohen, who had previously worked for the Department of Insurance.  *Id.* at 5.  During a 17-minute telephone call, plaintiffs' counsel imparted confidential information to Cohen concerning the class actions.  *Id.*  Cohen declined the consultancy due to a potential conflict on the part of his employer at the time, Fireman's Fund.  *Id.* at 6.

More than a year later, Cohen left Fireman's Fund and joined the law firm of Sonnenschein, Nath & Rosenthal.  *Id.* at 6-7.  Plaintiffs' counsel then again attempted to hire Cohen as a consultant.  *Id.* at 7.  When Cohen conducted a conflict check, he discovered that Sonnenschein represented First American, and again declined the consultancy.  *Id.*  Weeks later, the three Bryan Cave attorneys who were representing First American in the class actions also joined Sonnenschein.  *Id.*  Plaintiffs immediately objected to Sonnenschein's representation of First American in the class actions due to their counsel's earlier consultations with Cohen.  *Id.* at 7-8.  Sonnenschein erected an ethical wall around Cohen providing that:  (1) Cohen could not work on the class actions; (2) no one working on the class actions could discuss them with Cohen; (3) Cohen could not be given non-public documents relating to the class actions; (4) Cohen was forbidden from accessing documents relating to the class actions on Sonnenschein's network; and (5) Cohen could not share in any of the fees associated with the class actions.  *Id.* at 8-9.

Despite the imposition of the ethical wall, Cohen assisted the First American team in drafting a letter in a separate First American matter addressing a subject which was also at issue in the class actions.  *Id.* at 9-10.  Plaintiffs then moved to disqualify Sonnenschein.  *Id.* at 10.  The trial court granted the motion, finding, *inter alia,* that when an attorney possesses disqualifying information, vicarious disqualification of the law firm is automatic, regardless of the presence of an ethical wall.  *Id.*

1    The Court of Appeal reversed based on three grounds:  (1) a law firm is not automatically

2    vicariously disqualified due to the imputed knowledge that one of its attorneys gained from a prior

3    representation while at a prior law firm; (2) evidence of a properly implemented ethical

4    wall can rebut the presumption that client confidences have been or will be shared among members

5    of the law firm; and (3) vicarious disqualification is not necessary after the disqualifying attorney

6    has left the firm where the evidence shows that no other member of the firm dealt with the client or

7    obtained confidential information.  *Id.* at 13-14.

8         **A.     California law does not require automatic vicarious disqualification here.**

9              **1.     *Kirk* concluded that vicarious disqualification is not automatic.**

10    The Court of Appeal in *Kirk* carefully reviewed the history and evolution of California

11   decisional law on imputed disqualification.  It found that appellate courts initially ruled that

12   vicarious disqualification was not automatic, but instead subject to a balancing test.  *Kirk*, slip op. at

13   16-20, 27.  Then, in *Henriksen v. Great Am. Sav. & Loan*, 11 Cal. App. 4th 109 (Cal. Ct. App.

14   1992), the Second Appellate District affirmed the vicarious disqualification of an attorney who had

15   switched sides *in the same case*, despite the new firm's attempt to isolate the attorney.  *Kirk*, slip op.

16   at 21 (citing *Henriksen*, 11 Cal. App. 4th at 117).  The *Henriksen* court established an absolute rule

17   that "ethical walls are not sufficient, and vicarious disqualification is mandatory" when the

18   disqualifying attorney:  "(1) is a nongovernmental attorney; (2) who formerly represented, and

19   therefore possesses confidential information from, a party; and (3) who switches sides in the same

20   case."  *Kirk*, slip op. at 21 (citing *Henriksen*, 11 Cal. App. 4th at 117).  The *Kirk* court found that

21   this was the "first time an *absolute rule* of vicarious disqualification was set forth in a California

22   opinion."  *Kirk*, slip op. at 21 (emphasis in original).

23    Subsequently, in *Flatt v. Super. Ct.,* 9 Cal. 4th 275 (1994), the California Supreme Court

24   cited *Henriksen* favorably and appeared to state a rule of automatic vicarious disqualification any

25   time material confidential information was presumed to be held by the disqualifying attorney.  The

26   *Kirk* court found, however, that in *Flatt* the issue before the Supreme Court was not whether a

27   disqualifying attorney's law firm was subject to vicarious disqualification, and thus the citation to

28                                            -4-

1   *Henriksen* amounted to nonbinding *dicta*.  *Kirk*, slip op. at 22.  *Flatt* implicated an attorney's duty

2   of loyalty, not the duty of confidentiality that is at issue in cases of vicarious disqualification.  *Id.* at

3   21.   In *Flatt*, an attorney interviewed a prospective client about a claim the prospective client

4   wanted to bring, but declined the representation upon realizing that the target of the proposed action

5   was another client.  *Id.* at 21 n.16.  The attorney refrained from advising the prospective client that

6   the applicable statute of limitations would soon expire on his claim.  *Id.*  Thus, the question before

7   the Supreme Court was whether the attorney had committed malpractice in refraining from advising

8   the potential client of the statute of limitations.  *Flatt*, 9 Cal. 4th at 278.  Because the Supreme Court

9   was not deciding the issue of whether a firm should be automatically vicariously disqualified in all

10  circumstances, its citation of *Henriksen* in *dicta* should not be construed to establish such a rule.

11  *Kirk*, slip op. at 23.

12      The *Kirk* court then analyzed the California Supreme Court's opinion in *SpeeDee Oil*,

13  finding that the Supreme Court deliberately did "not consider whether an attorney can rebut a

14  presumption of shared confidences, and avoid disqualification, by establishing that the firm

15  imposed effective screening procedures," because in *SpeeDee Oil* the firm failed to demonstrate that

16  an effective screening process had been established.  *Kirk*, slip op. at 25.  Thus, the "Supreme

17  Court's language suggests that it believed that the question of whether an effective screening wall

18  may rebut the presumption of vicarious disqualification was a question it had not yet resolved."  *Id.*

19  at 25.  Subsequent appellate court opinions have split on the issue, with some applying an absolute

20  rule and others stating that vicarious disqualification is only appropriate in the absence of an

21  effective ethical screen.  *Id.*

22      This meticulous analysis led the *Kirk* court to conclude that "it is improper to rely on *Flatt* as

23  creating an absolute rule of vicarious disqualification in California."  *Kirk*, slip op. at 28.  Instead,

24  "in the proper circumstances, the presumption is a rebuttable one, which can be refuted by evidence

25  that ethical screening will effectively prevent the sharing of confidences in a particular case."  *Id.*

26

27

28

SANOFI'S MOTION FOR RECONSIDERATION                    CASE NO. C 08-04909 SI (BZ)
OF DISQUALIFICATION ORDER

## 2. A number of factors militate against a rule of automatic vicarious disqualification.

The *Kirk* court identified a number of reasons why a rule of automatic vicarious disqualification should be rejected. Changing realities in law practice, wherein many attorneys practice in large firms and movement among firms is much more common, militate in favor of a more flexible standard and the acceptance of ethical walls to prevent the compromise of client confidences. *Kirk*, slip op. at 29-31. The court also found persuasive the fact that nearly half of the states within the United States, and the ABA's Model Rules of Professional Conduct, permit ethical screening as a means of dealing with conflicts of interest.

The *Kirk* court also found it "significant" that in considering a proposed change in the California ethics rules "a majority of the [California] Commission for the Revision of the Rules of Professional Conduct believed that screening *should* be ethically permissible in limited circumstances." *Id.* at 36 (emphasis in original). Further, the *Kirk* court identified situations where California law already recognizes the effectiveness of ethical screens in other contexts. *Id.* at 38

## 3. Policy considerations weigh in favor of allowing ethical screens under appropriate circumstances.

The *Kirk* court identified several important policy considerations to be taken into account in a motion for disqualification: (1) a client's right to chosen counsel; (2) an attorney's interest in representing a client; (3) the financial burden on a client to replace disqualified counsel; (4) the possibility that tactical abuse underlies the disqualification motion; (5) the need to maintain ethical standards of professional responsibility; and (6) the preservation of public trust in the scrupulous administration of justice and the integrity of the bar. *Kirk*, slip op. at 40. The court found persuasive an analysis by the ABA Standing Committee on Ethics and Responsibility which emphasized that imputation does not involve a stark choice between client protection and lawyer mobility. Rather, "[s]creening is a mechanism to give effect to the duty of confidentiality, not a tool to undermine it." *Id.* at 40 (quotation and citation omitted). Moreover, every order of disqualification

1
2
3
4

> results in a client that loses its law firm of choice.  The harm to all such clients is
> real, not theoretical.  Often the disqualification of a firm . . . occurs after a manner
> [sic] is well under way and the affected client has spent substantial sums in fees.
> Typically, such clients have played no part in the circumstances that led to the
> imputed disqualification, yet they suffer the cost, disruption, and delay resulting
> from it.

5   *Id.* at 41.  In *Kirk*, the disqualified team of attorneys had represented First American for over a decade.

6   *Id.* at 4.  The team had defended First American in numerous class actions across the country.  The

7   attorneys on the team were very familiar with, and had good rapport with, First American's in-house

8   counsel, officers, and management employees.  *Id.*  They were "uniquely and extensively

9   knowledgeable about First American's personnel, products, services, data systems, history and

10  organization on a national basis, including . . . California."  *Id.* at 4-5 (ellipsis in original).  In the

11  related class actions, the team defended hundreds of depositions and reviewed hundreds of thousands

12  of pages of documents.  *Id.* at 5.  By the time the motion for disqualification was filed, First American

13  had incurred over $5.5 million in attorney's fees and another $1 million in expenses in the class actions.

14          Like First American, there is no question that Sanofi will suffer significant prejudice by reason

15  of the disqualification of McDonnell Boehnen, particularly at this stage.  The firm has served as

16  Sanofi's counsel for over two years in this matter alone.  (Declaration of Joseph P. Kirk Jr. ("Kirk

17  Decl.") ¶ 4.)  As in *Kirk,* McDonnell Boehnen has served as counsel to Sanofi and its predecessors in

18  numerous and varied matters for over a decade, and has precisely the type of close relationship,

19  characterized by a unique and detailed knowledge of all aspects of Sanofi's business, as the First

20  American team had with its client.   (Kirk Decl. ¶ 3.)  The dispute in this case is highly complex,

21  involving biotechnology patents affecting gene expression.  Sanofi's originally chosen counsel has the

22  specialized knowledge and expertise necessary to deal knowledgeably and effectively with this subject

23  matter in the context of a patent dispute.

24          Having thoroughly examined California decisional law, the realities of the contemporary

25  practice of law, the law of other jurisdictions, recent developments in the California ethical rules, other

26  contexts where California law permits ethical screens, and policy considerations, the *Kirk* court

27  concluded that California law does not automatically require the imputed disqualification of a law firm.

28

1    Instead, a firm may avoid disqualification by appropriately screening lawyers who may possess

2    disqualifying confidential information.  Those circumstances are present here.  The Court should thus

3    allow McDonnell Boehnen, which established an effective screen around the Sanofi team in the early

4    stages of the litigation, to continue representing Sanofi in this case.

5          **B.     An effective screen rebuts the presumption of shared confidences within a law

6                   firm**.

7          Once a party moving for disqualification has established that an attorney possesses confidential

8    information, "a rebuttable presumption arises that the attorney shared that information with the

9    attorney's law firm.  The burden then shifts to the challenged law firm that the practical effect of formal

10   screening has been achieved."  *Kirk*, slip op. at 43.  An effective screen must incorporate two elements:

11   (1) it must be timely imposed; and (2) it must impose preventive measures to guarantee that

12   information will not be conveyed.  The typical elements of an ethical wall include:

13        (1)     physical, geographic, and departmental separation of attorneys;

14        (2)     prohibitions against and sanctions for discussing confidential matters;

15        (3)     established rules and procedures preventing access to confidential information and files;

16        (4)     procedures preventing a disqualified attorney from sharing in the profits from the

17                representation; and

18        (5)     continuing education in professional responsibility.

19   *Kirk*, slip op. at 44 (citing *Henriksen*, 11 Cal. App. 4th at 116 n.6).  To this list the *Kirk* court added one

20   factor, "commonly noted in ethical rules governing imputed conflicts: . . . notice to the former client."

21   *Kirk,* slip op. at 48.  The inquiry into the screening mechanism, however, is "*not* to determine whether

22   all of a prescribed list of elements (beyond timeliness and the imposition of prophylactic measures)

23   have been established; it is, instead, a case-by-case inquiry focusing on whether the court is satisfied

24   that the tainted attorney has not had and will not have any improper communication with others at the

25   firm concerning the litigation."  *Kirk*, slip op. at 44-45.

26        In *Kirk*, the Sonnenschein firm had erected an ethical screen around attorney Cohen after

27   receiving notice of the potential conflict; the screen was generally effective in preventing Cohen from

28

SANOFI'S MOTION FOR RECONSIDERATION                    CASE NO. C 08-04909 SI (BZ)
OF DISQUALIFICATION ORDER

1   working on the class actions.  Because Cohen had since left the Sonnenschein firm, however,

2   "circumstances [had] changed," and the court proceeded to articulate the rule applicable to such

3   circumstances.  That rule, applied to the present facts, requires that McDonnell Boehnen not be

4   disqualified.

**C.     An attorney's departure from the firm obviates the need for disqualification absent evidence that the attorney shared confidential information.**

7       Once a disqualifying attorney has left a firm, "vicarious disqualification is not necessary

8   'where the evidence establishes that no one other than the departed attorney had any dealings with

9   the client or obtained confidential information.'"  *Kirk*, slip op. at 52 (citing *Goldberg v.*

10  *Warner/Chappell Music, Inc.*, 125 Cal. App. 4th 752, 755 (2005).  The "inquiry is no longer a

11  prospective one, but a retrospective one" involving not "the *risk* of transmitting information . . . but,

12  instead, whether the [disqualifying] attorney *actually* conveyed confidential information."  *Id.* at 52

13  (emphases in original).  In conducting this inquiry, the court may consider the "elements of the

14  ethical wall . . . as the strength of the wall may well be relevant to a determination of whether it is

15  likely that confidential information was actually conveyed."  *Id.* at 53.  The *Kirk* court thus

16  remanded the case to the trial court to assess the elements and effectiveness of Sonnenschein's

17  ethical wall.

**1.     Dr. McDonnell has retired from McDonnell Boehnen.**

19      Dr. McDonnell has retired from McDonnell Boehnen.  (Declaration of John J. McDonnell in

20  Support of Sanofi's Motion for Reconsideration ("McDonnell Decl.") ¶ 2.)  He is no longer

21  employed by the Firm in any capacity and has withdrawn as counsel of record from all active cases

22  in which he appeared on behalf of the Firm.  *Id.*  Dr. McDonnell no longer receives financial

23  compensation from the Firm in exchange for any type of work, and no longer receives any non-

24  financial benefits from McDonnell Boehnen other than those negotiated as part of his retirement

25  package.  (*Id.* ¶¶ 2-4.)  Thus, Genentech does not face the prospect that Dr. McDonnell is active

26  and present at the Firm or that he is communicating with lawyers at the Firm on any business

27

28

-9-

1   matters related to Genentech.  (Declaration of John Steele in Support of Motion for Reconsideration

2   of Disqualification Order ("Steele Decl.") ¶ 9(b).)

3          Because Dr. McDonnell has retired from McDonnell Boehnen, the appropriate inquiry is

4   whether he *in fact* conveyed confidential information to other McDonnell Boehnen attorneys.  *Kirk*,

5   slip op. at 52.

6          **2.      Dr. McDonnell conveyed no confidential Genentech information to other**

7   **McDonnell Boehnen attorneys.**

8          There is not a single shred of evidence suggesting that Dr. McDonnell conveyed confidential

9   Genentech information to other McDonnell Boehnen attorneys.  To the contrary, Dr. McDonnell

10  has declared that he does not even remember any such information.  (Declaration of John J.

11  McDonnell in Support of Sanofi's Opposition to Genentech's Motion to Disqualify ("McDonnell

12  Opp. Decl.") ¶ 9.)   Dr. McDonnell has never discussed any Genentech subject matter, aside from

13  the current disqualification issue, with any attorney or other person at McDonnell Boehnen.

14  (Second Declaration of John J. McDonnell in Support of Sanofi's Supplemental Memorandum in

15  Opposition to Genentech's Motion to Disqualify ("McDonnell Supp. Decl.") ¶ 6.)  Dr. McDonnell

16  has had no involvement in this action other than in connection with Genentech's motion to

17  disqualify.  (McDonnell Opp. Decl. ¶ 3.)  Indeed, Dr. McDonnell has done no work at all for Sanofi

18  for at least the last three years – well before this action was filed.  (*Id.* ¶ 2.)  Nor has Genentech

19  introduced any evidence that Dr. McDonnell in fact conveyed any confidential Genentech

20  information to McDonnell Boehnen attorneys.  There is simply no evidence supporting a conclusion

21  that Dr. McDonnell disclosed such information.  Indeed, the Court's Disqualification Order was

22  based entirely on the *presumed* sharing of such information.  DQ Order at 13, citing *SpeeDee Oil,*

23  20 Cal.4th 1135, at 1153-54.  This presumption is rebutted by McDonnell's ethical screen.

24

25

26

27

28

SANOFI'S MOTION FOR RECONSIDERATION                    CASE NO. C 08-04909 SI (BZ)
OF DISQUALIFICATION ORDER

**3.    McDonnell Boehnen implemented an appropriate ethical screen which adequately protected Genentech's confidential information.**

McDonnell Boehnen implemented an ethical screen in a timely manner that meets the criteria set forth in *Kirk*, as well as the standards of protection that are customary in situations where courts permit the use of ethical screens.  (Steele Decl. ¶ 11.)

      (a)    McDonnell Boehnen implemented the screen as soon as it was aware of a conflict, with notice to Genentech's parent corporation.

In an early stage of this litigation, before substantive discovery had begun and well before the disqualification issue arose, McDonnell Boehnen erected an ethical wall between all McDonnell Boehnen personnel working on this case and every other member of the firm, including Dr. McDonnell.  (McDonnell Supp. Decl. ¶ 5 and Exh. A thereto.)  McDonnell Boehnen implemented this ethical wall after obtaining a waiver from Roche Holdings AG, Genentech's parent corporation and a client of McDonnell Boehnen, allowing McDonnell Boehnen to represent Sanofi against Genentech in this action.  (McDonnell Supp. Decl. Exh. A at 1.)  McDonnell Boehnen fully informed Genentech's parent of, and Genentech's parent concurred in, this ethical wall. (McDonnell Supp. Decl. ¶ 5 and Exh. A thereto at 1.)  It is, and always has been, Dr. McDonnell's understanding that he has been ethically walled off from the Sanofi litigation team in relation to any matter involving Roche Holdings AG subsidiaries, including wholly-owned subsidiary Genentech. (McDonnell Supp. Decl. ¶ 5.)

      (b)    The screen imposed preventive measures to protect Genentech's confidential information.

McDonnell Boehnen's ethical screen meets the criteria set forth in *Kirk*, and was more than adequate to protect Genentech's confidential information during Dr. McDonnell's tenure at the firm. (Steele Decl. ¶ 11.)  McDonnell Boehnen circulated a memorandum to the entire firm which set forth the parameters of the screen.  *See Kirk*, slip op. at 44 (quoting *In re Complex Asbestos Litig.*, 232 Cal. App. 3d 572, 594 (Cal. 1991)) ("To avoid inadvertent disclosures and establish an evidentiary record, a memorandum should be circulated warning the legal staff to isolate the [tainted] individual from communications on the matter and to prevent access to the relevant files.").  Generally, ethical screens

-11-

1   designed to protect a party's confidences under circumstances like those present here focus on (1)

2   safeguarding documents from improper access; (2) preventing oral discussions that would reveal

3   confidences; and (3) isolating the lawyers in question from participating in new matters adverse to the

4   party whose confidences are being protected.   (Steele Decl. ¶ 7.)   McDonnell Boehnen's screen

5   accomplished all of these goals.  (Steele Decl. ¶ 11.)

6              (i)    McDonnell   Boehnen   established   prohibitions   against
7                     discussing confidential matters.

8        The   screening   memorandum   provided   that   Sanofi   team   members   were   prohibited   from

9   accessing "ANY work product materials, correspondence, conversations, pleadings, documents, billing

10  information, or other confidential information regarding Roche Diagnostics . . . or any Roche Holdings

11  AG affiliate, apart from information related to Genentech, Inc. that arises from or is necessary to

12  MBHB's continued representation of Sanofi-Aventis. . . . [N]o one shall discuss with these individuals

13  any aspect of MBHB's representation of Sanofi-Aventis in its suit against Genentech."  (McDonnell

14  Supp. Decl. Exh. A at 2.)   The memorandum further prohibited the Sanofi team from discussing

15  confidential Roche matters with any employees of the firm, and vice versa.  (McDonnell Supp. Decl.

16  Exh. A at 2 ¶ 3.)  Employees were instructed not to discuss confidential Roche matters with each other

17  in the presence of any member of the Sanofi team; if employees started such a discussion, Sanofi team

18  members were to instruct them to stop.   (*Id.*; *see also* Steele Decl. ¶¶ 9(a), 11.)   Indeed, Dr.

19  McDonnell's declaration under oath in this case that he did not discuss confidential Genentech

20  information with anyone at McDonnell Boehnen exceeds the assurances that a former client typically

21  seeks from former counsel in situations like this one that counsel has not revealed the client's

22  confidences.  (Steele Decl. ¶ 9(c).)

23             (ii)   McDonnell   Boehnen   established   rules   and   procedures
24                    preventing access to confidential information and files.

25       McDonnell Boehnen isolated the Sanofi team from "all material confidential knowledge

26  concerning any Roche matter that MBHB may handle, including, for example, all work product,

27  documents, correspondence, secrets and confidences of Roche."  (McDonnell Supp. Decl. Exh. A at 2 ¶

28

-12-

1   (1).)  Documents were to be physically stored "away from locations normally accessed by these

2   individuals."  (*Id.*)  The Sanofi team was prohibited from accessing "any documents or electronic files

3   relating to Roche on MBHB's Document Management System ("DMS") or litigation portal."  (*Id.*)

4   Sanofi team members were likewise prohibited from accessing "any rooms storing Roche discovery

5   material or other litigation matters, and shall not be provided access to any Roche prosecution files."

6   (*Id.* at 3 ¶ 4.)  These protections "easily meet the standard expectations for screens in such cases."

7   (Steele Decl. ¶¶ 8, 8(a).)

8                       (iii)   Dr. McDonnell did not share in the profits of McDonnell
                               Boehnen's representation of Sanofi in this action.
9

10          Dr. McDonnell ceased being a partner in McDonnell Boehnen, and became Senior Counsel, in

11   2005, before this action was filed.  (McDonnell Supp. Decl. ¶ 2.)  After becoming Senior Counsel, Dr.

12   McDonnell was compensated based only on the work he performed and work performed for clients

13   whose representation he originated.  (*Id.* ¶ 7.)  He has performed no work for Sanofi at least in the last

14   three years, since before this action was filed.  (McDonnell Opp. Decl. ¶ 2.)  Thus, he received no

15   Sanofi-related compensation.  (Steele Decl. ¶¶ 10, 10(a).)

16                      (iv)   Dr. McDonnell was effectively physically segregated from the
                               screened Sanofi attorneys.
17

18          During his last five years of employment at McDonnell Boehnen, Dr. McDonnell worked

19   successively fewer hours each year.  (McDonnell Decl. ¶ 5.)  Doing the year 2008, when this action

20   commenced, Dr. McDonnell billed fewer than 400 hours.  (*Id.*)  Dr. McDonnell billed fewer than 300

21   hours in 2009 and fewer than 50 hours in 2010 prior to his retirement.  (*Id.*)  Dr. McDonnell worked the

22   majority of those hours from his home or other locations outside McDonnell Boehnen's offices,

23   although he maintained an office at the Firm's offices in Chicago.  (*Id.*)  In practical effect, Dr.

24   McDonnell was physically segregated from the members of the Sanofi team.  "Taken all together, the

25   isolation of [Dr.] McDonnell from the Sanofi litigation meets or exceeds what is customary in such

26   situations."  (Steele Decl. ¶ 10(b).)

27

28                                                    -13-

(v)     Dr. McDonnell had little supervisory role over the attorneys involved in this action after the action was filed.

During his last three years of employment at McDonnell Boehnen, Dr. McDonnell directly supervised very little work – less than ten hours, approximately – performed by any members of the Sanofi team identified in the Firm's ethical wall memorandum dated April 29, 2009.  (McDonnell Decl. ¶ 6.)  None of that work related to this case or to Genentech.  (*Id.*; *see also* Steele Decl. ¶ 10.)

(vi)    McDonnell Boehnen attorneys are subject to requirements for continuing education in professional responsibility.

All McDonnell Boehnen attorneys are admitted to practice in the state of Illinois.  (Declaration of Joshua R. Rich in Support of Sanofi's Motion for Reconsideration of Disqualification Order ("Rich Decl.") ¶ 2.)  As Illinois attorneys, all McDonnell Boehnen attorneys are required to comply with Illinois Supreme Court Rules 793 and 794, which require admitted attorneys to complete a certain number of hours of continuing legal education during prescribed periods of time.  (Rich Decl. ¶¶ 2-4 and Exh. A thereto.)  Those continuing legal education hours must include education devoted to issues of ethics and professionalism.  (*Id.* ¶¶ 3-4 and Exh. A thereto.)

To assist its attorneys in complying with their continuing legal education obligations, McDonnell Boehnen has hosted a variety of internal presentations concerning legal ethics.  (*Id.* ¶ 6.)  For instance, in 2010, McDonnell Boehnen hosted two internal continuing legal education presentations by the former administrator of the Illinois Attorney Registration and Disciplinary Commission ("ARDC").  (Rich Decl. ¶ 6.)  The ARDC is the agency of the Illinois Supreme Court that is responsible for maintaining current records of registration and discipline information for lawyers licensed to practice in Illinois, investigating allegations of misconduct by lawyers, and prosecuting the cases where a lawyer's misconduct suggests a threat to the public or to the integrity of the legal profession.  (*Id.*)  During previous years, McDonnell Boehnen has presented other legal ethics-related continuing legal education programs.  (*Id.*)

McDonnell Boehnen further assists its attorneys by subscribing to the extensive library of continuing legal education programs by the Practising Law Institute ("PLI"), allowing McDonnell

-14-

1    Boehnen attorneys free access to, *inter alia*, PLI's ethics programs.  (Rich Decl. ¶ 7.)  McDonnell

2    Boehnen also has an administrative staff member charged with circulating notice of continuing legal

3    education opportunities.  (*Id.*)  Finally, McDonnell Boehnen maintains a software program for

4    tracking the continuing legal education earned by each attorney during each reporting period.  (*Id.*)

5                        (vii)    McDonnell Boehnen notified Genentech's parent company as
                                  soon as it was aware of a conflict with the parent company.
6

7            As described more fully at pp. 10-11 above, McDonnell Boehnen obtained a waiver from

8    Roche Holdings AG, Genentech's parent corporation and a client of McDonnell Boehnen, allowing

9    McDonnell Boehnen to represent Sanofi against Genentech in this action.  (McDonnell Supp. Decl.

10   Exh. A at 1.)  Thus, McDonnell Boehnen fully informed Genentech's parent of, and Genentech's

11   parent concurred in, this ethical wall.  (McDonnell Supp. Decl. ¶ 5 and Exh. A thereto at 1.)

12   **II.      THIS COURT SHOULD FOLLOW *KIRK* BECAUSE THE CALIFORNIA
              SUPREME COURT IS LIKELY TO RULE THE SAME WAY.**
13

14           Federal courts sitting in diversity are bound by decisions of the state's highest court

15   interpreting state law.  *Johnson v. Symantec Corp.,* 58 F. Supp. 2d 1107, 1109 (N.D. Cal. 1999)

16   (internal citation and quotation omitted).  Where the state's highest court has not decided an issue,

17   the task of the federal court is to predict how the state high court would resolve it.  *Air-Sea*

18   *Forwarders, Inc. v. Air Asia Co.,* 880 F.2d 176, 186 (9th Cir. 1989) (internal quotation and citation

19   omitted).  Though the Supreme Court's *dicta* "command [the Court's] serious respect, . . . language

20   contained in a judicial opinion is to be understood in the light of the facts and issue then before the

21   court, and an opinion is not authority for a proposition not therein considered.  When questions

22   about an opinion's import arise, the opinion should receive a reasonable interpretation and an

23   interpretation which reflects the circumstances under which it was rendered, and its statements

24   should be considered in context."  *Kirk*, slip op. at 22-23 (internal quotations and citations omitted).

25           The decisions of the state's intermediate appellate courts are data that a federal court must

26   consider in undertaking this analysis.  *Air-Sea,* 880 F.2d at 186 (citations omitted).  But where the

27   state's intermediate appellate courts have reached conflicting results, the federal court must

28                                                        -15-

1   ascertain for itself the most authoritative assessment of state law.  *Id.* (citation omitted); *see also*

2   *Johnson*, 58 F. Supp. 2d at 1109.

3   The California Supreme Court would be likely to reach the same ruling that the *Kirk* court

4   did.  As described in detail above, the *Kirk* court undertook an exhaustive review of decisional law,

5   practical issues and policy considerations.  Its rationale hews faithfully to *Flatt* and *SpeeDee Oil*,

6   the most recent pronouncements by the California Supreme Court on the issue of automatic

7   vicarious disqualification, with respect to issues both decided and undecided by that Court.

8   Significantly, it recognizes and places in correct context the Supreme Court's *dictum* in citing

9   *Henriksen* with approval in *Flatt*, and acknowledges, with both sensitivity and respect, the Supreme

10   Court's restraint leaving unresolved the issue whether an appropriate ethical wall may rebut the

11   presumption of shared confidences within a law firm.

12   Moreover, *Kirk* is factually analogous to this case in that Sanofi's relationship with

13   McDonnell Boehnen, like the relationship between First American and its counsel, uniquely

14   positions McDonnell Boehnen to provide Sanofi with exceptional representation in this case.

15   McDonnell Boehnen has extensive knowledge of Sanofi's business, extremely close relationships

16   with management, and has been representing Sanofi in this matter since its inception.  (Kirk Decl.

17   ¶¶ 3-4.)

18   Indeed, the facts in *Kirk* presented a more egregious potential conflict than the facts here.

19   As an initial matter, Sonnenschein only erected its ethical wall *after* the class action plaintiffs

20   brought the conflict to Sonnenschein's attention.  *Kirk,* slip op. at 8.  Here, by contrast, McDonnell

21   Boehnen erected its ethical wall months *before* the parties – including Genentech – were aware of

22   Dr. McDonnell's involvement in the patent interference.  (McDonnell Supp. Decl. Exh. A.)

23   Additionally, McDonnell Boehnen's screen, unlike Sonnenschein's, was fully effective: despite

24   Sonnenschein's screen, Cohen admittedly performed work on another First American matter

25   involving related issues.  *Kirk*, slip op. at 51.  The *Kirk* court refrained from deciding whether

26   Cohen's work on the related matter was or was not disqualifying of Sonnenschein, instead

27   instructing the trial court, in view of Cohen's departure from the firm, to "determine whether

28   -16-

1 │ Cohen's activities at the firm actually resulted in the improper transmission, directly or indirectly,

2 │ of confidential information from Cohen to the First American team, or any other member of the

3 │ Sonnenschein firm who may have worked on the related class action." *Id.* at 53. McDonnell

4 │ Boehnen's ethical screen, on the other hand, worked as it was supposed to do. Dr. McDonnell

5 │ conveyed no Genentech information to any member of the Sanofi team or, indeed, to any

6 │ McDonnell Boehnen employee. (McDonnell Supp. Decl. ¶ 6.)

7 │ Finally, the *Kirk* court's rationale and holding are consistent with California courts' great

8 │ reluctance to disqualify counsel. As the Court acknowledged in the Disqualification Order,

9 │ "Because disqualification is a drastic measure, it is generally disfavored and should only be

10 │ imposed when absolutely necessary." DQ Order at 5. Additionally, "[m]otions to disqualify are

11 │ often tactically motivated and can be disruptive to the litigation process." *Id.*

12 │ It is not necessary to disqualify McDonnell Boehnen in this case. Genentech's confidential

13 │ information has been safeguarded at every step. There is no reason to believe that any confidential

14 │ Genentech information has been transmitted to Sanofi's counsel. No party's interest will be

15 │ advanced by disqualification. Sanofi will be significantly prejudiced by having to educate its new

16 │ counsel at great expense after years of litigation. Genentech may be prejudiced if delays result from

17 │ required review of already-plowed ground; if the Court grants Sanofi's motion for reconsideration,

18 │ however, such delays will be prevented. The administration of justice will likewise suffer. On the

19 │ opposite side of the balance, there is no advantage to disqualification. Genentech's confidential

20 │ information is as safe within the constraints of the ethical wall as it would be following McDonnell

21 │ Boehnen's disqualification. In fact, to the extent that there was ever any risk of disclosure (which

22 │ McDonnell Boehnen denies), that risk has now been eliminated by Dr. McDonnell's resignation

23 │ from McDonnell Boehnen. Consistent with *Kirk*, the Court should allow McDonnell Boehnen to

24 │ continue representing Sanofi in this case.

25 │ ## CONCLUSION

26 │ The California Court of Appeal, in a meticulous, soundly reasoned opinion, has now

27 │ established that California law does not require disqualification of a law firm under the

28 │

circumstances presented here. Dr. McDonnell has resigned from McDonnell Boehnen; McDonnell Boehnen implemented an effective screen which adequately protected any confidential information; and Sanofi will be severely prejudiced by having to replace its counsel at this stage of the proceedings. For the reasons set forth above, Sanofi respectfully requests that the Court reconsider its disqualification order and permit McDonnell Boehnen to continue representing Sanofi in this action.

Dated: April 22, 2010          Respectfully submitted,

                              HARVEY SISKIND LLP
                              D. PETER HARVEY
                              NAOMI JANE GRAY
                              RAFFI V. ZEROUNIAN

                              By: _____/s/_____
                                       Naomi Jane Gray

                              Attorneys for Plaintiff/Counterdefendant
                              SANOFI-AVENTIS DEUTSCHLAND GMBH

SANOFI'S MOTION FOR RECONSIDERATION          CASE NO. C 08-04909 SI (BZ)
OF DISQUALIFICATION ORDER

# Exhibit 1 to
# Sanofi's Motion for Reconsideration
# Of Disqualification Order

Filed 4/7/10

*CERTIFIED FOR PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PATRICK KIRK et al., | B218956 |
| Plaintiffs and Respondents, | (Los Angeles County |
| v. | Super. Ct. Nos. BC372797, BC329482, BC370141, BC382826) |
| THE FIRST AMERICAN TITLE INSURANCE COMPANY et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge.  Reversed with directions.

Horvitz & Levy, David M. Axelrad and Lisa Perrochet; Haight Brown & Bonesteel, Peter Q. Ezzell and Nancy E. Lucas for Defendants and Appellants, The First American Corporation; First American Title Insurance Company, First American Title Company and Sonnenschein Nath & Rosenthal.

The Bernheim Law Firm, Bernie Bernheim, Nazo S. Semerdjian and Wilson K. Park; The Kick Law Firm, Taras Kick, Matthew Hess and Thomas Segal for

Plaintiffs and Respondents, Patrick Kirk, Jeffrey Sjobring, Wendy Kaufman, Elizabeth Wilmot and Jason Munro.

Allen Matkins Leck Gamble Mallory & Natsis and Marvin E. Garrett; Best Best & Kreiger and Robert J. Hanna; Bingham McCutchen and Michael J. Plishner; Boies, Schiller & Flexner and David W. Shapiro; Cooley Godward Kronish and Ann M. Mooney; DLA Piper, William S. Boggs and Stanley J. Panikowski; Dykema Gossett and Alex W. Craigie; Gibson, Dunn & Crutcher, Dean Kitchens and Robert E. Palmer; Gotshal & Manges and Jason D. Kipnis; Greenberg Traurig and Frank E. Merideth, Jr.; Jones Day and Elwood Lui; K&L Gates and Paul W. Sweeney, Jr., Latham & Watkins and Robert J. Malionek; Mayer Brown and Neil M. Soltman; Morrison & Foerster and Douglas L. Hendricks; O'Melveny & Myers and Marvin S. Checov; Orrick, Herrington & Sutcliffe and Lawrence B. Low; Paul, Hastings, Janofsky & Walker and Geoffrey L. Thomas; Perkins Coie and Dan L. Bagatell; Pillsbury Winthrop Shaw Pittman and Ronald E. Van Buskirk; Reed Smith and Margaret M. Grignon; Schiff Hardin and Eliot S. Jubelirer; Sidley Austin and Mark E. Haddad; Weil, King & Spalding and David F. Zimmer, Jr.; attorneys for Amici In Support of Appellants.

Hinshaw & Culbertson, Ronald E. Mallen and Kara Farmer, attorneys for Amici In Support of Respondents.

When an attorney obtains confidential information from a client, that attorney is prohibited from accepting a representation adverse to the client in a matter to which the confidential information would be material.  In this case, we are not concerned with the issue of disqualifying the attorney possessing the material client confidences from representing an adverse party; it is conceded that the attorney is disqualified from doing so.  Instead, we are concerned with the issue of the vicarious disqualification of the attorney's entire law firm.  We conclude that, under the circumstances of this case, *automatic* vicarious disqualification is not required, and that, instead, there is a *rebuttable* presumption that the attorney's knowledge of client confidences is imputed to the firm, which can be refuted by evidence that the law firm adequately screened the attorney from the others at the firm representing the adverse party.  In addition, as the disqualified attorney has left the firm, the trial court's examination of the screen's adequacy should be on a retrospective, not prospective, basis.

## *FACTUAL AND PROCEDURAL BACKGROUND*

### 1.   *The Underlying Litigation*

The instant attorney disqualification dispute arose in the context of four related class actions brought against First American Title Insurance Company and related First American entities (collectively, First American).  Each class action is based on different allegations, although they each challenge business practices of First American as violative of, among other things, various consumer protection laws.[1]  One class action alleges that First American pays kickbacks to lenders for referring business to it.  The

---

[1]      We have greatly simplified the allegations of the underlying actions.

second action alleges that First American imposes title-related or escrow-related fees in excess of the rates First American filed with the California Department of Insurance, and that customers were not given discounts to which they were entitled.  The third action alleges specific fee overcharges (sub-escrow fee, wire transfer fee, messenger fees), kickbacks, and charging customers for one type of policy based on the pricing for a different type.  The fourth action alleges charges for more expensive policies than those sought, and kickbacks.  The first of these four actions was filed on February 25, 2005.  In each case, the plaintiffs were represented by the Bernheim Law Firm and the Kick Law Firm (collectively, plaintiffs' counsel).[2]  Collectively, we refer to the cases as the related class actions.

First American was represented by Bryan Cave, LLP.  Three attorneys at Bryan Cave, Joel D. Siegel, Charles Newman, and Jason Maschmann (the First American team), were primarily responsible for the defense of the related class actions. Newman was first retained as counsel for First American in 1997; he defended against the related class actions from their initial filing.  Together, the First American team has defended First American in 80 class actions across the country, and has also been retained to give legal advice to First American.  The attorneys on the First American team are very familiar with, and have good rapport with, First American's in-house counsel, officers, and management employees.  They "are uniquely and extensively

---

[2]     The first action was brought by the Law Offices of Bernie Bernheim – apparently, the predecessor of the Bernheim Law Firm – and Parisi & Havens LLP.  At some point, Parisi & Havens was substituted out and the Kick Law Firm was substituted in.

knowledgeable about First American's personnel, products, services, data systems, history and organization on a national basis, including . . . California."

The related class action litigation is large, time-consuming, and expensive. A discovery referee was appointed and handled numerous disputes.[3]  The First American team defended hundreds of depositions and reviewed hundreds of thousands of pages of documents.  By April 2009, First American had incurred over $5.5 million in attorney's fees in the related class actions and another $1 million in additional expenses.  The related class actions are extremely complex and have been aggressively litigated.

### 3. *Plaintiffs' Counsel Contact Gary Cohen*

At one time, Gary Cohen had been Deputy Commissioner and General Counsel at the California Department of Insurance.  In October 2007, he was chief counsel for Fireman's Fund Insurance Company.  During that month, plaintiffs' counsel spoke by telephone with Cohen and solicited his services as a consultant in the related class actions, apparently due to his experience at the Department of Insurance.

After introductions by a mutual acquaintance, a 17-minute phone call took place between Cohen and plaintiffs' counsel.  While it is clear that some portion of the conversation was devoted to Cohen's experience and qualifications, it is *undisputed* that plaintiffs' counsel, during this conversation, conveyed confidential information to Cohen material to the related class actions.  Indeed, Attorney Bernheim specifically told

---

[3]     The record includes the discovery referee's *tenth* recommendation, regarding *fourteen* separate motions.

Cohen that plaintiffs' counsel would be discussing confidential information. While the precise content of the information disclosed is not identified, plaintiffs' counsel conveyed attorney work product to Cohen, including plaintiffs' theories of the case, and their concerns regarding defense strategy and tactics. Plaintiffs' counsel also disclosed their estimates of the value of the cases.

Cohen expressed his interest in the related class actions, but indicated that he had to obtain permission from his employer before he could work with plaintiffs' counsel. A series of e-mails followed, the upshot of which was that Cohen declined the consultant position because it was possible that Fireman's Fund had provided Directors and Officers coverage to one or more of the First American entities.[4] Cohen did not, however, cut off all communication with plaintiffs' counsel. Instead, when plaintiffs' counsel asked if, despite Cohen's inability to become plaintiffs' consultant, plaintiffs' counsel could "make contact with [Cohen] one more time regarding [his] thoughts," Cohen responded that he would telephone plaintiffs' counsel later.[5]

Nothing further happened relevant to this matter for more than a year. Then, on December 8, 2008, the law firm of Sonnenschein Nath & Rosenthal LLP (Sonnenschein) issued a press release announcing that Cohen would join its

---

[4]     After Cohen declined, plaintiffs' counsel responded with *further* information about the case, and an offer of "full time employment." We need not consider whether any of the information conveyed *after* Cohen declined the consultant position is to be protected as confidential, as it is undisputed that confidential information was conveyed during the initial 17-minute telephone call.

[5]     It appears that a final telephone call was held, but it was between Cohen and the mutual acquaintance, not plaintiffs' counsel.

San Francisco office as a partner in its insurance regulatory practice group on January 5, 2009.

Upon learning that Cohen would be leaving Fireman's Fund – and the possible conflict associated with that employment – plaintiffs' counsel again e-mailed Cohen and reasserted their interest in hiring him as an expert consultant. On January 12, 2009, after Cohen had moved to Sonnenschein, Cohen responded, stating that he would do a conflicts check and asking for one of the complaints to be sent to him by e-mail. The next day, plaintiffs' counsel sent to Cohen edited versions of the complaints (reducing them to what plaintiffs' counsel believed to be the main issues). Less than a half-hour later, Cohen responded, "It turns out that the firm does represent First American, so I'm afraid that I won't be able to be of any help. I haven't read the attachments to your email and will delete them without having read them." There was no further contact between Cohen and plaintiffs' counsel.

### 4. *The First American Team Moves to Sonnenschein*

On February 2, 2009, the First American team moved from Bryan Cave to Sonnenschein. Siegel moved to Sonnenschein's Los Angeles office, while Newman and Maschmann moved to Sonnenschein's St. Louis office. None of the First American team moved to the San Francisco office, where Cohen was located. Nor does it appear that any of them were part of the insurance regulatory practice group, in which Cohen practiced.

On February 3, 2009, First American filed substitutions of counsel in the related class actions, reflecting that Sonnenschein was now handling its defense, although the

three main attorneys representing First American did not change.  On February 4, 2009, plaintiffs filed a case management statement in which they "objected" to the representation of First American by Sonnenschein, due to their prior confidential consultation with Cohen.  Until that point, the First American team had been unaware of Cohen's prior contacts with plaintiffs' counsel.  That day, Siegel contacted John Koski, a partner in Sonnenschein's Chicago office who serves as the firm's General Counsel and sits on the firm's Ethics Committee.  Koski discussed the matter with Siegel and Newman, and "had a separate, private discussion" with Cohen.  Thereafter, Koski established an ethical screen around Cohen.  That night, Koski sent a memorandum to all attorneys, paralegals, and secretaries at Sonnenschein, setting forth "mandatory screening procedures" for the related class actions.

The screening memorandum recites that it was created to "formalize and memorialize the procedures necessary to assure that no confidences or secrets relating to the [related class actions] will be disclosed, even inadvertently, to [the First American team] or any other Sonnenschein lawyer who may be asked to work on the [related class actions]."  The memorandum indicated that the failure to observe the procedures would subject the offender to discipline.  The memorandum provided that:  (1) Cohen could not work on the related class actions; (2) no attorney or paralegal who may work on the related class actions may discuss them with Cohen; (3) Cohen may not be given non-public documents pertaining to the related class actions; (4) Cohen shall not access any documents on Sonnenschein's computer network pertaining to the related class actions;

8

and (5) no fees from any work related to the related class actions would be apportioned to Cohen.

### 5. *Cohen Works on the Lyons Matter*

The First American team also represents First American in another matter, referred to as the *Lyons* case, which is now pending in the Superior Court for the County of Contra Costa.  (*Lyons v. First American Title Ins. Co.* (Super. Ct. Contra Costa County, No. C08-01850).)  In the *Lyons* case, plaintiffs, who are African-American, claim racially discriminatory pricing policies in connection with the sale of lenders' refinancing title policies.[6]  The *Lyons* plaintiffs are not represented by plaintiffs' counsel in the related class actions.

In January 2009, before the First American team had moved from Bryan Cave to Sonnenschein, it obtained an order in the *Lyons* case staying the action and requiring the plaintiffs to exhaust their administrative remedies with the Department of Insurance.  The *Lyons* plaintiffs thereafter wrote a letter to the Department of Insurance requesting the Department to decline jurisdiction and return the matter to the trial court.  On March 5, 2009, Sonnenschein wrote a letter in opposition.  The letter was written by the First American team, but Cohen had participated in its drafting.  Cohen subsequently admitted billing a total of 3.35 hours to the *Lyons* matter; according to his declaration,

---

[6]     The theory of the *Lyons* case is that First American charged higher fees in connection with "non-prime" loans, and that African-Americans are disproportionately more likely to have a non-prime loan.

9

his involvement "was limited to providing advice as to the best approach to correspond with the Department with respect to the Lyons' claims."[7]

The issue of exhaustion of administrative remedies was also an issue in the related class actions. By the time the First American team moved to Sonnenschein, it had filed and fully briefed demurrers which raised the issue of exhaustion in two of the related class actions, although the court had not yet held a hearing on the demurrers. In April 2009, First American filed additional briefing on the demurrers, calling the trial court's attention to similar favorable rulings in other trial courts, including the trial court order requiring exhaustion it had obtained in the *Lyons* case. As we later discuss, Cohen's work on the *Lyons* matter, and the First American team's subsequent citation to a *Lyons* order in the related class actions, was the cause of substantial concern to the trial court.

6.   *The Disqualification Motion*

On March 18, 2009, plaintiffs moved to disqualify Sonnenschein from further representation of the First American defendants, based on plaintiffs' counsel's prior confidential communications with Cohen. Sonnenschein opposed the motion, although it retained independent counsel to prepare the opposition in order to preserve its ethical wall. Much of the dispute centered on whether plaintiffs' counsel actually conveyed confidential information to Cohen; this is not an issue on appeal. As to whether the entire Sonnenschein firm should be vicariously disqualified, Sonnenschein relied on the

---

[7]     Cohen states that he billed a total of 3.35 hours to the *Lyons* matter "[i]n March and April 2009." As First American's letter was sent on March 5, 2009, it is unclear what work Cohen did on the *Lyons* matter in April, after the letter had been sent.

ethical screening wall it had constructed.  Both Cohen[8] and Siegel[9] submitted

declarations indicating their compliance with the ethical screening wall.  First American

also submitted the declaration of its Senior Vice President and national litigation

counsel, who testified to the key experience of the First American team and their

irreplaceability.  Specifically, he stated that it would cost First American millions of

dollars to retain new counsel sufficiently prepared to defend the related class actions,

"although it would be impossible for new counsel to attain the level of knowledge and

proficiency of First American's current attorneys."

7.    *Order Granting Disqualification*

The trial court ultimately granted the motion for disqualification.  In its order, the

trial court indicated that, "[n]o one is to blame for this situation except perhaps the

itinerant nature of attorneys that has developed over the last fifteen years."  The trial

court found that plaintiffs' counsel disclosed confidential and privileged attorney work

product information to Cohen during the initial 17-minute telephone call, a conclusion

not challenged on appeal.

---

[8]    In his April 20, 2009 declaration in opposition to the disqualification motion, Cohen stated that he never spoke with, or e-mailed, the First American team for any reason other than a brief inadvertent contact at a partner retreat.  When plaintiffs responded with evidence that Cohen had participated in the *Lyons* matter six weeks earlier, Cohen submitted a supplemental declaration indicating that he "provided some very brief assistance" in the *Lyons* matter.  The trial court did not believe that Cohen intentionally hid his work on that matter.  Instead, it concluded that Cohen had simply "forgot[ten]" his work on the *Lyons* case.

[9]    In addition, Siegel declared that neither Newman nor Maschmann had spoken with Cohen regarding the related class actions.  It is not clear why Newman and Maschmann did not provide their own declarations.

11

As to vicarious disqualification, the court reviewed applicable case law, and concluded that, when an attorney possesses disqualifying confidential client information, vicarious disqualification of the law firm is *automatic*, regardless of any ethical screening wall created.

The trial court further concluded, however, that even if California law permitted the use of ethical walls in this context, "there is evidence that the wall Sonnenschein erected has not been a complete success." Specifically, the trial court was concerned about the work Cohen had performed on the *Lyons* matter. The trial court believed that Cohen's work on the *Lyons* matter constituted a breach of the ethical wall, and the fact that Cohen initially forgot about his work on the *Lyons* matter illustrates why California courts are leery of ethical walls. The trial court was careful to state that no party deliberately engaged in unethical behavior, but instead concluded that the ease with which one can accidentally reveal client confidences demonstrates that an ethical wall is insufficient.

Additionally, the trial court indicated that the balance of interests weighed in favor of disqualification. The court recognized "the substantial financial burden disqualification places on [First American], who will have to obtain new counsel and bring them up the learning curve on these very complex cases that have been litigated over a number of years." However, the court found that two competing policy interests outweighed these concerns. Specifically, the court relied on the need for vigorous representation of parties by independent counsel unencumbered by conflicts of interest,

12

and the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.

First American and Sonnenschein[10] filed timely notices of appeal.[11]  Pursuant to a stipulation of the parties, we issued a qualified stay of all trial court proceedings in the related class actions pending our resolution of the predicate question raised by the trial court's disqualification order.  Due to the obvious need to quickly resolve the issue, we have, pursuant to the agreement of the parties, imposed an expedited briefing and oral argument schedule.  In addition, we have permitted various law firms to file amicus curiae briefs on behalf of both First American and Sonnenschein, and plaintiffs.

### ISSUES ON APPEAL

It is undisputed that Cohen possessed confidential client or attorney work product information from plaintiffs' counsel that is material to the related class actions. It is also undisputed that Cohen is disqualified from representing First American in the related class actions.  The first issue presented by this appeal is whether Sonnenschein must be *automatically* vicariously disqualified from representing First American, or if it may avoid vicarious disqualification by the construction of a proper ethical wall. Concluding that vicarious disqualification is not automatic, but may be rebutted by

---

[10]     Although not a party to the underlying action, Sonnenschein, which was disqualified from continuing representation of the First American defendants, has standing to appeal the disqualification order.  Disqualified attorneys themselves have standing to challenge the orders disqualifying them.  (*A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1077.)

[11]     The order granting the motion to disqualify counsel is appealable as a final order on a collateral matter. (*Henriksen v. Great American Savings & Loan* (1992) 11 Cal.App.4th 109, 111, fn. 1.)

a proper ethical wall, we reach the second issue, which is the standards by which

a proper ethical wall is to be judged.  A third issue is raised by a fact which came to

light while this appeal was pending.  Cohen left the Sonnenschein firm, effective

January 15, 2010, to return to government service.  We therefore must also consider the

impact of this fact on the necessary analysis of the important issues raised in this appeal.

## *DISCUSSION*

1.   *Standard of Review*

"A trial court's authority to disqualify an attorney derives from the power

inherent in every court '[t]o control in furtherance of justice, the conduct of its

ministerial officers, and of all other persons in any manner connected with a judicial

proceeding before it, in every matter pertaining thereto.' [Citations.]"  (*People ex rel.*

*Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135,

1145 (*SpeeDee Oil*).)  "A motion to disqualify a party's counsel may implicate several

important interests.  Consequently, judges must examine these motions carefully to

ensure that literalism does not deny the parties substantial justice.  [Citation.]

Depending on the circumstances, a disqualification motion may involve such

considerations as a client's right to chosen counsel, an attorney's interest in representing

a client, the financial burden on a client to replace disqualified counsel, and the

possibility that tactical abuse underlies the disqualification motion."  (*Id.* at

pp. 1144-1145.)  Disqualification motions involve "a conflict between the clients' right

to counsel of their choice and the need to maintain ethical standards of professional

responsibility.  [Citation.]  The paramount concern must be to preserve public trust in

14

the scrupulous administration of justice and the integrity of the bar.  The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." (*Id.* at p. 1145.)

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion.  [Citations.]  If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence.  [Citations.]  When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion.  [Citation.]  However, the trial court's discretion is limited by the applicable legal principles.  [Citation.]  Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law.  [Citation.]  In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion." (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1143-1144.)

2.      *Historical Development of the Law Regarding Vicarious Disqualification*

Generally speaking, the Rules of Professional Conduct govern attorney discipline; they do not create standards for disqualification in the courts.  (*Hetos Investments, Ltd. v. Kurtin* (2003) 110 Cal.App.4th 36, 47.)  Nonetheless, as will be seen in our discussion, courts analyzing questions of disqualification often look to the Rules of Professional Conduct for guidance.

California Rules of Professional Conduct, rule 3-310(E) provides, "A member shall not, without the informed written consent of the client or former client, accept

employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."[12]  While the Model Rules of Professional Conduct promulgated by the American Bar Association (ABA) address the issue of *vicarious* disqualification (see ABA Model Rules Prof. Conduct, rule 1.10), the California Rules of Professional Conduct do not.[13]  Thus, in California, vicarious disqualification rules are the result of decisional law.  (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847.)  It is useful for our analysis that we first discuss the development of California law in this area in some detail.[14]

 a. *Caselaw Initially Provides For a Case-By-Case Analysis*

Our discussion begins with *Chambers v. Superior Court* (1981) 121 Cal.App.3d 893.  In *Chambers*, the Third District Court of Appeal was concerned not with the usual situation of a tainted attorney moving from one private law firm to another, but an attorney moving from government employment to private employment.  It was not established that the tainted attorney actually possessed confidential client information,

---

[12] We again stress that there is no dispute that Cohen is prohibited from representing First American in the related class actions.

[13] Recently, California considered adopting an ethical rule regarding vicarious disqualification, based, in part, on ABA Model Rule 1.10.  However, the Board of Governors ultimately determined not to recommend the adoption of any such rule.  We will briefly discuss the history of the proposed rule below.

[14] In most cases, the issue concerned an attorney who, under the Rules of Professional Conduct, was personally disqualified from the representation of a client at the attorney's new place of employment.  We will refer to that attorney as the "tainted attorney."  It is not necessarily the case, however, that a tainted attorney personally possess confidential client information.

but only that he had had access to it. In considering whether the tainted attorney's conflict should be imputed to the rest of the firm, the court took guidance from the ABA rules regarding disqualification of former government employees. The ABA rules provided that the tainted attorney himself would not be disqualified unless he had " 'substantial responsibility' " for the matter while a public employee. (*Id.* at p. 898.) A formal ethics opinion concluded that this limitation was imposed in order to " 'inhibit government recruitment as little as possible and to enhance the opportunity for all litigants to obtain competent counsel of their own choosing, particularly in specialized areas.' " (*Ibid.*) The ethics opinion went on to conclude, " 'An inflexible extension of disqualification throughout an entire firm would thwart those purposes. So long as the individual lawyer is held to be disqualified and is screened from any direct or indirect participation in the matter, the problem of his switching sides is not present; by contrast, an inflexible extension of disqualification throughout the firm often would result in real hardship to a client if complete withdrawal of representation was mandated, because substantial work may have been completed regarding specific litigation prior to the time the government employee joined the partnership, or the client may have relied in the past on representation by the firm.' " (*Id.* at p. 899.) The ethics opinion specifically expressed concern that if vicarious disqualification were always the rule for former government employees, this would restrict a former government employee's options for future employment, and potentially harm the government's ability to attract talented attorneys. (*Id.* at p. 899.) The *Chambers* court was persuaded by this analysis, and

17

adopted the approach of *not* automatically requiring vicarious disqualification of a former government employee's new law firm. (*Id.* at pp. 902-903.)

The next case relevant to our discussion is *William H. Raley Co. v. Superior Court* (1983) 149 Cal.App.3d 1042. In that case, the plaintiff sued a defendant, the stock of which was entirely owned by a testamentary trust. The trustee of the trust was a bank, which discharged its responsibilities through a committee appointed by its board of directors. The tainted attorney was both a director of the bank and a member of the committee; it was undisputed that the tainted attorney could not represent the plaintiff. The issue was whether the tainted attorney's entire firm was vicariously disqualified from doing so. The court ultimately concluded that the tainted attorney's attempt at ethical walls (both at the firm and the bank) did not sufficiently outweigh the risk to the defendant's confidential information, and therefore mandated vicarious disqualification of the firm. (*Id.* at p. 1049.)

Important for our analysis, however, is the fact that the court did not apply an absolute rule of vicarious disqualification. The court concluded that "[a]utomatic or mechanical application of the vicarious disqualification rule can be harsh and unfair to both a law firm and its client." (*Id.* at p. 1049.) Instead, the court reasoned that "[t]he better approach is to examine the circumstances of each case" in light of the applicable competing interests. (*Id.* at p. 1049.) "The court must weigh the combined effect of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair

18

resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest. [Citations.]  In a case such as this the court also must consider in favor of disqualification the disruptive effect of repeated disqualification proceedings on the administrative process of the court [citation] and the financial burden of such proceedings on the moving party." (*Id.* at p. 1048.)

In 1984, the same court which had decided *Chambers* returned to the issue of vicarious disqualification in *Dill v. Superior Court* (1984) 158 Cal.App.3d 301.  The tainted attorney in that case had been personally involved with the representation of a plaintiff (taking depositions and appearing at a hearing), and subsequently left the firm and began working at the firm representing the defendant.  The defendant's firm argued that the appellate court had rejected vicarious disqualification in *Chambers*.  (*Id.* at p. 304.)  The court disagreed, and distinguished *Chambers* on three grounds:  (1) the tainted attorney in *Dill* had actually performed legal work on behalf of his former client in the same matter; (2) vicarious disqualification of a former government employee's firm "is not imposed as strictly as it is in other instances"; and (3) any appearance of impropriety in *Chambers* by the firm's continued representation "was greatly outweighed by the benefits to the judicial process of representation by an attorney with relevant governmental experience." (*Id.* at pp. 305-306.)  In this case, the court concluded that the tainted attorney's "personal involvement" on the former client's behalf in the identical litigation compelled vicarious disqualification of the firm.  (*Id.* at p. 306.)  The *Dill* court, however, did not adopt an absolute rule of vicarious

disqualification in all situations not involving former government attorneys.  Instead, the court found compelling the fact that the tainted attorney was personally involved on the adverse party's behalf in the same litigation.

In *Klein v. Superior Court* (1988) 198 Cal.App.3d 894, the Sixth Appellate District held that when a tainted attorney actually possesses confidential client information, and there has been no attempt to screen him from the litigation from which he is disqualified, vicarious disqualification of the firm is mandated.  (*Id.* at pp. 913-914.)  The court observed that, with the exception of former government attorneys, no California case appeared to have permitted disqualification of a tainted attorney without disqualifying the entire firm.  (*Id.* at pp. 912-913.)  Nonetheless, the court distilled from *Chambers* the rule that an ethical screen "can suffice, in a proper case.  The test is whether the individual attorney had any responsibility over matters related to the instant action or had acquired confidential information regarding the action and whether the firm had taken sufficient protective measures to screen the attorney from participation."[15]  (*Id.* at p. 909.)

> b.   *Henriksen Concludes That, in Certain Circumstances, Vicarious Disqualification is Mandatory*

The next development came in 1992, in *Henriksen v. Great American Savings & Loan*, *supra*, 11 Cal.App.4th 109 (*Henriksen*).  This case concerned a tainted attorney

---

[15]    A subsequent case cited *Klein* for the proposition that the courts "disagree on whether vicarious disqualification should be automatic in attorney conflict of interest cases, or whether a presumption of shared confidences should be rebuttable."  (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 593.)  We do not see *Klein* recognizing such a split in authority, but rather acknowledging that the presumption is rebuttable, but had rarely been found to have been rebutted.

who had switched sides in the same case; the trial court disqualified the new firm, even though the firm had attempted to isolate the tainted attorney.  In *Henriksen*, Division Four of the First Appellate District affirmed the firm's vicarious disqualification, setting forth an absolute rule that ethical walls are not sufficient, and vicarious disqualification is mandatory, when the tainted attorney:  (1) is a nongovernmental attorney; (2) who formerly represented, and therefore possesses confidential information from, a party; and (3) who switches sides in the same case.  (*Id.* at p. 115, 117.)  This rule is certainly in line with the holding in *Dill*, but appears to be the first time an *absolute rule* of vicarious disqualification was set forth in a California opinion.

      c.    *The Supreme Court, in Dicta, Appears to Adopt and Extend Henriksen to All Cases of Vicarious Disqualification*

In 1994, the Supreme Court addressed a problem relating to the duty of attorney loyalty.  (*Flatt v. Superior Court* (1994) 9 Cal.4th 275 (*Flatt*).)[16]  In the course of its discussion, the Supreme Court distinguished the duty of *loyalty*, which was at issue in that case, from the duty of client *confidentiality*, which is at issue in cases of vicarious disqualification.  To properly understand *Flatt* in context, however, it is necessary to briefly discuss the "substantial relationship" test.  When it is alleged by a former client that its former attorney possesses material confidential information and is therefore

---

[16]    In *Flatt, supra,* 9 Cal.4th at pp. 278-279, an attorney interviewed a prospective client regarding a suit the prospective client wanted to bring.  The attorney then realized that the target of the action was another client.  The attorney declined the new representation, without advising the prospective client regarding the statute of limitations or that new counsel should be sought.  The issue before the Supreme Court was whether the duty of client loyalty had *prohibited* the attorney from giving such advice to the prospective client, which would have harmed the existing client.

21

disqualified from representing an adversary in *another* case, it is difficult for the former client to establish, as a factual matter, "what is in the mind of the attorney."  (*Western Continental Operating Co. v. Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 759-760.) The courts have therefore established a test, under which, if the former client can demonstrate a substantial relationship between the subjects of the former and the current representations, it is presumed that the attorney had access to confidential information in the first representation which is relevant to the second representation.  (*Flatt, supra,* 9 Cal.4th at p. 283.)

In discussing the substantial relationship test in *Flatt*, the Supreme Court stated that once the test is met, "disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm." (*Id.* at p. 283.)  The Supreme Court cited *Henriksen* for the proposition that vicarious disqualification is compelled as a matter of law.  (*Ibid.*)  The *Flatt* case, however, was not concerned with whether a tainted attorney's law firm was subject to vicarious disqualification.

"[O]ur Supreme Court's decisions bind us, and its dicta command our serious respect.  [Citations.]  However, 'language contained in a judicial opinion is " 'to be understood in the light of the facts and issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]' " [Citations.]'  [Citation.] When questions about an opinion's import arise, the opinion 'should receive a reasonable interpretation [citation] and an interpretation which reflects the circumstances under which it was rendered [citation]' [citation], and its statements

should be considered in context [citation]." (*Dyer v. Superior Court* (1997)

56 Cal.App.4th 61, 66.)

In the context of *Flatt*, the Supreme Court's citation of *Henriksen* with approval

and statement of a rule of automatic vicarious disqualification should not be read as

a binding adoption of a rule of automatic vicarious disqualification *in all circumstances*,

as the issue was not then before the Supreme Court.  Indeed, as we will now discuss, the

Supreme Court itself has subsequently indicated that the question of whether vicarious

disqualification can be overcome by the creation of an ethical wall is still an open one.

Prior to that indication, however, appellate courts rejected attempts to avoid vicarious

disqualification with the creation of ethical screening walls simply by quoting the

language of *Flatt*.  (See, e.g., *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*

(1999) 69 Cal.App.4th 223, 238.)

      d.    *The Supreme Court Recognizes that Whether Vicarious*
              *Disqualification is Always Absolute is Still an Open Question*

In 1999, the issue of vicarious disqualification was more directly presented to the

Supreme Court in *SpeeDee Oil, supra*, 20 Cal.4th 1135.  In setting forth the issue

presented by that case, the court stated, "When a conflict of interest requires an

attorney's disqualification from a matter, the disqualification normally extends

vicariously to the attorney's entire law firm.  (See *Flatt*[, *supra*, 9 Cal.4th at p. 283].)

This rule safeguards clients' legitimate expectations that their attorneys will protect

client confidences.  (*Id.* at pp. 283-284.)  Here, we decide whether the same rule should

apply when a party unknowingly consults an attorney 'of counsel' to the law firm

23

representing the party's adversary in the subject of the consultation." (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1139.)

The Supreme Court reasoned, "For attorneys in the same firm to represent adverse parties in the same litigation is so patently improper that the rule of disqualification is a per se or 'automatic' one. (See *Flatt, supra,* 9 Cal.4th at p. 284, fn. 3 and accompanying text.[17])" (*Ibid.*) "When attorneys presumptively share access to privileged and confidential matters because they practice together in a firm, the disqualification of one attorney extends vicariously to the entire firm. (*Flatt, supra,* 9 Cal.4th at p. 283.) The vicarious disqualification rule recognizes the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." (*Id.* at pp. 1153-1154.) "Conflicting representations that would disqualify all of a law firm's attorneys are not more acceptable when an attorney of counsel to the firm creates the conflict. Clients, and the public, should expect confidentiality and loyalty from attorneys who effectively declare they practice law in a close, personal, and continuing association.[18] These legitimate expectations would be frustrated if a firm could represent one party in litigation while an attorney of counsel to the firm represented an adversary in the same case." (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1139-1140.)

---

17      The reference is to a discussion in *Flatt* of the breach of the duty of *loyalty* which occurs by the simultaneous representation of clients whose interests are directly adverse in the same litigation.

18      Under California Rules of Professional Conduct, rule 1-400(E), std. (8), an attorney cannot represent another attorney as "of counsel," unless there is a relationship which is "close, personal, continuous, and regular."

After the Supreme Court concluded that the firm should be vicariously disqualified, the court went on to state, "In any event, we need not consider whether an attorney can rebut a presumption of shared confidences, and avoid disqualification, by establishing that the firm imposed effective screening procedures." (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1151.) The Supreme Court found it unnecessary to reach this issue in *SpeeDee Oil* because the court concluded that the firm failed to demonstrate an effective screening process had been established. Nonetheless, the Supreme Court's language suggests that it believed that the question of whether an effective screening wall may rebut the presumption of vicarious disqualification was a question it had not yet resolved.

### e. *More Recent Opinions Are Not Consistent*

In the years following the *SpeeDee Oil* opinion, courts have differed in their response to its language regarding the issue of ethical walls.[19] Some courts have stated that the rule of vicarious disqualification applies *in the absence of an effective ethical screen.* (*Farris v. Fireman's Fund Ins. Co.* (2004) 119 Cal.App.4th 671, 689, fn. 17; *Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1333.) Other courts, however, have continued to state that the rule of vicarious disqualification is absolute. (See, e.g., *City of Santa Barbara v. Superior Court* (2004) 122 Cal.App.4th 17, 24; *Frazier v. Superior Court* (2002) 97 Cal.App.4th 23, 30.)

---

[19] Federal cases have taken the position that automatic vicarious disqualification is still the rule in California, but *SpeeDee Oil* is a sign that the California courts may shift. (*In re County of Los Angeles* (9th Cir. 2000) 223 F.3d 990, 995; *UMG Recordings, Inc. v. MySpace, Inc.* (C.D.Cal. 2007) 526 F.Supp.2d 1046, 1060-1061.)

The Supreme Court itself granted review in a case that raised the issue of whether, when a private attorney is personally disqualified from participation in a matter due to prior adverse representation not arising from public employment, the attorney's entire firm must be disqualified or if disqualification may be averted by appropriate screening techniques. (*Panther v. Park*, review granted Sept. 19, 2002, S110025.) Review was dismissed, however, on January 15, 2003, after the client dismissed the writ proceeding challenging the representation.

In 2006, the Supreme Court considered the issue of the vicarious disqualification of an entire City Attorney's office as the City Attorney himself was the tainted attorney. The court concluded that the City Attorney cannot be effectively screened from his entire office. (*City and County of San Francisco v. Cobra Solutions, Inc., supra*, 38 Cal.4th at pp. 853-854.) In the course of its discussion, the court cited *SpeeDee Oil* for the proposition that a conflict is normally imputed to the tainted attorney's entire firm on the rationale that attorneys practicing together generally share each other's, and their clients', confidential information. (*Id.* at pp. 847-848.) This language prompted a dissent by Justice Corrigan, joined by Chief Justice George, stating that the automatic disqualification rule "is being questioned even in the private practice context," due to increases in attorney mobility and firm mergers. (*Id.* at p. 855 (dis. opn. of Corrigan, J.).)

In 2008, we stated, "[c]urrently, in the context of private law firms, there is no definitive California authority authorizing ethical walls." (*Sharp v. Next Entertainment, Inc.* (2008) 163 Cal.App.4th 410, 438, fn. 11.) Most recently, we addressed the issue in

26

*Meza v. H. Muehlstein & Co.* (2009) 176 Cal.App.4th 969 (*Meza*), a case involving a tainted attorney possessing confidential information who switched sides in the same lawsuit. Relying on *Henriksen*, *Flatt*, and the Supreme Court's rationale for vicarious disqualification in *SpeeDee Oil*, we concluded that "an 'ethical wall' between an attorney with confidential information and his or her firm will generally not preclude the disqualification of the firm. [Citation.] Instead, there is a presumption that each member of the firm has imputed knowledge of the confidential information." (*Id.* at p. 979.) Although we stated that an ethical wall will *generally* not preclude disqualification, we did not address in what circumstances an ethical wall *may* preclude disqualification, or whether the presumption can ever be rebutted.

       3.   *Distillation of the Current State of the Law*

     In very brief summary, the history of the law of vicarious disqualification appears to be as follows: (1) appellate courts initially concluded vicarious disqualification was not automatic, but instead subject to a balancing test; (2) *Henriksen* concluded the burden of rebutting the presumption of imputed knowledge simply could not be established in the case of a tainted attorney who represented one party and switched sides in the same case; (3) the Supreme Court favorably cited *Henriksen* and appeared to state a rule of automatic vicarious disqualification any time material confidential information was presumed to be held by the tainted attorney (*Flatt*); (4) the Supreme Court subsequently suggested that whether vicarious disqualification can be avoided by a proper ethical wall was still an open question (*SpeeDee Oil*); and (5) the Supreme Court has never directly addressed the issue on the merits.

27

Given this history, we conclude that it is improper to rely on *Flatt* as creating an absolute rule of vicarious disqualification in California. Instead, we believe that neither *Flatt* nor *SpeeDee Oil* addressed the issue of whether vicarious disqualification is absolute, and the state of the law is that as initially expressed by the appellate courts: (1) a case-by-case analysis based on the circumstances present in, and policy interests implicated by, the case; (2) tempered by the *Henriksen* rule that vicarious disqualification should be automatic in cases of a tainted attorney possessing actual confidential information from a representation, who switches sides in the same case.[20]

We do not doubt that vicarious disqualification is the *general* rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in the proper circumstances, the presumption is a rebuttable one, which can be refuted by evidence that ethical screening will effectively prevent the sharing of confidences in a particular case.

---

[20]   The *Henriksen* rule is based on an understanding that in the most extreme cases of direct conflict, no amount of ethical screening can rebut the presumption of imputed knowledge. While *Henriksen* considered the circumstances of an attorney who obtained numerous client confidences while fully participating in the representation of the client, joining a firm opposing the client in the same case, we need not determine if that is the *only* scenario in which the presumption should be conclusive.

*Pound v. DeMera DeMera Cameron* (2005) 135 Cal.App.4th 70, 74, 76-77, stated that *Henriksen* applies to an attorney who switched sides in a case some three years after a one-hour meeting with counsel for the other side. We disagree with *Pound* to the extent it sees no qualitative distinction between an attorney who had a brief preliminary meeting with counsel for the first client and an attorney who was actively involved with the first client's representation. In any event, *Pound* did not consider whether the presumption could be rebutted by an appropriate ethical wall, as there had been no attempt made to isolate the tainted attorney; indeed, in that case, the tainted attorney was subsequently *associated as counsel* for the second, opposing, client. (*Id.* at p. 77.)

28

4.     *Other Considerations Support This Conclusion*

While we believe our interpretation of the law follows from our analysis of its historical development, this much seems clear:  the Supreme Court has not considered and definitively decided whether the presumption of imputed knowledge can be rebutted in a non-governmental attorney context with evidence of an ethical wall.  We therefore consider three factors which lead us to conclude ethical walls should be recognized in California:  (1) changing realities in the practice of law which undermine the rationale for an automatic rule of vicarious disqualification; (2) California's favorable experience with ethical walls in other circumstances; and (3) an understanding of policy considerations which supports the recognition of ethical walls in the proper cases.

a.     *Changing Realities are Undermining the Rationale for an Automatic Rule of Vicarious Disqualification*

(1)     *Courts Are Recognizing the Changing Circumstances*

As expressed by the Supreme Court, the vicarious disqualification rule is based on a recognition of "the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1153-1154.)  This "is not so much a conclusive presumption that confidential information has passed as a pragmatic recognition that the confidential information will work its way to the nontainted attorneys at some point." (*Goldberg v. Warner/Chappell Music, Inc.* (2005) 125 Cal.App.4th 752, 765.)

29

But several cases have questioned this paradigm as representing an outdated view of the practice of law.  (*City and County of San Francisco v. Cobra Solutions, Inc., supra,* 38 Cal.4th at p. 855 (dis. opn. of Corrigan, J.) ["The automatic disqualification rule arose in the context of private practice, at a time when it was relatively uncommon for attorneys to move from one firm to another.  Thus, the rule's burdens were relatively light.  Now, however, attorney mobility and firm mergers have increased exponentially.  Accordingly, the automatic disqualification rule is being questioned even in the private practice context."];  *Adams v. Aerojet-General Corp., supra,* 86 Cal.App.4th at p. 1336 ["Large law firms . . . are becoming ever larger, opening branch offices nationwide or internationally, and merging with other large firms.  Individual attorneys today can work for a law firm and not even know, let alone have contact with, members of the same firm working in a different department of the same firm across the hall or a different branch across the globe."];  *In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 586 ["In the era of large, multioffice law firms and increased attention to the business aspects of the practice of law, we must consider the ability of attorneys . . . to change employment for personal reasons or from necessity."];  *In re County of Los Angeles, supra,* 223 F.3d at p. 997 ["The changing realities of law practice call for a more functional approach to disqualification than in the past."].)  The instant case illustrates the changing landscape of legal practice -- we are concerned with the tainted attorney working in a different geographical office and in a different practice group from the attorneys with responsibility for the litigation.  These are not attorneys discussing their cases regularly, passing each other in the hallways, or at risk of

accidentally sharing client confidences at lunch.  In a situation where the "everyday reality" is no longer that all attorneys in the same law firm actually "work[] together," there would seem to be no place for a rule of law based on the premise that they do.[21]

      (2)    *Other Jurisdictions Are Also Recognizing and Adapting to the Changing Reality*

Other states are very nearly split evenly as to whether to permit ethical screening of attorneys moving from one private law firm to another.  Twelve states have adopted rules of professional conduct permitting such screening with no limitations based on the scope of the disqualified attorney's prior involvement in the representation.  (Del. Rules Prof. Conduct, rule 1.10; Ill. Rules Prof. Conduct, rule 1.10; Ky. Supr. Ct. Rules, rule 3.130(1.10); Md. Rules Prof. Conduct, rule 1.10; Mich. Rules Prof. Conduct, rule 1.10; Mont. Rules Prof. Conduct, rule 1.10; N.C. Rules Prof. Conduct, rule 1.10; Or. Rules Prof. Conduct, rule 1.10; Pa. Rules Prof. Conduct, rule 1.10; R.I. Rules Prof. Conduct, rule 1.10; Utah Rules Prof. Conduct, rule 1.10; Wash. Rules Prof. Conduct, rule 1.10.)  An additional twelve states have adopted rules permitting screening when the disqualified attorney was not substantially involved in the prior representation, or

---

[21]    We note here that amici in support of plaintiffs argue that while the paradigm may be changing for large law firms, the vast majority of California attorneys practice in small firms, and judicial recognition of a rule permitting ethical screening may lead attorneys in small firms to attempt ethical screening in situations in which it cannot be accomplished successfully.  We therefore wish to emphasize that we are not adopting a broad rule permitting ethical screening in all cases.  In this case, we are simply holding that, consistent with prior authority, *in the proper situation*, ethical screening may be sufficient to rebut the presumption of imputed knowledge.  That some attorneys may attempt ethical screening in practices where it could not possibly work is not a sufficient basis to prohibit ethical screening in situations where it may; this is particularly the case when the unnecessary vicarious disqualification of an entire law firm would work a severe hardship on the client deprived of counsel of its choice.

31

under other similar limitations on the attorney's prior involvement.[22]  (Ariz. Ethics

Rules, rule 1.10; Colo. Rules Prof. Conduct, rule 1.10; Ind. Rules Prof. Conduct,

rule 1.10; Mass. Rules Prof. Conduct, rule 1.10; Minn. Rules Prof. Conduct, rule 1.10;

Nev. Rules Prof. Conduct, rule 1.10; N.J. Rules Prof. Conduct, rule 1.10; N.M. Rules

Prof. Conduct, rule 16-110; N.D. Rules Prof. Conduct, rule 1.10; Ohio Rules Prof.

Conduct, rule 1.10; Tenn. Rules Prof. Conduct, rule 1.10; Wis. Supr. Ct. Rules,

rule 20:1.10.)

  That nearly half of the states have chosen to permit some level of ethical

screening in the non-governmental attorney context demonstrates a growing

understanding that law is often practiced in firms in which effective screening is

---

[22] Moreover, 36 states and the District of Columbia permit ethical screening when the confidential information was conveyed by a former *prospective* client, although these rules generally apply only when the attorney took reasonable measures to avoid exposure to more information than was reasonably necessary to determine whether to accept the representation – a circumstance which arguably did not occur in the instant case.  (Alaska Rules Prof. Conduct, rule 1.18; Ariz. Rules Prof. Conduct, rule 1.18; Ark. Rules Prof. Conduct, rule 1.18; Colo. Rules Prof. Conduct, rule 1.18; Conn. Rules Prof. Conduct, rule 1.18; Del. Rules Prof. Conduct, rule 1.18; D.C. Rules Prof. Conduct, rule 1.18; Fla. Bar Rules 4-1.18; Ill. Rules Prof. Conduct, rule 1.18; Ind. Rules Prof. Conduct, rule 1.18; Iowa Court Rules, rule 32:1.18; Ky. Supr. Ct. Rules, rule 3.130(1.18); La. Rules Prof. Conduct, rule 1.18; Me. Rules Prof. Conduct, rule 1.18; Md. Rules Prof. Conduct, rule 1.18; Minn. Rules Prof. Conduct, rule 1.18; Mo. Rules Prof. Conduct, rule 4-1.18; Mont. Rules Prof. Conduct, rule 1.20; Neb. Rules Prof. Conduct, § 3-501.18; Nev. Rules Prof. Conduct, rule 1.18; N.H. Rules Prof. Conduct, rule 1.18; N.J. Rules Prof. Conduct, rule 1.18; N.M. Rules Prof. Conduct, rule 16-118; N.Y. Rules Prof. Conduct, rule 1.18; N.C. Rules Prof. Conduct, rule 1.18; Ohio Rules Prof. Conduct, rule 1.18; 5 Okla. Stats. § Rule 1.18 (OSCN 2010) Appendix 3-A; Or. Rules Prof. Conduct, rule 1.18; Pa. Rules Prof. Conduct, rule 1.18; R.I. Rules Prof. Conduct, rule 1.18; S.C. Rules Prof. Conduct, rule 1.18; S.D. Rules Prof. Conduct, rule 1.18; Utah Rules Prof. Conduct, rule 1.18; Vt. Rules Prof. Conduct, rule 1.18; Wash. Rules Prof. Conduct, rule 1.18; Wis. Supr. Ct. Rules, rule 20:1.18; Wyo. Rules Prof. Conduct, rule 1.18.)

possible.  In 2009, the ABA Model Rules of Professional Conduct were modified to permit screening of a tainted (non-former-governmental) attorney at a private law firm. ABA Model Rule 1.10 had, for many years, provided for the vicarious disqualification of a law firm when a lawyer in that firm would be prohibited from representing the client due to a conflicting former representation.  In February 2009, however, the ABA modified Model Rule 1.10 to permit the law firm to accept the representation if the disqualified lawyer is timely and adequately screened.  (ABA Model Rules Prof. Conduct, rule 1.10(a)(2).)  This change was made after the ABA Standing Committee on Ethics and Professional Responsibility had inquired of states permitting screening and learned that their experience demonstrated "that properly established screens are effective to protect confidentiality."  (ABA Standing Committee on Ethics and Professional Responsibility, Recommendation 109 (February 16, 2009) p. 11.)

> ### (3) *The State Bar's Consideration and Ultimate Rejection of a New Ethical Rule Illustrates the Growing Recognition of the Changing Reality*

In September 2009, the California Commission for the Revision of the Rules of Professional Conduct circulated for public comment a proposed Rule 1.10, which would govern discipline for imputed conflicts of interest (Former Proposed Rule 1.10). (Commission for the Revision of the Rules of Professional Conduct, State Bar of California, Proposed Amendments to the Rules of Professional Conduct of the State Bar

of California (Discussion Draft, Sept. 2009) pp. 127-149.)  Former Proposed Rule 1.10 was based on ABA Model Rule 1.10.[23]

Former Proposed Rule 1.10 provided for imputed conflicts of interest, without adopting the Model Rule's exception for screening.  However, the introduction to the draft proposed rule indicated, "the Commission is equally divided on the issue of permitting screening in limited situations to facilitate the mobility of lawyers who were only peripherally involved in the matter.  [Citation.]  The Commission is interested in receiving input from the public and the profession on this issue and will specifically solicit public comment on whether California should sanction any kind of non-consensual ethical screening."  (Commission for the Revision of the Rules of Professional Conduct, State Bar of California, Proposed Amendments to the Rules of Professional Conduct of the State Bar of California (Discussion Draft, Sept. 2009) p. 129.)

"After initial public comment distribution, the Commission recommended adoption of a modified version of Model Rule 1.10 that would have permitted, in limited circumstances [those in which the attorney had not 'substantially participated' in the prior representation], the screening of a lawyer who moves from one private firm to

---

[23]     California is currently considering the adoption of a rule, based on ABA Model rule 1.18, which would permit ethical screening in the circumstance where confidential information was obtained from a prospective client, as long as the attorney took reasonable measures to avoid exposure to more information than was reasonably necessary to determine whether to represent the prospective client.  (Commission for the Revision of the Rules of Professional Conduct, State Bar of California, Proposed Amendments to the Rules of Professional Conduct of the State Bar of California (Discussion Draft, January 2010) p. 147.)  However, there is disagreement within the Commission over whether such screening should be permitted.  (*Id.* at pp. 145-146.)

another.  However, a minority of the Commission took the position that no rule which

provides that an ethical wall could effectively rebut the presumption of shared

confidences in context of a lawyer moving from one private firm to another should be

adopted. The Board of Governors Committee on Regulation and Admissions considered

the Commission's recommendation (including the view of the Commission minority) at

its March 5, 2010 meeting and the Board Committee determined not to recommend that

the Board [of Governors] adopt any part of the proposed rule, including that part of the

rule which addressed the concept of imputation of one lawyer's prohibition to other

members in the firm.  As to the screening provision, the Board Committee observed that

the concept of ethical walls, in the context of lateral attorney movement from one

private law firm to another, was an unsettled issue in California.  As to the provisions

concerning imputation, the Board concluded that the concept of imputation is

well-settled in California case law and that a Rule of Professional Conduct was not

necessary.  In accordance with the Board Committee's action, a California version of

Model Rule 1.10 is not being recommended for adoption." (State Bar Commission for

the Revision of the Rules of Professional Conduct, Rules and Concepts that were

Considered, but are Not Recommended for Adoption (March 2010) p. 11

<http://www.calbar.ca.gov/calbar/pdfs/ethics/RPC/RRCPubComConceptsConsideredRe

jected.pdf> [as of March 29, 2010].)

  We agree with the Board of Governors that the issue of whether attorney

screening can overcome vicarious disqualification in the context of an attorney moving

between private law firms is not clearly settled in California law.  We find it significant,

35

however, that a majority of the Commission for the Revision of the Rules of

Professional Conduct believed that screening *should* be ethically permissible in limited

circumstances.

      b.   *California's Experience in Other Contexts Suggests that*
             *Ethical Screening in Private Law Firms Can Be Effective*

      It is undisputed that the presumption of imputed knowledge is uniformly

rebuttable and may be overcome by a proper ethical screen when the issue arises in the

context of government and former government attorneys.[24]  (*In re Charlisse C.* (2008)

45 Cal.4th 145, 162, *Chambers v. Superior Court, supra,* 121 Cal.App.3d at

pp. 902-903.)  Yet if ethical screening can, in any given case, be considered effective to

screen a former government attorney in a private law firm, it gives rise to the question

why screening cannot be equally effective to screen a private attorney in the same

---

[24]     In cases of a tainted attorney working in a government office, the courts have concluded the following policy considerations justify the use of only a rebuttable presumption of imputed knowledge:  (1) public sector attorneys do not have a financial interest in the matters on which they work, so have less of an incentive than private attorneys to breach client confidences; (2) public sector attorneys do not recruit clients or accept fees, so have no financial incentive to favor one client over another; (3) disqualification increases the costs for public entities, raising the possibility that litigation decisions will be driven by financial considerations rather than the public interest; and (4) automatic vicarious disqualification will restrict the government's ability to hire attorneys with relevant private sector experience.  (*City of Santa Barbara v. Superior Court, supra,* 122 Cal.App.4th at pp. 24-25.)  We note that, except for the last consideration, none of the other three could possibly apply in the context of a *former* government attorney working in a *private* law firm.  Nonetheless, courts have not hesitated to apply only a rebuttable presumption of imputed knowledge in those cases as well.  (*Chambers v. Superior Court, supra,* 121 Cal.App.3d at pp. 898-901.)

private law firm.  The effectiveness of the screening process depends on the policies

implemented by the law firm, not on the former employment of the screened attorney.[25]

There is another context in which a rebuttable presumption of imputed

knowledge -- and therefore, the use of ethical screens -- has been adopted, that of the

tainted *non-attorney employee*.  When a tainted non-attorney employee of a law firm,

possessing confidential case information, moves to an opposing law firm, vicarious

disqualification of the opposing law firm is not necessary if the employee is effectively

screened.  (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at pp. 579, 593,

596.)  The same rule applies to a non-retained expert, who is then employed by the

opposing side.[26]  (*Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th

1067, 1084-1085.)  Indeed, a rebuttable presumption applies *within an expert firm*,

allowing an expert firm to ethically screen an expert who interviewed with a plaintiff

---

[25]    We note that Cohen is a former government attorney.  The law cannot possibly
be that Sonnenschein could effectively screen Cohen if he was tainted from information
obtained when he worked for the Department of Insurance, but cannot effectively screen
him if he was tainted from information obtained when he worked for Fireman's Fund.

[26]    For this reason, First American suggests that the rebuttable presumption of
imputed knowledge should apply in this case, as Cohen allegedly had been interviewed
by plaintiffs' counsel as a *consultant*, not as an *attorney*.  This argument appears to have
been impliedly foreclosed by the Supreme Court in *SpeeDee Oil*.  There, the "of
counsel" attorney was to have been "retain[ed] as a consultant."  (*SpeeDee Oil, supra,*
20 Cal.4th at p. 1141.)  Nonetheless, the Supreme Court concluded that the "of counsel"
attorney had formed an attorney-client relationship, and applied the ethical rules
governing attorneys to the situation.  (*Id.* at pp. 1148, 1152.  See also Vapnek, et al,
California Practice Guide: Professional Responsibility (The Rutter Group 2009) ¶ 3:81,
p. 3-33 (rev. #1, 2009) [hiring an attorney as a consultant to give advice with respect to
a particular client may create an attorney-client relationship between the consultant
attorney and the hiring attorney and/or the client].)

from an expert retained by the defendant in the same matter.  (*Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1485.)

In all of these situations -- government employees, former government employees, non-attorney employees, experts, and expert firms -- the presumption of imputed knowledge is rebuttable, not conclusive.  Moreover, the use of a rebuttable presumption is not justified as a "necessary evil" in order to advance important policy considerations.  Instead, the rebuttable presumption is accepted because it is believed that, under the proper circumstances, ethical screening can work.  There is no legitimate reason to believe that the same screening could not work in the context of private attorneys at a private firm.  For example, in *City of Santa Barbara v. Superior Court, supra,* 122 Cal.App.4th at p. 27, the court upheld an ethical wall in a government office, and stated, "*Like all attorneys,* [the tainted attorney] knows that her participation and use of confidential information against a former client would subject her to a host of problems including tort liability and state bar discipline.  Such conduct would be a recipe for financial and professional suicide.  We are confident that an attorney's oath and the severe consequences that would inexorably flow from a breach thereof, coupled with [an effective] 'ethical wall,' are sufficient to safeguard the former clients' confidences and preserve the integrity of the judicial process."  (Emphasis added.)  We agree.  These same considerations, and a proper ethical wall, can also be sufficient in the case of a tainted private attorney at a private firm.

c.    *Policy Considerations*

Plaintiffs argue that there should be an irrebuttable presumption of imputed

knowledge and automatic disqualification in order to "preserve public trust in the

scrupulous administration of justice and the integrity of the bar."[27]   (See *SpeeDee Oil,*

*supra,* 20 Cal.4th at p. 1145.)  We agree that preservation of the public trust is a policy

consideration of the highest order.  However, it is *just one* of the many policy interests

which must be balanced by a trial court considering a disqualification motion, and we

are not prepared to say that this interest *always* outweighs the opposing party's right to

counsel of its choice.  We reiterate the policy considerations to be taken into

consideration in a motion for disqualification:  (1) a client's right to chosen counsel;

(2) an attorney's interest in representing a client; (3) the financial burden on a client to

replace disqualified counsel; (4) the possibility that tactical abuse underlies the

disqualification motion;[28] (5) the need to maintain ethical standards of professional

---

[27]    Additionally, amici in support of plaintiffs argue that even if an ethical wall may
be factually effective, the presence of a tainted attorney at opposing counsel's firm gives
rise to an appearance of impropriety which the courts should not countenance.
California courts, however, are in agreement that the mere *appearance* of a conflict is
not sufficient to justify disqualifying an attorney from a representation.  (See *In re*
*Jasmine S.* (2007) 153 Cal.App.4th 835, 843; *Hetos Investments, Ltd. v. Kurtin, supra,*
110 Cal.App.4th at p. 40; *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291,
306-307.)

[28]    When setting forth these factors in *SpeeDee Oil*, the Supreme Court noted that
two of the interests -- possible tactical abuse in the bringing of the motion, and the
financial burden on the client to replace disqualified counsel -- were not present in the
case before it.  (*Id.* at p. 1145, fn. 2.)  The Supreme Court was careful to distinguish the
case before it from cases where a party "attempt[s] to disrupt the case at a critical
juncture" by belatedly moving for disqualification, or where a party "trie[s] to increase
an opponent's litigation burden by seeking disqualification only after the challenged

responsibility; and (6) the preservation of public trust in the scrupulous administration

of justice and the integrity of the bar.  (*SpeeDee Oil, supra,* 20 Cal.4th at

pp. 1144-1145.)

In this regard, we find persuasive the following analysis of the ABA Standing

Committee on Ethics and Professional Responsibility:  "[F]raming the issue of

imputation as a choice between client protection and lawyer mobility presents a false

choice.  Clients <u>must</u> be protected, and their confidence (as well as that of the public) in

their lawyers' promise to keep their secrets must be preserved.  The question is not

*whether* but *how* that should be accomplished.  No one contends that the lawyer himself

may represent others against a former client on substantially related matters after

moving to a new firm.  [The Model Rules are] unequivocal on this subject.  In addition,

no one disputes that the confidentiality duty continues after termination of the

client-lawyer relationship.  If a lawyer breaches that duty, she is subject to discipline,

whether she has changed firms or not.  Screening is a mechanism to give effect to the

duty of confidentiality, not a tool to undermine it."  (ABA Standing Committee on

Ethics and Professional Responsibility, Recommendation 109 (February 16, 2009)

pp. 10-11; italics in original.)  The Standing Committee further noted, "Although much

of the debate over lateral screening has been focused on the concerns of the clients of

the lateral's former firm, there is a parallel set of interests:  after a transferring lawyer

has been hired, every imputed disqualification based on the unavailability of screening

---

counsel performed a substantial amount of work."  (*Ibid.*)  As such, the Supreme Court
stated that it was not expressing an opinion on "the relative weight these concerns might
deserve in deciding a disqualification motion based on a conflict of interest."  (*Ibid.*)

results in a client that loses its law firm of choice.  The harm to all such clients is real, not theoretical.  Often the disqualification of a firm, based upon an imputed conflict of a newly-hired lawyer, occurs after a manner is well under way and the affected client has spent substantial sums in fees.  Typically, such clients have played no part in the circumstances that led to the imputed disqualification, yet they suffer the cost, disruption, and delay resulting from it.  [¶] . . . .  Thus, clients have interests on both sides of the screening question.  Screening does not solve all such problems, but reduces them to situations where the interests of the former clients cannot adequately be addressed by the screening mechanism."  (*Id.* at pp. 11-12.)

Courts have recognized the "interest in preserving the continuity of the lawyer-client relationship; otherwise, if such relationships were easily disrupted, complicated cases . . . would take even longer to resolve, the costs of litigation would be even higher, and unscrupulous attorneys would have an incentive to seize on strained facts and theories to pursue the tactical advantage of ousting their adversary's lawyers."  (*UMG Recordings, Inc. v. MySpace, Inc., supra,* 526 F.Supp.2d at p. 1065; see also *In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 565 [concerned with depriving a party of his counsel at a late stage in the proceedings].)

In short, the general policy concern of "client protection" is not merely the interest in protecting client confidences which would weigh in favor of vicarious disqualification in all cases.  It is, instead, a two-fold concern, which also implicates the interest in protecting a client who has established a longstanding relationship with counsel, and is at risk of losing that attorney by means of vicarious disqualification,

41

through no fault of the client (or the client's attorney).  A properly established ethical screen can satisfy both concerns – protecting client confidences from being used against the client by the tainted attorney's new firm, while still protecting the opposing client's longstanding attorney-client relationship.

In the days prior to large law firms, when there was limited firm-to-firm mobility, the latter concern was rarely implicated in cases involving vicarious disqualification.  Now, however, with the proliferation of multi-office "mega-firms," frequent firm mergers, and attorneys increasingly changing firms throughout their careers, clients are at greater risk of finding their longstanding attorney-client relationships challenged due solely to their counsel's changing affiliations.

We hasten to add that we are not here attempting to effect a balancing of the policy interests in this case -- this will be a matter for the trial court on remand.  We do conclude, however, that, in certain cases, the public trust in the scrupulous administration of justice is not advanced (and, in fact, may be undermined) by an order disqualifying a party's long-term counsel due to the presence of another attorney in a different office of the same firm, who possesses only a small amount of potentially relevant confidential information, *and* has been *effectively* screened.

5.     *The Elements of an Effective Screen*

Once the moving party in a motion for disqualification has established that an attorney is tainted with confidential information, a rebuttable presumption arises that the

42

attorney shared that information with the attorney's law firm.[29]  The burden then shifts

to the challenged law firm to establish "that the practical effect of formal screening has

been achieved.  The showing must satisfy the trial court that the [tainted attorney] has

not had and will not have any involvement with the litigation, or any communication

with attorneys or []employees concerning the litigation, that would support a reasonable

inference that the information has been used or disclosed."[30]  (*In re Complex Asbestos*

*Litigation, supra,* 232 Cal.App.3d at p. 596.)

      The specific elements of an effective screen will vary from case to case, although

two elements are necessary:  First, the screen must be timely imposed; a firm must

impose screening measures when the conflict first arises.[31]  It is not sufficient to wait

until the trial court imposes screening measures as part of its order on the

disqualification motion.  (*Klein v. Superior Court, supra,* 198 Cal.App.3d at pp. 906,

---

[29]     We reiterate, however, that the presumption is not rebuttable in those cases that fall within the *Henriksen* and *Meza* exception.

[30]     As California's Commission for the Revision of the Rules of Professional Conduct is proposing a rule which would permit screening when confidential information was obtained from a prospective client, the Commission is recommending a definition of the term "screened."  According to the proposed rule, " 'Screened' means the isolation of a lawyer from any participation in a matter, including the timely imposition of procedures within a firm that are *adequate under the circumstances* (i) to protect information that the isolated lawyer is obligated to protect under these Rules or other law; and (ii) to protect against other law firm lawyers and non-lawyer personnel communicating with the lawyer with respect to the matter."  (Commission for the Revision of the Rules of Professional Conduct, State Bar of California, Proposed Amendments to the Rules of Professional Conduct of the State Bar of California (Discussion Draft, January 2010) p. 8; italics added.)

[31]     "[S]creening should be implemented before undertaking the challenged representation or hiring the tainted individual."  (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 594.)

913-914; see also *Hitachi, Ltd. v. Tatung Co.* (N.D. Cal. 2006) 419 F.Supp.2d 1158,

1165 ["The time to have moved the matter [to another office] would have been when

the ethical conflict was discovered, not after losing a motion to disqualify."].)  Second,

it is not sufficient to simply produce declarations stating that confidential information

was not conveyed or that the disqualified attorney did not work on the case; an effective

wall involves the imposition of *preventive measures* to guarantee that information will

not be conveyed.  (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1142, 1151-1152 & fn. 5.)  "To

avoid inadvertent disclosures and establish an evidentiary record, a memorandum

should be circulated warning the legal staff to isolate the [tainted] individual from

communications on the matter and to prevent access to the relevant files."  (*In re*

*Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 594.)

"The typical elements of an ethical wall are:  [1] physical, geographic, and

departmental separation of attorneys; [2] prohibitions against and sanctions for

discussing confidential matters; [3] established rules and procedures preventing access

to confidential information and files; [4] procedures preventing a disqualified attorney

from sharing in the profits from the representation; and [5] continuing education in

professional responsibility."  (*Henriksen, supra,* 11 Cal.App.4th at p. 116, fn. 6.)  We

briefly discuss the first four of these elements.[32]  We stress, however, that the inquiry

before a trial court considering the efficacy of any particular ethical wall is *not* to

determine whether all of a prescribed list of elements (beyond timeliness and the

---

[32]     We do not discuss "continuing education in professional responsibility," as
California requires compliance with mandatory Minimum Continuing Legal Education
requirements.

imposition of prophylactic measures) have been established; it is, instead, a case-by-case inquiry focusing on whether the court is satisfied that the tainted attorney has not had and will not have any improper communication with others at the firm concerning the litigation.

The first factor -- physical, geographic and departmental separation of attorneys – can also be described as "isolation."  Isolation of the tainted attorney is the best way to prevent the *accidental* disclosure of confidential information.  The rule of vicarious disqualification is based on the "everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1153-1154.)  Close proximity of attorneys "increases the actual risk of intentional or unintentional disclosure of [client] confidential information."  (*Hitachi, Ltd. v. Tatung Co., supra,* 419 F.Supp.2d at p. 1165.)  In a small practice group, separating the tainted attorney from the case alone might not be sufficient; separation from the attorneys handling the case can prevent inadvertent disclosure.[33]  (*Ibid.*)

---

[33]   Perhaps in recognition of the fact that Cohen worked with the First American team on the *Lyons* matter, First American argues that isolating the tainted attorney from *the matter from which he is disqualified* is sufficient, and that it is not necessary to isolate the tainted attorney from the other attorneys working on the matter.  It cannot be determined, as a matter of law, whether, in all cases, complete isolation of the tainted attorney from the attorneys working on the matter from which the tainted attorney is disqualified *is* or *is not* necessary.  We indicate only that isolation of the tainted attorney from the attorneys working on the matter would eliminate *any* possibility of the direct transmission of confidential information between the tainted attorney and the attorneys working on the matter.  In some cases, particularly where the attorneys work closely together in a small office, complete isolation may be necessary to satisfy a court that the presumption of disclosure has been refuted.

We turn to the second factor -- prohibitions against the discussion of confidential information.[34]  Such a prohibition is the primary goal of any ethical wall.  In all but the most unusual case, it would be necessary for the challenged law firm to establish express prohibitions against the discussion of confidential information as part of its ethical wall.  The purpose of an ethical wall is prophylactic; it seeks to prevent the sharing of client confidences which is otherwise assumed when attorneys are practicing together.  An express prohibition against discussing the information which must not be discussed is a basic first step toward establishing this goal.

The third factor -- established rules and procedures preventing access to confidential information and files – focuses on additional ways to prevent the accidental disclosure of confidential information.  Files may be stored in a separate location to which the tainted attorney has no access.  (*City of Santa Barbara v. Superior Court*, *supra*, 122 Cal.App.4th at p. 21.)  Warnings can be posted on file room doors (*UMG Recordings, Inc. v. MySpace, Inc., supra*, 526 F.Supp.2d at p. 1052) or files may be protected by lock and key (see *In re Charlisse C., supra*, 45 Cal.4th at p. 155).  Electronic documents can be coded with restrictions on access.  (*UMG Recordings, Inc. v. MySpace, Inc., supra*, 526 F.Supp.2d at p. 1052.)  As with the other factors, we do not

---

[34]      *Henriksen* suggests an ethical wall should also include "sanctions for discussing confidential matters."  (*Henriksen v. Great American Savings & Loan, supra*, 11 Cal.App.4th at p. 116, fn. 6.) While we believe that a firm establishing an ethical wall does well to warn its attorneys and staff that violating the provisions of the ethical wall will have negative consequences – thereby demonstrating the firm's serious commitment to upholding the wall – we believe the idea of "sanctions for discussing confidential matters" may miss the point.  If confidential matters are discussed in violation of the ethical wall, the firm may be subject to vicarious disqualification *regardless* of whether it sanctions the offending parties.

hold that any particular method of preventing access to confidential information and files is necessary – indeed, a trial court might conclude that a simple directive not to access the information is sufficient.  The more steps a firm has taken to prevent any disclosure, however, the more likely it is that a court will find the ethical wall to be sufficient.

The fourth factor is the establishment of procedures preventing a disqualified attorney from sharing in the profits from the representation.  ABA Model Rules for Professional Conduct, rule 1.10(a)(2)(i) specifically provides that vicarious disqualification is not necessary when the disqualified lawyer is timely screened from participation in the matter "and is apportioned no part of the fee therefrom[.]"[35] Comment 8 to that rule provides that it "does not prohibit the screened lawyer from receiving a salary or partnership share established by prior independent agreement, but that lawyer may not receive compensation directly related to the matter in which the lawyer is disqualified."  The rationale is clear; if the disqualified attorney will not share in the profits of the representation, there is no financial incentive for the disqualified attorney to covertly assist the representation by improperly disclosing confidential information.

---

[35]     California's Proposed Rule 1.18, allowing screening in certain situations when an attorney is disqualified due to having obtained confidential information from a prospective client, includes the same language.  (Commission for the Revision of the Rules of Professional Conduct, State Bar of California, Proposed Amendments to the Rules of Professional Conduct of the State Bar of California (Discussion Draft, January 2010) p. 147.)

An additional element favorably acknowledged in caselaw is that the disqualified attorney has no supervisory powers over the attorneys involved in the litigation, and vice-versa. (*City of Santa Barbara v. Superior Court, supra,* 122 Cal.App.4th at p. 27.) This is similar to the factor discussed above, that the tainted attorney receive no compensation from the matter. If the attorneys handling the matter are *supervising* the tainted attorney; the tainted attorney may feel an obligation to assist the supervising attorneys in their representation. Likewise, if the tainted attorney is supervising the attorneys involved in the litigation, there could be concerns that the tainted attorney sets policies that might bear on the subordinates' handling of the litigation. (*City and County of San Francisco v. Cobra Solutions, Inc., supra,* 38 Cal.4th at p. 850, fn. 2.)

Although not discussed in the caselaw, we believe one additional factor, commonly noted in ethical rules governing imputed conflicts, should also be considered by trial courts in their analysis: notice to the former client.[36] ABA Model Rules for Professional Conduct, rule 1.10(a)(2), provides that, when a disqualified attorney is timely screened, "written notice [must be] promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this Rule, which shall include a description of the screening procedures employed; a statement of the firm's and of the screened lawyer's compliance with these Rules; a statement that review may be available before a tribunal; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening

---

[36]     As with the other elements, notice is not an element required in all cases in order for an ethical wall to rebut the presumption of imputed knowledge and prevent disqualification of the law firm.

48

procedures[.  Additionally,] certifications of compliance with these Rules and with the

screening procedures are [to be] provided to the former client by the screened lawyer

and by a partner of the firm, at reasonable intervals upon the former client's written

request and upon termination of the screening procedures."  (See also Commission for

the Revision of the Rules of Professional Conduct, State Bar of California, Proposed

Amendments to the Rules of Professional Conduct of the State Bar of California

(Discussion Draft, January 2010) p. 147 [where California's proposed rule would permit

screening when an attorney has obtained confidences from a prospective client, such

screening is permitted only when "written notice is promptly given to the prospective

client to enable the prospective client to ascertain compliance with the provisions of this

Rule"].)

       The reasons for providing notice to the former client should be obvious.  Notice

increases the public perception of the integrity of the bar, by making the interested party

aware of the potential threat to its confidential information and the measures taken to

prevent the improper use or disclosure of such information.  Moreover, notice

establishes an enforcement mechanism, in that the interested party will be able to

suggest measures to strengthen the wall, and to challenge any apparent breaches.

However, the interested party's *consent* is not required.

       We note that these are the "typical elements" of a wall.  Each of these elements

need not necessarily be present for an ethical wall to be sufficient to rebut the

presumption of imputed knowledge.  Any ethical wall must ultimately be judged by

whether it is sufficient to meet its purpose:  satisfying the trial court that the tainted

49

attorney has not had and will not have any involvement with, or communication

concerning, the litigation which would support a reasonable inference that confidential

information was or will be disclosed.

6.   *The Trial Court Erred in Ruling Vicarious*
     *Disqualification was Automatic*

In sum, we have concluded that, when a tainted attorney moves from one private

law firm to another, the law gives rise to a rebuttable presumption of imputed

knowledge to the law firm, which may be rebutted by evidence of effective ethical

screening.  However, if the tainted attorney was actually involved in the representation

of the first client, and switches sides in the same case, no amount of screening will be

sufficient, and the presumption of imputed knowledge is conclusive.  (See *Meza, supra*,

176 Cal.App.4th at pp. 977-979; *Henriksen, supra*, 11 Cal.App.4th at pp. 114-115.)

When considering a motion to disqualify a law firm on the basis of imputed

knowledge, in a case where the presumption is rebuttable, a trial court should consider,

on a case-by-case basis, whether the ethical screening imposed by the firm is effective

to prevent the transmission of confidential information from the tainted attorney.

Moreover, the court should consider all of the policy interests implicated by the

disqualification motion, in determining how to exercise its discretion.  In this case, the

trial court concluded that automatic vicarious disqualification was the rule; this was

error.

However, the trial court also concluded that, even if ethical screening were

permissible, the ethical screening wall in this case was breached and it was therefore

50

ineffective.  In reaching its conclusion that the wall was breached, however, the court relied on a factual determination that Cohen's work on the *Lyons* matter was used against plaintiffs in two of the related class actions.  Substantial evidence does not support this conclusion.  It is clear that Cohen performed work on the *Lyons* matter prior to the time the First American team cited to an order of the *Lyons* trial court in connection with its demurrers in the related class actions.  However, the record before us establishes that the *Lyons* order to which the First American team cited had been obtained prior to the First American team's move to Sonnenschein.  Thus, there is no evidence that Cohen's work on the *Lyons* matter was used by the First American team in the related class actions.  As the trial court relied on its finding to the contrary in order to support its conclusion that the ethical wall was ineffective in this case, and that finding is not supported by the record, the court's conclusion that the ethical wall was ineffective cannot stand.

    We do not here decide that Cohen's work on the *Lyons* matter was or was not disqualifying of Sonnenschein.  Clearly, the safest approach would have been for Sonnenschein to screen Cohen *completely* from the First American team and all First American cases.  However, the fact remains that the screening wall Sonnenschein built prohibited Cohen from working on the related class actions, and no evidence that we have found in the record before us indicates that he did.  Under normal circumstances, we would stop here and remand for the trial court to consider whether the provisions of Sonnenschein's ethical wall were *adequate* to rebut the presumption of imputed knowledge.  The circumstances, however, have changed.

51

7.     *Effect of Cohen's Departure From Sonnenschein*

On First American's motion, we have taken additional evidence on appeal. (Code Civ. Proc., § 909.)  That evidence indicates that Cohen is no longer employed by Sonnenschein.  This changes the inquiry the trial court is to make on remand.

The purpose of a disqualification order is prophylactic, not punitive.  (*Gregori v. Bank of America, supra,* 207 Cal.App.3d at pp. 308-309.)  That is, the issue is whether there is a genuine likelihood that allowing the attorney to remain on the case will affect the outcome of the proceedings before the court.  (*Ibid.*)  When considering vicarious disqualification of a firm based on the presence of a tainted attorney, the issue is whether there is a likelihood that other attorneys at the firm may receive and use the information possessed by the tainted attorney in the pending action.

However, once the tainted attorney has left the firm, vicarious disqualification is not necessary "where the evidence establishes that no one other than the departed attorney had any dealings with the client or obtained confidential information." (*Goldberg v. Warner/Chappell Music, Inc., supra,* 125 Cal.App.4th at p. 755.)  Thus, the inquiry is no longer a prospective one, but a retrospective one.  The trial court should not consider the *risk* of transmitting information from the tainted attorney to those involved in the challenged representation, but, instead, whether the tainted attorney *actually* conveyed confidential information.[37]  (*Id.* at p. 762; cf. *Adams v.*

---

[37]     Our opinion in *Meza, supra,* 176 Cal.App.4th at p. 979 is not to the contrary. There, we concluded that the trial court did not abuse its discretion in disqualifying the law firm representing a plaintiff even though the tainted attorney had left the law firm before the disqualification motion was granted.  In that case, however, the plaintiff's

*Aerojet-General Corp., supra,* 86 Cal.App.4th at p. 1335.)  As part of its inquiry,

however, the trial court may consider the elements of the ethical wall constructed by

Sonnenschein, as the strength of the wall may well be relevant to a determination of

whether it is likely that confidential information was actually conveyed.

In this case, Cohen was present at the Sonnenschein firm for approximately one

year.  On remand, the trial court must determine whether Cohen's activities at the firm

actually resulted in the improper transmission, directly or indirectly, of confidential

information from Cohen to the First American team, or any other member of the

Sonnenschein firm who may have worked on the related class actions.  If (1) the

Sonnenschein firm can overcome the rebuttable presumption that confidential

information was transmitted, by offering sufficient evidence that confidential

information was not, in fact, transmitted;[38] and (2) the trial court, in the exercise of its

---

law firm had been fully aware that it was hiring an attorney who had represented
a defendant in the same action.  Indeed, the plaintiff's firm had been aware that the
attorney had shared confidences with counsel representing other defendants in the
matter pursuant to a joint defense agreement.  (*Id.* at p. 979.)  In those circumstances,
we held that the trial court could have properly concluded "that allowing the [plaintiff's]
firm to continue to represent [plaintiff] would undermine California's policy in favor of
protecting attorney work product, its own [case management order permitting
defendants' counsel to share confidences without waiving the work product privilege],
and the integrity and fairness of the proceedings." (*Ibid.*)  Such egregious
circumstances are not present in the instant case.

[38]     In this regard, we note that Sonnenschein did not provide declarations of all
members of the First American team, nor a declaration from John Koski, the
Sonnenschein partner who established the ethical wall after a "private discussion" with
Cohen.  Clearly, every Sonnenschein attorney who worked on the related class actions,
as well as any other member of the Sonnenschein firm whom Cohen is claimed to have
had reason or occasion to discuss information obtained from plaintiffs' counsel, should
provide testimonial evidence. (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1152, fn. 5.)

discretion, concludes that the implicated policy considerations favor allowing Sonnenschein to remain as counsel, the trial court should deny the motion for disqualification.  If, however, the trial court concludes that (1) Sonnenschein has not sufficiently rebutted the presumption that confidential information was transmitted, or (2) despite a finding that confidential information was not transmitted, the competing policy considerations nonetheless mandate disqualification of the entire firm under the circumstances, the trial court should grant the motion for disqualification.  We express no opinion on the resolution of any of these questions, which are for the trial court to determine in the first instance.

## DISPOSITION

The order of disqualification of the Sonnenschein firm is reversed.  The matter is remanded to the trial court for further proceedings not inconsistent with the views expressed herein.  Each party shall pay its own costs on appeal.

## CERTIFIED FOR PUBLICATION

CROSKEY, J.

WE CONCUR:

KLEIN, P. J.

KITCHING, J.

1

2  HARVEY SISKIND LLP
   D. PETER HARVEY (State Bar No. 55712)
3  pharvey@harveysiskind.com
   NAOMI JANE GRAY (State Bar No. 230171)
4  ngray@harveysiskind.com
   RAFFI V. ZEROUNIAN (State Bar No. 236388)
5  rzerounian@harveysiskind.com
   Four Embarcadero Center, 39th Floor
6  San Francisco, California 94111
   Telephone:  415-354-0100
7  Facsimile:  415-391-7124

8
   Attorneys for Plaintiff/Counterdefendant
9  SANOFI-AVENTIS DEUTSCHLAND GMBH

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

14  SANOFI-AVENTIS DEUTSCHLAND          Case No.:  C 08-04909 SI (BZ)
15  GMBH,
                Plaintiff,             DECLARATION OF JOSEPH P. KIRK
16                                     JR. IN SUPPORT OF SANOFI'S
                v.                     MOTION FOR RECONSIDERATION OF
17                                     DISQUALIFICATION ORDER
18  GENENTECH, INC. and BIOGEN IDEC
    INC.,                              Date:
19                                     Time:
                Defendants.            Courtroom 10
20                                     The Honorable Susan Illston
21  GENENTECH, INC. and BIOGEN IDEC
    INC.,
22
                Counterplaintiffs,
23
                v.
24
25  SANOFI-AVENTIS DEUTSCHLAND
    GMBH,
26              Counterdefendant.

27

28

DECLARATION OF JOSEPH P. KIRK JR. IN SUPPORT OF MOTION          CASE NO. C 08-04909 SI (BZ)
FOR RECONSIDERATION OF DISQUALIFICATION ORDER

1       I, Joseph P. Kirk Jr. hereby declare:

2          1.      I am an attorney and Senior Director at Sanofi-Aventis U.S. Inc. ("Sanofi").  I

3 have personal knowledge of the facts set forth in this declaration, and if called upon to do so, could

4 and would testify competently thereto.

5          2.      Sanofi is a subsidiary of Sanofi-Aventis, a multinational pharmaceutical

6 company, with over 100,000 employees in over 100 countries and global sales of €29.3 billion in

7 2009.  Sanofi-Aventis researches, develops, manufactures and markets pharmaceutical products, and

8 is the third largest pharmaceutical company in the world, ranked by prescription sales for the twelve

9 months through September 2009.  Sanofi-Aventis has an extensive portfolio of prescription drugs,

10 vaccines, generics and consumer healthcare products targeting a balanced mix of traditional markets

11 and emerging countries.  Sanofi-Aventis's products span major therapeutic areas, including:

12 cardiovascular and thrombosis, central nervous system, diabetes, internal medicine, oncology, and

13 vaccines.

14          3.      Sanofi's relationship with the law firm of McDonnell Boehnen Hulbert &

15 Berghoff LLP ("McDonnell Boehnen" or the "Firm") commenced over a decade ago.  In that time,

16 the Firm has represented Sanofi and its affiliated companies in at least 10 patent infringement

17 actions in jurisdictions throughout the United States and abroad.  McDonnell Boehnen and Sanofi

18 have developed an extremely close working relationship as a result of this shared history.  Over the

19 years, McDonnell Boehnen has developed extensive institutional knowledge of Sanofi's corporate

20 approach to litigation strategy and how that approach advances Sanofi's short- and long-term

21 business goals.

22          4.      McDonnell Boehnen has represented Sanofi in connection with its claims in

23 this action for over two years.  Before bringing suit on Sanofi's behalf, McDonnell Boehnen, in

24 cooperation with Sanofi, conducted an investigation into Genentech's products and manufacturing

25 methods over a period of many months.  Following this investigation, Paul Berghoff contacted

26 Genentech's counsel in June 2008 and initiated negotiations in an effort to avoid litigation.  The

27 dispute between the parties has spanned multiple jurisdictions and dispute resolution mechanisms,

28

-1-

1   including arbitration before the International Chamber of Commerce, litigation in the Eastern District

2   of Texas and litigation in this Court.  McDonnell Boehnen has represented Sanofi in all of these

3   related actions.

4        I declare under penalty of perjury that the foregoing statements are true and correct to the best

5   of my knowledge.

6

7   Dated:  April 2O, 2010                    Respectfully submitted,

8

9

10                                            Joseph P. Kirk Jr.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

DECLARATION OF JOSEPH P. KIRK JR. IN SUPPORT OF MOTION          CASE NO. C 08-04909 SI (BZ)
FOR RECONSIDERATION OF DISQUALIFICATION ORDER

1

2  HARVEY SISKIND LLP
D. PETER HARVEY (State Bar No. 55712)

3  pharvey@harveysiskind.com
NAOMI JANE GRAY (State Bar No. 230171)

4  ngray@harveysiskind.com
RAFFI V. ZEROUNIAN (State Bar No. 236388)

5  rzerounian@harveysiskind.com
Four Embarcadero Center, 39th Floor

6  San Francisco, California 94111
Telephone:  415-354-0100

7  Facsimile:  415-391-7124

8

9  Attorneys for Plaintiff
SANOFI-AVENTIS DEUTSCHLAND GMBH

10

11            **UNITED STATES DISTRICT COURT**

           **NORTHERN DISTRICT OF CALIFORNIA**

12              **SAN FRANCISCO DIVISION**

13

14  SANOFI-AVENTIS DEUTSCHLAND     Case No.:  **C 08-04909 SI (BZ)**
GMBH,

15                      **DECLARATION OF JOSHUA R. RICH**
        Plaintiff,            **IN SUPPORT OF SANOFI'S MOTION**

16                      **FOR RECONSIDERATION OF**
        v.                **DISQUALIFICATION ORDER**

17

18  GENENTECH, INC. and BIOGEN IDEC    **Date:**
INC.,                         **Time:**

19                        **Courtroom 10**
        Defendants.         **The Honorable Susan Illston**

20

21

22

23

24

25

26

27

28

---

DECLARATION OF JOSHUA R. RICH IN SUPPORT OF MOTION       CASE NO. C 08-04909 SI (BZ)
FOR RECONSIDERATION OF DISQUALIFICATION ORDER

I, Joshua R. Rich, hereby declare:

1.    I am an attorney with the law firm of McDonnell Boehnen Hulbert & Berghoff LLP ("McDonnell Boehnen" or the "Firm"), attorneys for Sanofi-Aventis Deutschland GmbH ("Sanofi") in this action. I have personal knowledge of the facts set forth in this declaration, and if called upon to do so, could and would testify competently thereto.

2.    All McDonnell Boehnen attorneys are admitted to practice in the state of Illinois. As Illinois attorneys, all McDonnell Boehnen attorneys are required to comply with Illinois Supreme Court Rules 793 and 794. Attached hereto as Exhibit A is a true and correct copy of an excerpt of the Illinois Supreme Court Rules (including Illinois Supreme Court Rules 793 and 794), available at http://www.state.il.us/court/SupremeCourt/Rules/Art_VII/default.asp (last accessed on April 20, 2010).

3.    Illinois Supreme Court Rule 793 requires every attorney admitted to practice in Illinois after December 31, 2005 to complete a Basic Skills Course of at least fifteen hours within one year of admission to practice. The Basic Skills Course is required to "cover such topics as . . . practice techniques and procedures under the Illinois Rules of Professional Conduct, client communications, use of trust accounts, required record keeping and other rudimentary elements of practice."

4.    Illinois Supreme Court Rule 794 requires every attorney admitted to practice in Illinois (whether before December 31, 2005 or after) to complete certain continuing legal education activities every two years. The minimum number of hours required increases with every two-year reporting period between 2008 and 2011. Thus, attorneys were required to complete at least 20 hours of continuing legal education activity for reporting periods ending in 2008 and 2009; are required to complete at least 24 hours of continuing legal education activity for reporting periods ending in 2010 and 2011; and will be required to complete at least 30 hours of continuing legal education activity for all subsequent two-year reporting periods.

-1-

5.      A minimum of four hours of continuing legal education activity required for any two-year period must be in the area of legal ethics, professionalism, diversity issues, mental illness and addiction issues, or civility.

6.      In 2010, McDonnell Boehnen hosted two internal continuing legal education presentations by the former administrator of the Illinois Attorney Registration and Disciplinary Commission ("ARDC").  The ARDC is the agency of the Illinois Supreme Court that is responsible for maintaining current records of registration and discipline information for lawyers licensed to practice in Illinois, investigating allegations of misconduct by lawyers, and prosecuting the cases where a lawyer's misconduct suggests a threat to the public or to the integrity of the legal profession. During previous years, McDonnell Boehnen has presented other legal ethics-related continuing legal education programs.

7.      Although compliance with the Illinois Supreme Court's continuing legal education requirements is ultimately each individual attorney's responsibility, McDonnell Boehnen provides further assistance to its attorneys in meeting that responsibility.  McDonnell Boehnen has a firm-wide subscription to PLI continuing legal education programs (allowing McDonnell Boehnen attorneys free access to many PLI programs, including ethics programs).  McDonnell Boehnen also has an administrative staff member charged with circulating notice of continuing legal education opportunities.  Finally, McDonnell Boehnen hosts a software program (CE Manager) for tracking the continuing legal education earned by each attorney during each reporting period.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Dated:  April 20 , 2010               Respectfully submitted,


                                      _____
                                      Joshua R. Rich

-2-

# Exhibit A to
# Declaration of Joshua R. Rich
# In Support of
# Sanofi's Motion for Reconsideration
# Of Disqualification Order

# ARTICLE VII. RULES ON ADMISSION AND

## DISCIPLINE OF ATTORNEYS

### PART A. ADMISSION TO THE BAR

## Rule 701. General Qualifications

(a) Subject to the requirements contained in these rules, persons may be admitted or conditionally admitted to practice law in this State by the Supreme Court if they are at least 21 years of age, of good moral character and general fitness to practice law, and have satisfactorily completed examinations on academic qualification and professional responsibility as prescribed by the Board of Admissions to the Bar or have been licensed to practice law in another jurisdiction and have met the requirements of Rule 705.

(b) Any person so admitted to practice law in this State is privileged to practice in every court in Illinois. No court shall by rule or by practice abridge or deny this privilege by requiring the retaining of local counsel or the maintaining of a local office for the service of notices. However, no person, except the Attorney General or the duly appointed or elected State's Attorney of the county of venue, may appear as lead or co-counsel for either the State or defense in a capital case unless he or she is a member of the Capital Litigation Trial Bar provided for in Rule 714.

Amended effective October 2, 1972; amended April 8, 1980, effective May 15, 1980; amended June 12, 1992, effective July 1, 1992; amended March 1, 2001. The amendment to paragraph (b) shall be effective one year after its adoption, and shall apply in capital cases filed by information or indictment on or after its effective date; amended October 2, 2006, effective July 1, 2007.

Committee Comments
Special Supreme Court Committee on Capital Cases
March 1, 2001

The requirement that all defense counsel and assistant prosecutors appearing as lead or co-counsel in capital cases must be members of the Capital Litigation Trial Bar was adopted to improve the fairness and reliability of capital trials. The minimum qualifications for membership in the Capital Litigation Trial Bar are intended to insure that capital cases are tried by experienced, well-trained attorneys. See Rule 714. The amendment to Rule 701(b) provides the means for enforcement of the qualification standards by prohibiting an attorney who is not a member of the Capital Litigation Trial Bar from appearing as lead or co-counsel in a capital case. See also Rule 416(c). The Capital Litigation Trial Bar membership requirement does not apply to the elected or appointed State's Attorney of the county of venue or the Attorney General. In addition, Rule 701(b) does not prohibit nonmembers from participating in a capital trial in the capacity of "third chair," provided such participation by a third attorney for the prosecution or defense is under the direct supervision of qualified lead or co-counsel.

For the purposes of Rule 701(b), the definition of a "capital" case is supplied by paragraphs (c) and (d) of Rule 416. Rule 416(c) provides that the State must give notice of its intent to seek or decline to seek the death penalty as soon as practicable, and in no event later than 120 days after arraignment, unless the court directs otherwise. Rule 416(d) provides that if the State provides notice of intent to seek the death penalty or fails to provide any notice in the time allowed by Rule 416(c), the trial court must confirm that attorneys appearing in the case are properly certified members of the Capital Litigation Trial Bar. Thus, the Capital Litigation Trial Bar membership requirement of Rule 701(b) is effective upon notification that the State will seek the death penalty or expiration of the time allowed for notice under Rule 416(c) without any notice from the State, whichever occurs first.

Though the trial court will not enforce the counsel qualification standards of this rule and Rule 714 until the State provides notice of intent to seek the death penalty or the time for notice expires, in any case where the defendant may be eligible for the death penalty, defense counsel must presume the case will be capital unless the State has provided notice to the contrary. Attorneys who are not members of the Capital Litigation Trial Bar should not agree to provide representation for a defendant in a potentially capital case (i.e., a case in which the defendant may be eligible for the death penalty, where the time for State notice has not expired and the State has not provided any notice with respect to its intent to seek or decline to seek the death penalty). Attorneys should also decline to provide representation as sole counsel for a defendant in a potentially capital case, unless they are properly certified as lead counsel. See Rule 714. An attorney who is not properly certified under Rule 714 should never agree to provide representation for a defendant in a potentially capital case on the assumption that the State will not seek the death penalty, or that admission to the Capital Litigation Trial Bar or proper certification will be obtained after accepting the engagement.

When considering representation of a defendant charged with first degree murder, an attorney who is not a member of the

fulfill the professional responsibility requirement in Rule 794(d)(1) for conformity with the accreditation standards and hours enumerated in Rule 795, exclusive of review as to substantive content. Those courses and activities determined to be in conformance shall be referred to the Supreme Court Commission on Professionalism for substantive review and approval as provided in Rules 799(c)(5) and (d)(6)(i). Professional responsibility courses or activities approved by both the Commission on Professionalism and the MCLE Board as specified in this subsection shall be eligible for accreditation by the MCLE Board.

(5) To submit an annual report to the Court evaluating the effectiveness of the MCLE Rules and the quality of the CLE courses, and presenting the Board's recommendations, if any, for changes in the Rules or their implementation, a financial report for the previous fiscal year, and its recommendations for the new fiscal year. There shall be an independent annual audit of the MCLE fund as directed by the Court, the expenses of which shall be paid out of the fund. The audit shall be submitted as part of the annual report to the Court.

(6) To coordinate its administrative responsibilities with the Attorney Registration and Disciplinary Commission ("ARDC"), and to reimburse expenses incurred by the ARDC attributable to enforcement of MCLE requirements.

(7) To take all action reasonably necessary to implement, administer and enforce these rules and the decisions of the MCLE Director, staff and Board.

(8) To establish policies and procedures for notification and reimbursement of course fees, if appropriate, in those instances where course accreditation is withheld or withdrawn.

(d) Administration

The Board shall appoint, with the approval of the Supreme Court, a Director of MCLE ("Director") to serve as the principal executive officer of the MCLE program. The Director, with the Board's authorization, will hire sufficient staff to administer the program. The Board will delegate to the Director and staff authority to conduct the business of the Board within the scope of this Rule, subject to review by the Board. The Director and staff shall be authorized to acquire or rent physical space, computer hardware and software systems and other items and services necessary to the administration of the MCLE program.

(e) Funding

The MCLE program shall initially be funded in a manner to be determined by the Court. Thereafter, funding shall be derived solely from the fees charged to CLE providers and from late fees and reinstatement fees assessed to individual attorneys. This schedule of CLE provider fees, late fees, and reinstatement fees must be approved by the Court, and any reference in these Rules to a fee assessed or set by the Board means a fee based on the Court-approved fee schedule.

Adopted September 29, 2005, effective immediately; amended December 6, 2005, effective immediately; amended June 5, 2007, effective immediately; amended November 23, 2009, effective December 1, 2009.

Rule 793. Basic Skills Course Requirement

(a) Scope

Except as specified in paragraph (f), every Illinois attorney admitted to practice after December 31, 2005, must complete a Basic Skills Course, totaling at least 15 actual hours of instruction.

(b) Completion Deadline

The course must be completed within one year of the newly admitted attorney's admission to practice in Illinois.

(c) Topics

The course shall cover such topics as the jurisdiction of local courts, local court rules, filing requirements for various government agencies, how to draft pleadings and other documents, practice techniques and procedures under the Illinois Rules of Professional Conduct, client communications, use of trust accounts, required record keeping and other rudimentary elements of practice.

**(d) Exemption From Other Requirements**

During this period, the newly admitted lawyer shall be exempt from the other MCLE requirements.

**(e) Initial Reporting Period**

The newly admitted attorney's initial two-year reporting period for complying with the MCLE requirements contained in Rule 794 shall commence, following the deadline for the attorney to complete the Basic Skills Course, on the next July 1 of an even-numbered year for lawyers whose last names begin with a letter A through M, and on the next July 1 of an odd-numbered year for lawyers whose last names begin with a letter N through Z.

**(f) Prior Practice**

The Basic Skills Course requirement does not apply to attorneys who are admitted in Illinois after practicing law in other states for a period of one year or more.

**(g) Approval**

The Basic Skills Course shall be offered by CLE providers, including "in-house" program providers, authorized by the Board after its approval of the provider's planned curriculum. Courses shall be offered throughout the state and at reasonable cost.

<u>Adopted September 29, 2005, effective immediately.</u>

**Rule 794. Continuing Legal Education Requirement.**

**(a) Hours Required**

Except as provided by Rules 791 or 793, every Illinois attorney subject to these Rules shall be required to complete 20 hours of CLE activity during the initial two-year reporting period (as determined on the basis of the lawyer's last name pursuant to paragraph (b), below) ending on June 30 of either 2008 or 2009, 24 hours of CLE activity during the two-year reporting period ending on June 30 of either 2010 or 2011, and 30 hours of CLE activity during all subsequent two-year reporting periods.

**(b) Reporting Period**

The applicable two-year reporting period shall begin on July 1 of even-numbered years for lawyers whose last names begin with the letters A through M, and on July 1 of odd-numbered years for lawyers whose last names begin with the letters N through Z.

**(c) Carryover of Hours**

(1) All CLE activity hours may be earned in one year or split in any manner between the two-year reporting period. If an attorney earns more than the required CLE hours in a two-year reporting period, the attorney may carry over a maximum of 10 hours earned during that period to the next reporting period, except for professional responsibility credits referred to in paragraph (d).

(2) A newly admitted attorney may carry over to his or her first two-year reporting period a maximum of 10 CLE activity hours (except for professional responsibility credits referred to in paragraph (d)) earned after completing the Basic Skills Course requirement pursuant to Rule 793.

(3) An attorney, other than a newly admitted attorney, may carry over to his or her first two-year reporting period a maximum of 10 CLE activity hours (except for professional responsibility credits referred to in paragraph (d)) earned between January 1, 2006, and the beginning of that period.

**(d) Professional Responsibility Requirement**

(1) A minimum of four of the total hours required for any two-year period must be in the area of professionalism, diversity issues, mental illness and addiction issues, civility, or legal ethics.

(2) Such credit may be obtained either by:

(i) Taking a separate CLE course or courses, or participating in other eligible CLE activity under these Rules, specifically devoted to professionalism, diversity issues, mental illness and addiction issues, civility, or legal ethics;

or

(ii) Taking a CLE course or courses, or participating in other eligible CLE activity under these Rules, a portion of which is specifically devoted to professionalism, diversity issues, mental illness and addiction issues, civility, or legal ethics credit. Only that portion of a course or activity specifically devoted to professionalism, diversity issues, mental illness and addiction issues, civility, or legal ethics shall receive CLE credit for the professional responsibility requirement of this paragraph.

**Adopted September 29, 2005, effective immediately.**

**Rule 795. Accreditation Standards and Hours**

**(a) Standards**

Eligible CLE courses and activities shall satisfy the following standards:

(1) The course or activity must have significant intellectual, educational or practical content, and its primary objective must be to increase each participant's professional competence as an attorney.

(2) The course or activity must deal primarily with matters related to the practice of law.

(3) The course or activity must be offered by a provider having substantial, recent experience in offering CLE or demonstrated ability to organize and effectively present CLE. Demonstrated ability arises partly from the extent to which individuals with legal training or educational experience are involved in the planning, instruction and supervision of the activity.

(4) The course or activity itself must be conducted by an individual or group qualified by practical or academic experience. The course or activity, including the named advertised participants, must be conducted substantially as planned, subject to emergency withdrawals and alterations.

(5) Thorough, high quality, readable and carefully prepared written materials should be made available to all participants at or before the time the course is presented, unless the absence of such materials is recognized as reasonable and approved by the Board.

(6) Traditional CLE courses or activities shall be conducted in a physical setting conducive to learning. The course or activity may be presented by remote or satellite television transmission, telephone or videophone conference call, videotape, film, audio tape or over a computer network, so long as the Board approves the content and the provider, and finds that the method in question has interactivity as a key component. Such interactivity may be shown, for example, by the opportunity for the viewers or listeners to ask questions of the course faculty, in person, via telephone, or on-line; or through the availability of a qualified commentator to answer questions directly, electronically, or in writing; or through computer links to relevant cases, statutes, law review articles, or other sources.

(7) The course or activity must consist of not less than one-half hour of actual instruction, unless the Board determines that a specific program of less than one-half hour warrants accreditation.

(8) A list of the names of all participants for each course or activity shall be maintained by the provider for a period of at least three years. The provider shall issue a certificate, in written or electronic form, to each participant evincing his or her attendance. Such lists and certificates shall state the number of CLE hours, including professionalism, diversity issues, mental illness and addiction issues, civility, or legal ethics CLE hours, earned at that course or activity.

**(b) Accredited CLE Provider**

The Board may extend presumptive approval to a provider for all of the CLE courses or activities presented by that provider each year that conform to paragraph (a)'s Standards (1) through (8), upon written application to be an "Accredited Continuing Legal Education Provider." Such accreditation shall constitute prior approval of all CLE courses offered by such providers. However, the Board may withhold accreditation or limit hours for any course found not to meet the standards, and may revoke accreditation for any organization which is found not to comply with standards. The Board shall assess an annual fee, over and above the fees assessed to the provider for each course, for the privilege of being an "Accredited Continuing Legal Education Provider."

**(c) Accreditation of Individual Courses or Activities**

1  HARVEY SISKIND LLP
   D. PETER HARVEY (State Bar No. 55712)
2  pharvey@harveysiskind.com
   NAOMI JANE GRAY (State Bar No. 230171)
3  ngray@harveysiskind.com
   RAFFI V. ZEROUNIAN (State Bar No. 236388)
4  rzerounian@harveysiskind.com
   Four Embarcadero Center, 39th Floor
5  San Francisco, California 94111
   Telephone:  415-354-0100
6  Facsimile:  415-391-7124
7
8  Attorneys for Plaintiff/Counterdefendant
   SANOFI-AVENTIS DEUTSCHLAND GMBH
9

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12                **SAN FRANCISCO DIVISION**

13  SANOFI-AVENTIS DEUTSCHLAND              **Case No.:  C 08-04909 SI (BZ)**
    GMBH,
14                                          **DECLARATION OF JOHN J.**
                 Plaintiff,                 **MCDONNELL IN SUPPORT OF**
15                                          **SANOFI'S MOTION FOR**
           v.                               **RECONSIDERATION OF**
16                                          **DISQUALIFICATION ORDER**
    GENENTECH, INC. and BIOGEN IDEC
17  INC.,
                                            **Date:**
18             Defendants.                  **Time:**
                                            **Courtroom 10**
19  GENENTECH, INC. and BIOGEN IDEC         **The Honorable Susan Illston**
    INC.,
20
21             Counterplaintiffs,
22         v.
23
    SANOFI-AVENTIS DEUTSCHLAND
24  GMBH,
               Counterdefendant.
25
26
27
28

I, John J. McDonnell, hereby declare:

1.      I am an attorney admitted to practice in the State of Illinois and before the U.S. Patent and Trademark Office.  I have personal knowledge of the facts set forth in this declaration, and if called upon to do so, could and would testify competently thereto.

2.      I was previously a partner in, then senior counsel to, McDonnell Boehnen Hulbert & Berghoff LLP ("McDonnell Boehnen" or the "Firm").  I have now retired.  I am no longer employed by the Firm in any capacity.  I have withdrawn as counsel of record from all active cases in which I appeared on behalf of the Firm.

3.      I no longer receive any financial compensation of any kind from McDonnell Boehnen in exchange for any type of work.  Specifically, I no longer receive a salary or any Firm profits.

4.      I no longer receive any non-financial benefits from McDonnell Boehnen beyond those negotiated as part of my retirement.  I am not covered by the Firm's malpractice insurance.  I can no longer contribute the Firm's 401(k) plan and am not covered by any Firm pension plan or Firm disability insurance or life insurance plan.  As part of my negotiated retirement package, the Firm is paying for medical and dental insurance for my wife and me through a "retiree" package through the end of 2010.  I understand that the Firm will not be paying for subsequent medical and dental insurance.

5.      During my last five years of employment at McDonnell Boehnen, I worked successively fewer hours each year.  I billed fewer than 1,100 hours in 2005; fewer than 1,000 hours in 2006; fewer than 500 hours in 2007; fewer than 400 hours in 2008; fewer than 300 hours in 2009; and fewer than 50 hours before my retirement in 2010.  I worked the majority of those hours from my home or other locations outside McDonnell Boehnen's offices, although I maintained an office at McDonnell Boehnen's offices in Chicago.

6.      During my last three years of employment at McDonnell Boehnen, I directly supervised very little work performed by any members of the Sanofi team identified in the Firm's ethical wall memorandum dated April 29, 2009.  I believe that I spent fewer than ten hours

-1-

1    supervising work by members of the Sanofi team during my last three years of employment at

2    McDonnell Boehnen.  None of that work related to this case or to Genentech.

3        I declare under penalty of perjury that the foregoing statements are true and correct to the best

4    of my knowledge.

5

6    Dated:  April 21, 2010                  Respectfully submitted,

7

8

9                                           John J. McDonnell

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                              -2-

28

DECLARATION OF JOHN J. MCDONNELL IN SUPPORT OF SANOFI'S      CASE NO. C 08-04909 SI (BZ)
MOTION FOR RECONSIDERATION OF DISQUALIFICATION ORDER

1  HARVEY SISKIND LLP
   D. PETER HARVEY (State Bar No. 55712)
2  pharvey@harveysiskind.com
   NAOMI JANE GRAY (State Bar No. 230171)
3  ngray@harveysiskind.com
   RAFFI V. ZEROUNIAN (State Bar No. 236388)
4  rzerounian@harveysiskind.com
5  Four Embarcadero Center, 39th Floor
   San Francisco, California 94111
6  Telephone:  415-354-0100
   Facsimile:  415-391-7124
7

8  Attorneys for Plaintiff/Counterdefendant
   SANOFI-AVENTIS DEUTSCHLAND GMBH
9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13  SANOFI-AVENTIS DEUTSCHLAND          Case No.:  C 08-04909 SI (BZ)
    GMBH,
14               Plaintiff,             DECLARATION OF JOHN STEELE IN
                                        SUPPORT OF SANOFI'S MOTION FOR
15         v.                           RECONSIDERATION OF
                                        DISQUALIFICATION ORDER
16
    GENENTECH, INC. and BIOGEN IDEC
17  INC.,                               Date:
                                        Time:
18               Defendants.            Courtroom 10
                                        The Honorable Susan Illston
19
    GENENTECH, INC. and BIOGEN IDEC
20  INC.,

21               Counterplaintiffs,

22         v.

23
    SANOFI-AVENTIS DEUTSCHLAND
24  GMBH,
                 Counterdefendant.
25

26

27

28

1    I, John Steele, declare as follows:

2        1.    I make this declaration as part of my direct testimony in the above-captioned matter.  I

3    have been retained by Harvey Siskind LLP, counsel for plaintiff Sanofi-Aventis Deutschland GmbH

4    ("Sanofi"), to review certain documents and offer my opinion regarding the effect that an ethical

5    screen might have on imputation of a former client conflict of interest.  If called as a witness, I could

6    and would testify competently to them.

7    <center>**MATERIALS REVIEWED**</center>

8        2.    In carrying out the assignment, I have reviewed and relied upon certain moving and

9    opposition papers related to a motion by Genentech, Inc. and Biogen IDEC, Inc., as well as the

10   Court's order dated March 20, 2010 ("Order") and Sanofi's proposed Motion for Reconsideration and

11   supporting declarations.

12   <center>**QUALIFICATIONS**</center>

13       3.    Attached as Exhibit A is a résumé describing some of my experience, training, and

14   education in the field of legal ethics, including my work for over fifteen years as the chief internal

15   ethics lawyer at an American Lawyer 100 and an American Lawyer 200 law firm; my private legal

16   practice in the field of legal ethics and professional liability for lawyers; my service as Co-Chair of

17   the Professional Responsibility Subcommittee of the ABA's Section on Intellectual Property Law;

18   my approximately twenty-five semesters of teaching legal ethics as an adjunct Lecturer or Visiting

19   Professor at UC-Berkeley School of Law, Stanford Law School, Santa Clara University School of

20   Law, and Indiana University – Bloomington (Maurer School of Law); my prior membership on the

21   State Bar of California's standing Committee on Professional Responsibility and Conduct

22   (COPRAC)(2005-08); and related experience.

23       4.    I have been qualified at trial (California Superior Court for the County of San Diego)

24   to provide expert testimony regarding legal ethics.  In other matters, I have been retained as a legal

25   ethics expert and have offered expert testimony at depositions and in sworn statements.

26       5.    It would be impossible to calculate with precision the number of times I have been

27   asked to analyze, or comment on, or make decisions about ethical screens in intellectual property

28   <center>-1-</center>

1   matters, but I can safely estimate that to be in the many hundreds of instances. I have done that

2   analysis from "all sides," that is, I have advised persons about whether an ethical screen legally

3   suffices, whether to trust an opponent's ethical screen, and whether the person I am advising should

4   build an ethical screen (and, if so, how to build it). In the course of that work, I have become

5   acquainted with prevailing norms and standards regarding screens and with the concerns expressed

6   by parties evaluating screens.

**OPINION**

7

8   6.      Here, there are several reasons to positively evaluate the efficacy of an ethical screen

9   to prevent imputation of Dr. McDonnell's disqualification to others at the McDonnell Boehnen firm

10  ("MBHB").

11  7.      Generally, when parties desire that a screen be erected to protect the party's

12  confidences or when they assert their views about how to build such a screen, they focus on (1)

13  safeguarding their documents from improper access; (2) preventing oral discussions that would reveal

14  their confidences; and (3) isolating their former lawyer from participation in new matters adverse to

15  the party.

16  8.      First, with respect to the documents of Genentech, I have seen no suggestion in the

17  moving papers that McDonnell had possession of any client documents from his prior work while he

18  was at MBHB and, further, it appears from the opposition papers that none were present at MBHB.

19  In other words, there have never been any Genentech documents at MBHB to screen off or to restrict

20  access to.

21  (a)      Nonetheless, MBHB did have an ethical wall erected within the firm that would have

22  prevented revelation of any documents from any Roche affiliate, which would have included

23  Genentech, to the lawyers working on the Sanofi matter. Given that such documents never existed at

24  MBHB, and that the ethical wall would have prevented revelation in any case, this protection easily

25  meets the standard expectations for screens in such cases.9. Second, with respect to oral discussions

26  that would reveal Genentech confidences, the moving papers reflect that McDonnell did not even

27  recall the work from twenty years prior and did not discuss the matter with anyone at MBHB.

28

-2-

1      (a)     Moreover, MBHB did erect an ethical wall within the firm that forbade anyone at the

2 firm from discussing any information relating to any affiliate of Roche, which would include

3 Genentech. So, even if McDonnell had recalled the work from two decades ago (which he had

4 denied under oath), the express terms of the ethical wall would have prevented him from discussing

5 those matters.

6      (b)     Now that McDonnell has left MBHB, Genentech is not facing the prospect that

7 McDonnell is active and present at the firm or that he is communicating with lawyers at the firm on

8 any business matters related to Genentech.

9      (c)     There is an additional factor to consider when thinking about oral discussions

10 involving McDonnell. In my experience, former clients often expect and demand the ability to seek

11 written assurances from a former lawyer and from the firm where their former lawyer works that the

12 former lawyer has not discussed the former client's previous matters or revealed the former client's

13 confidences. That expectation of former clients finds expression in rules like American Bar

14 Association Model Rule of Professional Conduct 1.18 and Model Rule 1.10(a). Here, Genentech has

15 received a *declaration under oath* from McDonnell that he has not discussed its matters or revealed

16 its confidences. That exceeds what is typically sought in such situations.

17      10.     Third, with respect to isolating the former lawyer from matters adverse to the former

18 client, it is customary for former clients to insist upon just that: no work or participation by the

19 former lawyer, and not even any supervisory participation over the adverse matters. In this case, it

20 appears undisputed that McDonnell never did any of that in any way adverse to Genentech.

21      (a)     Further, because McDonnell was no longer a partner at MBHB in the relevant

22 timeframe, he did not receive profits directly or indirectly from the Sanofi matter.

23      (b)     Finally, it appears that during the years that MBHB was adverse to Genentech on the

24 Sanofi matters, McDonnell's work had dwindled down to a few hundred billable hours per year and

25 that the majority of those hours were performed outside of the firm's offices in Chicago. Taken all

26 together, the isolation of McDonnell from the Sanofi litigation meets or exceeds what is customary in

27 such situations.

28

-3-

11.     Given all these factors, it is my professional opinion that the conduct within MBHB and the ethical screen in place at MBHB easily meets the standards of effective protection that are customary in situations where courts permit the use of ethical screens.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Dated: April 22, 2010

Respectfully submitted,

John Steele

DECLARATION OF JOHN STEELE IN SUPPORT OF SANOFI'S
MOTION FOR RECONSIDERATION OF DISQUALIFICATION ORDER      CASE NO. C 08-04909 SI (BZ)

# EXHIBIT A TO
# DECLARATION OF JOHN STEELE
# IN SUPPORT OF
# SANOFI'S MOTION FOR
# RECONSIDERATION
# OF DISQUALIFICATION ORDER

**JOHN STEELE**
**ATTORNEY AT LAW**
**2225 E. BAYSHORE RD.; SUITE 200**
**PALO ALTO, CA 94303**
ph: 650-320-7662
john.steele@johnsteelelaw.com
www.johnsteelelaw.com

For over fifteen years, Mr. Steele served as the top internal ethics lawyer at an AmLaw 100 and an AmLaw 200 law firm. Now a solo practitioner, he represents clients on matters of legal ethics, professional liability, risk management, and the law of lawyering. Mr. Steele speaks widely to professional audiences about legal ethics and risk management. For approximately twenty-five semesters he has served as an adjunct lecturer, teaching legal ethics at leading American law schools, including at Stanford and UC-Berkeley.

**WORK HISTORY**

John Steele, Attorney at Law
    Solo practitioner (2009-)
    Emphasizing legal ethics, the law of lawyering, and risk management

Fish & Richardson P.C. (2004-2009)
    Special Counsel; Director of Conflicts & Ethics

Rogers, Joseph, O'Donnell & Phillips (2003-2004)
    Shareholder (2003-2004)
    Representation of lawyers and law firms regarding legal ethics and professional liability

Fenwick & West LLP
    Partner (1994-2003)
    Ethics Partner (1994-2003)
    Associate (1989-1993)

**COMMITTEE, PROFESSIONAL ASSOCIATION & TEACHING EXPERIENCE**

- State Bar of California; Committee on Professional Responsibility and Conduct (COPRAC) (2005-2008)
- Taught approximately 25 semesters of legal ethics as appointed lecturer and/or visiting professor at Stanford Law School (2003, 2009), UC-Berkeley School of Law (1997-2009), Indiana University (Maurer School of Law) (Spring 2010) and Santa Clara University School of Law
- SCCBA Fee Arbitration Program: Panel Arbitrator (1999-2009); Executive Committee (2001)
- SCCBA Professionalism Committee; Member (2001-2004); Chair (2003)
- SCCBA Fee Arbitration Program: Panel Arbitrator (1999-2009); Executive Committee (2001)
- Bar Association of San Francisco Ethics Committee (2003-04)
- American Bar Association Intellectual Property Law Section's Committee on Professional Responsibility (2002-03); Co-chair (2005-06)
- Association of Professional Responsibility Lawyers (2001-present)
- Law Firm General Counsel Roundtable (Hildebrandt) (2005-2009)
- Hundreds of hours of CLE, program presentations, and lectures on ethics and risk management