HARVEY SISKIND LLP
D. PETER HARVEY (State Bar No. 55712)
pharvey@harveysiskind.com
NAOMI JANE GRAY (State Bar No. 230171)
ngray@harveysiskind.com
RAFFI V. ZEROUNIAN (State Bar No. 236388)
rzerounian@harveysiskind.com
Four Embarcadero Center, 39th Floor
San Francisco, California 94111
Telephone:  415-354-0100
Facsimile:  415-391-7124

FITZPATRICK, CELLA, HARPER & SCINTO
WILLIAM E. SOLANDER (admitted *pro hac vice*)
wsolander@fchs.com
DOMINICK A. CONDE (admitted *pro hac vice*)
dconde@fchs.com
PETER D. SHAPIRO (admitted *pro hac vice*)
pshapiro@fchs.com
JOSHUA A. DAVIS (admitted *pro hac vice*)
jdavis@fchs.com
1290 Avenue of the Americas
New York, New York 10104
Telephone:  212-218-2100
Facsimile:  212-218-2200

Attorneys for Plaintiff
SANOFI-AVENTIS DEUTSCHLAND GMBH

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SANOFI-AVENTIS DEUTSCHLAND GMBH,<br><br>            Plaintiff,<br><br>      v.<br><br>GENENTECH, INC. and BIOGEN IDEC INC.,<br><br>            Defendants. | Case No.: C 08-04909 SI (BZ)<br>Case No.: C 09-04919 SI<br><br>**SANOFI'S OPPOSITION TO DEFENDANT BIOGEN-IDEC'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY FOR LACK OF WRITTEN DESCRIPTION** |

## TABLE OF CONTENTS

STATEMENT OF THE ISSUE ................................................................................................. 1

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 2

I.      The Science of Enhancers ........................................................................................... 2

II.     The Patents-in-Suit ...................................................................................................... 3

        A.      The Scope of the Claims .................................................................................. 3

        B.      The Specification of the Patents-in-Suit ......................................................... 4

ARGUMENT ............................................................................................................................ 6

III.    Legal Standards ........................................................................................................... 6

        A.      Summary Judgment Standard .......................................................................... 6

        B.      The Written Description Requirement ............................................................. 6

IV.     A POSA Would Understand The Specification To Describe the Claimed
        Enhancer ...................................................................................................................... 8

V.      Biogen's Assertions Are Unsupported And Incorrect ................................................. 9

VI.     "Promoter/Regulatory Region" Was Known In the Art at the Time of the
        Invention .................................................................................................................... 13

CONCLUSION ....................................................................................................................... 15

SANOFI'S OPPOSITION TO BIOGEN'S MOTION          CASE NOS. C 08-04909 SI (BZ); C 09-04919 SI
FOR SUMMARY JUDGMENT OF INVALIDITY

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 6

*Ariad v. Lilly*, 598 F.3d 1336 (Fed. Cir. 2010) ............................................... *passim*

*Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists*,
No. SA 08-CV-01349-MRP (SSx) (C.D. Cal. May 26, 2010) ........................................ 13

*Capon v. Eshhar*, 418 F.3d 1349 (Fed. Cir. 2005)................................................. 7, 8, 9

*Carnegie Mellon Univ. v. Hoffman-La Roche, Inc.*,
541 F.3d 1115 (Fed. Cir. 2008)................................................ 10, 13

*Enzo Biochem. Inc. v. Gen-Probe, Inc.*, 296 F.3d 1316 (Fed. Cir. 2002)...................................... 6

*Falkner v. Inglis*, 448 F.3d 1357 (Fed. Cir. 2006) ................................................ 6, 7, 8

*Fiers v. Revel*, 984 F.2d 1164 (Fed. Cir. 1993)................................................ 12

*In re Lukach*, 442 F.2d 967 (C.C.P.A. 1971) ................................................ 14

*In re Wallach*, 378 F.3d 1330 (Fed. Cir. 2004)................................................ 13

*Invitrogen Corp. v. Clontech Labs., Inc.*,
429 F.3d 1052 (Fed. Cir. 2005)................................................ 6, 7

*Lucent Techs. Inc. v. Gateway, Inc.*, No. 02CV2060,
2007 WL 1449804 (S.D. Cal. May 15, 2007)................................................ 7, 9

*Regents of the University of California v. Eli Lilly & Co.*,
119 F.3d 1559 (Fed. Cir. 1997)................................................ 12

*University of Rochester v. G.D. Searle*, 358 F.3d 916 (Fed. Cir. 2004) ...................................... 12

*Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991) ................................................ 7, 8, 9

**Rules & Statutes**

35 U.S.C. § 112................................................ 6, 7

35 U.S.C. § 282................................................ 6

**STATEMENT OF THE ISSUE**

Whether there is a genuine issue of material fact as to whether a person of ordinary skill in the art ("POSA") in 1984 would have understood, based on the disclosure of the human cytomegalovirus ("HCMV") immediate early ("IE") enhancer in U.S. Patent Nos. 5,849,522 and 6,218,140, and the state of the art at that time, that these patents adequately describe the claimed HCMV IE enhancer.

**INTRODUCTION**

Defendant Biogen Idec Inc. (hereafter "Biogen") has moved for summary judgment that U.S. Patent Nos. 5,849,522 ("the '522 patent") and 6,218,140 ("the '140 patent") (collectively, "the patents") are invalid for lack of written description—a technical patent law requirement that simply calls for a description of the claimed invention in the patent specification.

The patents relate to the DNA enhancer from the IE region of HCMV, which Biogen undeniably uses to manufacture its drug product Rituxan®. As shown in the accompanying expert declaration of Professor Deborah Spector, the patents describe in detail the claimed enhancer, including its location within the HCMV genome, its structure, function, and methods by which it is obtained and used. This disclosure, in light of the information that was available to a person of ordinary skill in the art in 1984, provides more than ample written description of the invention. In its motion, Biogen does not dispute that the inventors possessed an invention. Rather, Biogen's sole challenge to the validity of the patents here is to the adequacy of their description.

On this motion, Biogen has a heavy burden; each claim of the patents is presumed valid. To overcome the presumption of validity, Biogen must prove the absence of adequate written description by clear and convincing evidence and must do so with all reasonable inferences drawn in Sanofi's favor. Whether a claim satisfies the written description requirement is a highly factual determination, and the Federal Circuit has recognized the critical importance of expert evidence on this issue. Yet Biogen presents no evidence—by expert declaration or otherwise—to show that the specification here is insufficient.

Biogen's only "evidence" is attorney argument that misconstrues both the specification and the patent claims. Biogen's assertion that the patents claim a "vast genus of possible enhancer

1    sequences" is wrong.  A POSA would understand that the claims do not cover a genus, but instead

2    are directed to a particular, well-defined enhancer.  Even if the subject matter could properly be

3    called a "genus," that genus is well-defined, small, and adequately supported by examples in the

4    specification.

5           Because Biogen has presented no competent evidence to the contrary, its motion should fail.

6    And at a minimum, Sanofi has presented a genuine material factual dispute that precludes summary

7    judgment.

8                              **STATEMENT OF FACTS**

9    **I.      The Science of Enhancers**

10          In 1981, Dr. Walter Schaffner and his colleagues first discovered a new type of regulatory

11   DNA sequence that significantly increased the expression of a gene by increasing transcription from

12   a promoter.[1]  Dr. Schaffner called this DNA fragment an "enhancer," and he recognized that

13   enhancers have important features that promoters do not.  (Spector Decl. ¶¶ 24-25.)  In particular, he

14   discovered that enhancers act to greatly increase transcription regardless of their orientation and even

15   when located long distances upstream or downstream of the gene of interest.  (Spector Decl. ¶¶ 24-

16   25.)  This means that enhancers are fundamentally different from promoters, which are always

17   located immediately upstream of the gene of interest and function only to initiate transcription of the

18   gene in the downstream direction.  (Spector Decl. ¶¶ 23, 25.)

19          Unlike other regulatory DNA elements, including promoters, there is no uniform DNA

20   sequence common to all enhancers that allows enhancers to be identified based solely on inspection

21   of a DNA sequence.  (Spector Decl. ¶ 26.)  Instead, the initial determination of whether a particular

22   fragment of DNA is an enhancer must be determined experimentally by showing that the fragment is

23   capable of:  (1) strongly stimulating transcription of a linked gene; (2) functioning independent of

24

25   [1]     A glossary of the relevant scientific terms is attached to Sanofi's Opposition to Genentech's
26   Summary Judgment Motion of Non-Infringement, which Sanofi submitted today.  Also
     accompanying that Response is the Declaration of Professor Randolph Wall.  A tutorial on the
27   relevant science can be found attached to Dr. Wall's declaration at Ex. C 8:1-44:24; Ex. D; Ex. E at
     ¶¶ 12-36.

1   orientation; and (3) functioning even if located long distances upstream or downstream relative to the

2   linked gene.  (Spector Decl. ¶ 28.)

3       Enhancer activity may correlate with the presence of repeat sequences within a DNA

4   fragment.  (Spector Decl. ¶ 27.)  But the presence of repeat sequences alone does not allow one to

5   conclude that a particular naturally-occurring DNA sequence contains an enhancer.  (Spector Decl. ¶

6   27.)  The presence of repeat sequences can only retrospectively serve to explain why enhancer

7   activity exists after an enhancer has been identified experimentally.  (Spector Decl. ¶ 27.)

8   **II.     The Patents-in-Suit**

9       The inventors claimed their invention in two patents:  the '522 patent, directed to methods of

10  increasing expression of a gene in a mammalian cell using the claimed enhancer; and the '140 patent,

11  directed to DNA plasmids and host cells which make use of the claimed enhancer.  The disclosures of

12  the patents-in-suit are virtually identical and fully disclose the claimed invention—the DNA enhancer

13  from a clearly identified region of the HCMV genome.

14      **A.     The Scope of the Claims**

15      The claims at issue from both the '522 and '140 patents concern both an enhancer and where

16  that enhancer is found.

17      In both patents, the claims are directed to an enhancer.  In the '522 patent, the claims are to

18  methods of using an "isolated DNA enhancer."  (DN 383 at 19.)  The claims in the '140 patent "refer

19  to this same enhancer, but in these claims, the enhancer, along with its target gene, is part of a

20  plasmid."  (DN 383 at 16.)

21      In both patents, the claims describe where the enhancer is found.  In the '522 patent, the

22  enhancer is found in the "DNA from the upstream region of the major immediate early (IE) gene of

23  human cytomegalovirus (HCMV)."  ('522 patent, col. 2 ll. 62-67; DN 383 at 19.)  In the '140 patent,

24  the enhancer is found in the "promoter/regulatory region of human cytomegalovirus (HCMV)."

25  ('140 patent, col. 5 ll. 1-7.)  Both claims refer to the same enhancer.

26

27

- 3 -

**B.     The Specification of the Patents-in-Suit**

The '522 and '140 patents have the same specification, which provides significant detail about the enhancer and its location within the HCMV genome.

*First*, the specification provides the location of the enhancer within the viral genome. The HCMV genome is approximately 240,000 base pairs in size. (Spector Decl. ¶ 19.) The specification teaches where the enhancer is located within the large viral genome by referring to a specific fragment of DNA that had been defined in the prior art. (Spector Decl. ¶¶ 29-31.) Specifically, it states that the enhancer is within "the Hind III E fragment (Greenaway et al., loc. cit.), which includes the Pst I-m fragment (about 2.1kb)."[2] ('522 patent, col. 1 ll. 37-39.) The location of both the Hind III E fragment and the Pst I-m fragment within it were known and had been published in the scientific literature before the priority date of the patents-in-suit, for example, by Greenaway *et al.* in 1982.[3] Accordingly, a POSA would understand the patents to refer to a fragment of DNA of approximately 2,100 base pairs (about 1% of the size of the HCMV genome) that results from cutting the HCMV genome with the restriction enzyme Pst I. (Spector Decl. ¶ 30; '522 patent, col. 1 l. 39.)

*Second*, the specification describes the enhancer itself by reference to the two overlapping "enhancer-active" fragments—"C2" and "C4"—that were discovered by the inventors. These fragments are located, respectively, at positions -118 to -458 and -263 to -524 relative to the transcription start site (+1) of the major IE gene of HCMV. These fragments overlap by 196 base pairs from positions -263 to -458. ('522 patent, col. 1 ll. 46-50.) This overlap "contains an essential part of the enhancer." ('522 patent, col. 1 ll. 46-50.)

Prior to the filing of the patents, the location of the transcription start site (+1) of the major IE gene had been disclosed at least twice in the scientific literature. For example, DNA sequences,

---

[2]     The Hind III E and Pst I-m fragments are fragments of DNA generated by cutting the HCMV genome with the restriction enzymes Hind III and Pst I. Restriction enzymes are enzymes that cut DNA at specific nucleotide sequences known as restriction sites. These enzymes can be used to create a restriction map, which indicates relative locations of DNA fragments and regulatory elements within a genome. (Spector Decl. ¶¶ 18-19.)

[3]     Greenaway *et al., Human Cytomegalovirus DNA: BamHI, EcoRI and PstI Restriction Endonuclease Maps*, 18 GENE 355 (1982). (Attached as Spector Decl. Ex. F.)

including the location of +1, were published by Stenberg *et al.* and by Thomsen *et al.* in 1984.[4]
(Spector Decl. ¶ 31.) Thus, a POSA knowing the coordinates of the C2 and C4 enhancer-active
fragments by reference to +1 could identify and isolate those fragments. (Spector Decl. ¶ 31.) The
location of +1 is confirmed by Figures 1a and 1b of the patents, which show the complete DNA
sequence of the enhancer. Knowing that an enhancer is present, a POSA would then associate the
repeat sequences in the C2 and C4 fragments (also shown in Figures 1a and 1b of the patents) with
the enhancer activity. ('522 patent, Fig. 1a; Spector Decl. ¶ 34.)

   *Third*, the specification defines the functionality of the enhancer. In particular, the
specification discloses that the enhancer "increases the expression of rabbit beta-globin in HeLa cells,
after incorporation downstream of the appropriate gene, by at least two orders of magnitude,
irrespective of orientation." ('522 patent, col. 1 ll. 57-62.) The specification further discloses that the
enhancer can be incorporated up to "about 7,000 bp, or about 3,000 bp, upstream or downstream of
the sites specified." ('522 patent, col. 1. ll. 27-30.) Thus, the specification describes the enhancer as
capable of (1) strongly stimulating transcription of a linked gene, (2) functioning independent of
orientation, and (3) functioning even if located long distances upstream or downstream of the linked
gene. ('522 patent, col. 1 ll. 25-30, 57-62, col. 2 ll. 57-62.)

   *Fourth*, the specification describes how the inventors obtained their invention using a
technique known as the "enhancer trap." The inventors used a method called sonication to break up
the 2,100 base pair Pst I-m fragment into even smaller fragments of approximately 300-base pairs.
('522 patent, col. 1 ll. 31-36, 37-39; Spector Decl. ¶ 32.) Using these 300-base pair fragments, the
inventors were able to identify the two enhancer-active fragments C2 and C4. ('522 patent, col. 1 ll.
14-30, col. 2. ll. 15-61; Spector Decl. ¶ 32.) They then determined the DNA sequence of these
fragments and their positions relative to the known transcription start site of the major IE gene, as
explained above. (Spector Decl. ¶¶ 31, 34.) This description in the specification also confirms that

---

[4]    Stenberg *et al.*, *Structural Analysis of the Major Immediate Early Gene of Human
Cytomegalovirus*, 49 J. VIROLOGY 190 (1984); Thomsen *et al.*, *Promoter-Regulatory Region of the
Major Immediate Early Gene of Human Cytomegalovirus*, 81 PROC. NAT'L ACAD. SCI. 659 (1984).
(Attached as Spector Decl. Exs. C and D.)

1    the enhancer is within the Pst I-m fragment and provides a functional test for locating it precisely.

2    (Spector Decl. ¶ 32.)  Because of the design of the enhancer trap experiment, a POSA would

3    understand that there were no enhancers within the Pst I-m fragment other than the enhancer

4    associated with C2 and C4.  (Spector Decl. ¶ 38.)  A POSA would therefore also recognize that a

5    sequence containing no overlap with the C2 or C4 fragments would not have enhancer activity.

6    (Spector Decl. ¶ 36.)

7            *Fifth*, and finally, the specification describes how the enhancer can be used to enhance

8    expression of proteins in "eukaryotic expression systems."  ('522 patent, col. 1 ll. 14-15.)  In

9    particular, the specification states that the enhancer can be used with or without the native HCMV

10   promoter.  ('522 patent, col. 2. ll. 1-10.)

11                                    **ARGUMENT**

12   **III.**    **Legal Standards**

13           **A.**       **Summary Judgment Standard**

14           Summary judgment is appropriate only if, drawing all inferences in favor of the nonmoving

15   party, the court finds that there are no disputed issues of material fact.  *Anderson v. Liberty Lobby,*

16   *Inc.*, 477 U.S. 242, 255 (1986); *see also Enzo Biochem. Inc. v. Gen-Probe, Inc.*, 296 F.3d 1316, 1322-

17   23 (Fed. Cir. 2002).

18           An issued patent is presumed valid.  35 U.S.C. § 282.  As such, to prevail on a defense of

19   invalidity based on the written description requirement, a patent challenger must prove its defense by

20   clear and convincing evidence.  *Id.* at 1323.

21           **B.**       **The Written Description Requirement**

22           The patent laws require simply that "[t]he specification shall contain a written description of

23   the invention."  35 U.S.C. § 112.  To prevail on this motion, Biogen has the burden of proving by

24   clear and convincing evidence, and as a matter of undisputed fact, that a POSA would not have

25   understood the patent specification to describe the claimed invention.  *Invitrogen Corp. v. Clontech*

26   *Labs., Inc.*, 429 F.3d 1052, 1072-73 (Fed. Cir. 2005); *see, e.g.*, *Falkner v. Inglis*, 448 F.3d 1357, 1363

27

- 6 -

1  (Fed. Cir. 2006); *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005).  Biogen cannot meet this

2  formidable burden.

3         The written description requirement ensures that in exchange for exclusivity, patentees

4  disclose the technological knowledge they seek to patent.  *Capon*, 418 F.3d at 1356-57.  It also

5  ensures that the patentee was actually in possession of the invention claimed.  *See Falkner*, 448 F.3d

6  at 1365 (quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991)).

7         Whether a patent satisfies the written description requirement is a question of fact, *Invitrogen*,

8  429 F.3d at 1072, and is judged from the perspective of a POSA as of the effective filing date of the

9  patent, *Falkner*, 448 F.3d at 1363.  The intensely factual nature of a written description analysis has

10  been recognized by many courts.  *See, e.g.*, *Vas-Cath Inc.* 935 F.2d at 1562 (citing decisions that

11  "stress[ ] the fact-specificity of the issue" and noting that because "compliance with the description

12  requirement of § 112 [in] each case must be decided on its own facts. . . . the precedential value of

13  cases in this area is extremely limited") (quotations and citations omitted).

14         At its core, a written description analysis concerns what a POSA would understand.

15  Accordingly, a written description defense typically requires opinion testimony from those who are

16  experts in the relevant art.  In *Lucent Techs. Inc. v. Gateway, Inc.*, No. 02CV2060, 2007 WL

17  1449804, at *3 (S.D. Cal. May 15, 2007), the court held:

18

19         Lacking an expert, Defendants have no other evidence on which to base the
       knowledge of one of skill in the art; the patent itself does not suffice.  Moreover,
20     the Court finds that the patent is not a simple technology and the specification is
       not readily accessible to interpretation by the average layman juror. Defendants'
21     assertion that the patent alone without expert testimony will evidence invalidity
       under a clear and convincing burden is unrealistic.

22

23  *Id.*

24         Although Biogen complains that the patent specification at issue here is "terse," that is

25  irrelevant because "[n]o length requirement exists for a disclosure to adequately describe the

26  invention."  *Falkner*, 448 F.3d at 1365-66.  Rather, the written description requirement is satisfied if a

27

- 7 -

1    POSA is able to "visualize or recognize" the claimed invention based on the patent disclosure. *Ariad*

2    *v. Lilly*, 598 F.3d 1336, 1350 (Fed. Cir. 2010); *see also Vas-Cath*, 935 F.2d at 1562-63.

3       The level of detail required to satisfy the written description requirement will necessarily vary

4    depending on the context. *Ariad*, 598 F.3d at 1351.  Even when a broad genus is claimed, there is no

5    bright-line rule governing the number of species that must be disclosed to adequately describe the

6    genus.  *Id.*  Rather, the number of examples "necessarily changes with each invention, and it changes

7    with progress in a field." *Id.*

8       And as explained further below, in the context of inventions comprising DNA sequences, the

9    Federal Circuit has affirmed the flexibility and fact-intensive nature of the written description

10   requirement. *See, e.g.*, *Ariad*, 598 F.3d at 1351; *Falkner*, 448 F.3d at 1363; *Capon*, 418 F.3d at 1358.

11   **IV. <u>A POSA Would Understand the Specification to Describe the Claimed Enhancer</u>**

12      Biogen does not dispute that the inventors possessed an invention:  "As the patents' disclosure

13   demonstrates, the applicants ***discovered*** two human cytomegalovirus ("HCMV") DNA fragments,

14   'C2' and 'C4', that boosted transcription of RNA." (Biogen Br. at 1) (emphasis added).  Thus,

15   Biogen's sole challenge to patent validity concerns whether the claimed invention was adequately

16   described.[5]  Here, however, the invention was explicitly described.  The specification, coupled with

17   the information available to a POSA at the time of invention, describes the claimed enhancer

18   structure, its function, location, and methods by which it is obtained and used. Specifically:

- A POSA would understand that the enhancer is located in the approximately 2,100 base pairs Pst I-m fragment.  (Spector Decl. ¶ 30.)

- A POSA knowing the coordinates of the enhancer-active fragments by reference to +1 could identify and isolate the enhancer using known techniques.  (Spector Decl. ¶ 31.)

- A POSA would know that the overlap region contains an essential part of the enhancer. ('522 patent, col. 1 ll. 46-50.)

---

[5]  Because Biogen's arguments with respect to the enhancer element of the '522 and '140 patent claims are identical, those arguments are addressed simultaneously in this brief.  Biogen's remaining argument concerning the "promoter/regulatory region" element of the '140 claims is addressed in Section V.

- Knowing that an enhancer is present, a POSA would associate the repeat sequences in the C2 and C4 fragments (shown in Figures 1a and 1b of the patents) with enhancer activity. (Spector Decl. ¶ 34.)

- A POSA would know that the enhancer (1) strongly stimulates transcription of a linked gene, (2) functions independent of orientation, and (3) functions even if located long distances upstream or downstream of the linked gene. ('522 patent, col. 1 ll. 25-30, 57-62, col. 2 ll. 57-62; Spector Decl. ¶ 33.)

- A POSA would know that the enhancer trap could be used to locate the enhancer within the Pst I-m fragment and that the enhancer trap was one possible way of obtaining the enhancer. (Spector Decl. ¶ 32.)

- A POSA would know how to use the enhancer, including that it can be used with or without the native HCMV promoter. ('522 patent, col. 2 ll. 1-10; Spector Decl. ¶ 35.)

Plainly, the specification provides more than enough information for a POSA to "visualize or recognize" the claimed enhancer, and thus the specification fully meets the written description standard. Indeed, Defendants use the claimed enhancer to manufacture Rituxan®. (Spector Decl. ¶ 42.)

Moreover, Federal Circuit precedent concerning DNA-related inventions confirms the adequacy of the written description in the patents at issue here. In *Capon*, for example, the Federal Circuit rejected the notion that claims to DNA-related inventions always require full gene sequence information to be fully described. *Capon*, 418 F.3d at 1358. In so doing, the *Capon* Court acknowledged that the written description requirement is flexible and must be applied in the context of the particular invention, with due consideration to the state of knowledge in the art.

Similarly, in its *Ariad* decision, the Federal Circuit acknowledged the flexibility of the written description requirement, stating that this "doctrine never created a heightened requirement to provide a nucleotide-by-nucleotide recitation of the entire genus of claimed genetic material; it has always permitted the disclosure of structural features common to members of the genus." *Ariad*, 598 F.3d at 1352.

V.   **Biogen's Assertions Are Unsupported And Incorrect**

The Federal Circuit has recognized the critical importance of expert evidence to resolution of a written description challenge. *See Vas-Cath*, 935 F.2d at 1567; *Lucent Techs. Inc.*, 2007 WL

- 9 -

1449804, at *3.  Yet Biogen presents no evidence—by expert declaration or otherwise—to show that the specification here is insufficient.

Biogen's only "evidence" is attorney argument that misconstrues both the specification and the patent claims.[6]  Biogen's own cases, therefore, do not support the relief it seeks on this motion because in every case Biogen cites, an expert opined on whether there was an adequate description of the claimed invention. (Biogen Br. (citing, *e.g.*, *Ariad*, 598 F.3d at 1354 (holding claims invalid where the patentee did not answer "undisputed expert testimony . . . that the field of the invention was particularly unpredictable [such that the] invention was made in a new and unpredictable field where the existing knowledge and prior art was scant"); *Carnegie Mellon Univ. v. Hoffman-La Roche, Inc.*, 541 F.3d 1115, 1126-27 (Fed. Cir. 2008) (upholding invalidity ruling based on lack of adequate written description because the patentee "did not dispute the statements made by [the patent challenger's expert] that were material to the court's invalidity holding").)

In contrast to Biogen's unsupported motion, Sanofi's opposition is supported by the declaration of Professor Spector, which demonstrates that the specification of the '522 and '140 patents plainly provides more than enough information for a POSA to "visualize or recognize" the claimed enhancer.  Because Biogen has presented no competent evidence to the contrary, its motion should fail.  And at a minimum, Sanofi has presented a genuine material factual dispute that precludes summary judgment.

Biogen's written description defense is based principally on its assertion that the patents claim a "vast genus of possible enhancer sequences" (Biogen Br. at 6), namely, a genus of every possible fragment that is 20 base pairs in size and up within a 17,000 base pair range of the HCMV genome.

---

[6]    Biogen similarly misconstrues the inventors' testimony (Biogen Br. 10-11) which does not, as Biogen asserts, confirm a lack of written description.  Dr. Boshart's cited statement simply reflects that DNA fragments, which contain some part of C2 or C4, have enhancer activity.  Similarly, Dr. Schaffner's statement that the enhancer boundaries are not well-defined reflects that while the enhancer must consist of some part of the C2 or C4 fragments, the addition of other nucleotides just upstream or downstream of the C2 and C4 regions will not diminish enhancer activity.  (Spector Decl. ¶¶ 35-36.)  Moreover, the remaining inventor's testimony cited by Biogen confirms what a POSA would understand—the enhancer encompasses the C2 and C4 fragments and that this is the only enhancer located in the HCMV IE gene region.  (Spector Decl. ¶ 38.)

1    Biogen then calculates that there are more than 144 million possible enhancer sequences covered by

2    the claims of the '522 patent and over 100,000 possible enhancer sequences claimed in the '140

3    patent.

4         Biogen's assertions, however, are flawed for a number of reasons:

5    • The patents do not claim a genus, but instead claim an enhancer from a well-defined
     region of HCMV. (*See, e.g.* Spector Decl. ¶ 38.)

6

7    • On the basis of the specification, a POSA would understand that the enhancer
     encompasses the C2 and C4 fragments and that this is the only enhancer located in the
8    HCMV IE gene region.  Biogen's assertion that the disclosed enhancer can consist of
     DNA, ***exclusive*** of DNA from the enhancer-active fragments identified in the
     specification (for example a DNA fragment consisting of -750 to -770), is thus contrary to
9    the specification.  (*See, e.g.* Spector Decl. ¶ 38.)

10   • No POSA would read the specification or claims as covering a fragment that does not
     contain some DNA from the C2 or C4 enhancer-active fragments.  (Spector Decl. ¶ 36.)
11

12   • There is no basis in the patents for Biogen's assertion that the disclosed enhancer can be
     as small as 20 base pairs, and Biogen cites none.  (Spector Decl. ¶ 39.)

13

14        Thus, to the extent it even can be said there is any "genus" claimed by the patents-in-suit

15   (which Sanofi disputes) that "genus" would be significantly narrower than that Biogen has alleged,

16   and any such genus would be limited to the enhancer, which encompasses the C2 and C4 fragments,

17   and its enhancer-active fragments.  This limited "genus" covered by the claims here stands in stark

18   contrast to the broad genus claims at issue in the cases Biogen cites.  In *Ariad*, where the Court did

19   find a lack of adequate written description, all of the patent claims were "genus claims" directed to a

20   method "encompassing the use of ***all*** substances, that achieve the desired result . . . ."  *Ariad*, 598

21   F.3d at 1341 (emphasis added).  The specification "***hypothesize[d]*** three types of molecules with the

22   potential to" accomplish that desired result, but the Court found that the specification provided ***no***

23   ***specific examples*** of any particular molecule.  *Id.* (emphasis added).  Put another way, although the

24   specification adequately described proposed "example structures" of the molecules in issue, there was

25   no description at all how such a molecule would perform the claimed method of achieving the desired

26   result.  *Id.* at 1357-58.  Thus, unlike the present case where the inventors disclosed working examples

27

- 11 -

1    of the claimed HCMV enhancer, the *Ariad* patent disclosed "no working or even prophetic examples

2    of methods" that achieved the desired result claimed by the inventors.  *Id.*

3         Biogen also relies upon *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d

4    1559 (Fed. Cir. 1997), another case in which the claimed genus was significantly broader than the

5    patent disclosure.  The *Lilly* patents claimed recombinant cDNA plasmids that encode for insulin of a

6    mammal *or* a human vertebrate.  *Id.* at 1563.  The patent disclosed specifics regarding *rat* cDNA, but

7    disclosed "only a general method for obtaining the human cDNA," and "[n]o sequence information

8    indicating which nucleotides constitute human cDNA . . . ." *Id.* at 1567.  Under these circumstances,

9    the Court held that "the claimed [genus] of vertebrate and mammal cDNA [is] not described by the

10   general language of the . . . written description supported only by the specific nucleotide sequence of

11   rat insulin."  *Id.* at 1569.  Here, in contrast, the claimed enhancer is the only DNA described in the

12   patent as an active enhancer**.**

13        In *University of Rochester v. G.D. Searle*, 358 F.3d 916 (Fed. Cir. 2004) (another case Biogen

14   cites), the Court considered claims directed to a method of inhibiting COX-2, which causes

15   inflammation, without also inhibiting the beneficial activity of COX-1.  The Federal Circuit affirmed

16   the district court's finding that the claims were invalid for lack of written description because the

17   specification **failed to disclose even a single compound** that could be used successfully in the

18   claimed method:

19           [I]t is undisputed that the [patent-in-suit] does not disclose **any** compounds that
             can be used in the claimed methods.  The claimed methods thus cannot be
20           practiced based on the patent's specification, even considering the knowledge of
             one skilled in the art.  No compounds that will perform the claimed method are
21           disclosed, nor has any evidence been shown that such a compound was known.

22

23   *Id.* at 927 (emphasis added).  In stark contrast, in the present case, the patents-in-suit specifically

24   disclose DNA sequences that have enhancer activity.

25        Biogen also cites *Fiers v. Revel*, 984 F.2d 1164 (Fed. Cir. 1993) for the proposition that "[a]n

26   adequate written description of DNA requires more than . . . a potential method for isolating it; what

27   is required is a description of the DNA itself."  (*See* Biogen Br. at 10.)  But, in *Fiers*, the claim was

directed to DNA which encodes a particular protein, and the applicant disclosed **no** sequence information to describe the "DNA which codes" for that particular protein.  *Id.* at 1166, 1170.  Here, the enhancer DNA sequences do not encode a protein—they act on promoters to enhance transcription.  And the identified enhancer fragments, including modifications explained by the specification, are demonstrated to work to accomplish that purpose.

Biogen's reliance on *Carnegie-Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115 (Fed. Cir. 2008) is also misplaced.  There, the Court determined that the claim term "a bacterial source" broadly encompassed DNA gene sequences originating from any bacterial strain.  Although thousands of bacteria were known, the patent specification only mentioned *E. coli*; and only three bacterial sources for the type of claimed genes were known in the art.  *Id.* at 1125.  The Court found under these circumstances that there was no genuine issue of material fact as to lack of written description because the three bacterial sources known in the art were insufficient to support a claim to **any** bacterial source.  In the present case, it is undisputed that the source of the claimed enhancer is the Pst I-m fragment of HCMV, which was disclosed in the specification, and not some other virus.

Biogen's remaining cases are similarly inapposite.  *See In re Wallach*, 378 F.3d 1330, 1332, 1334 (Fed. Cir. 2004) (inadequate written description for claim to an "isolated DNA molecule . . . coding for" a particular protein because applicants disclosed only 5% of the DNA claimed); *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists*, No. SA 08-CV-01349-MRP (SSx), slip. op. at 6 (C.D. Cal. May 26, 2010) (finding invalidity for lack of written description where no species of the claimed genus were identified in the specification and claimed genus would have captured later discovered species).

## VI. "Promoter/Regulatory Region" Was Known In the Art at the Time of the Invention

Biogen asserts that claims 42 through 44 of the '140 patent lack adequate written description because "they are not based on the inventors' discovery of C2 and C4, but on the discovery of the 'promoter/regulatory region' by Mark F. Stinski."  (Biogen Br. at 14.)  Biogen is wrong.

- 13 -

1       First, this Court construed the claim term "promoter/regulatory region" based on the

2 disclosure of the patent, including the coordinates of the C2 and C4 fragments set forth in the

3 specification.  This belies the notion that there is no description of this region in the patent:

> Since an enhancer is by definition part of the regulatory region of a gene, and
> the patent enhancer extends to position -524, the Court finds that the upstream
> boundary of the "immediate early (IE) promoter/regulatory region of human
> cytomegalovirus (HCMV)" extends to approximately position -524.
>
>            *   *   *
>
> The Court finds that the location of the patented enhancer fragments, coupled
> with the understanding of scientists skilled in the art at the time, indicates that
> the transcription start site is the proper downstream boundary [of the
> promoter/regulatory region].

11 (DN 383 at 16.)

12       Second, a POSA would have understood that "promoter/regulatory region" refers to the

13 portion upstream of the coding region of the gene that includes the promoter and other regulatory

14 elements that control transcription of a gene, as this was terminology that was well known in the art

15 at the time the patent was filed. (Spector Decl. ¶¶ 40-41.)  It is well settled that language in a patent

16 specification can be combined with the knowledge of persons skilled in the art to supply the

17 necessary written description.  *In re Lukach,* 442 F.2d 967, 969 (C.C.P.A. 1971).

18 ///

19 ///

1

## CONCLUSION

2      Biogen's motion should be denied because the competent evidence proffered by Sanofi shows

3   that the written description requirement was fully met for all asserted claims.  Biogen's mere attorney

4   argument cannot serve to refute that evidence, much less to satisfy Biogen's heavy burden of proving

5   the presumptively valid patent claims invalid by clear and convincing evidence, and as a matter of

6   undisputed fact.

7   Dated:  September 16, 2010                Respectfully submitted,

8                                             HARVEY SISKIND LLP
9                                             D. PETER HARVEY
                                              NAOMI JANE GRAY
10                                            RAFFI V. ZEROUNIAN

11                                            FITZPATRICK, CELLA, HARPER & SCINTO
12                                            WILLIAM E. SOLANDER (*pro hac vice*)
                                              DOMINICK A. CONDE (*pro hac vice*)
13                                            PETER D. SHAPIRO (*pro hac vice*)
                                              JOSHUA A. DAVIS (*pro hac vice*)
14
                                              By:  _____/s/_____
15                                                        William E. Solander

16                                            Attorneys for Plaintiff
17                                            SANOFI-AVENTIS DEUTSCHLAND GMBH

18

19

20      I, Raffi V. Zerounian, am the ECF User whose identification and password are being used to

21   file this document.  Pursuant to General Order 45.X.B, I hereby attest that William E. Solander has

22   concurred in this filing.

                                              _____/s/_____
23                                                       Raffi V. Zerounian

24

25

26

27

- 15 -